## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| **KASEY ANDERSON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **Case No. 4:24-cv-00531-BCW** |
| | ) | |
| **EQUIPMENTSHARE.COM INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM IN SUPPORT OF
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ iii

I.  INTRODUCTION ......................................................................................... 1

II.  STATEMENT OF UNCONTROVERED MATERIAL FACTS .................................... 2

    A.  Anderson's Employment History with EquipmentShare .................................. 2

    B.  Anderson's Performance Issues and Termination ............................................ 5

    C.  Anderson's "Complaints" ................................................................................. 8

        1.  Performance Improvement Plan Concern ............................................... 8

        2.  Employee Hygiene Concern .................................................................. 9

        3.  Compensation Concern ........................................................................ 9

        4.  Concerns with Lasley's Selection ......................................................... 12

    D.  Anderson's Claims in this Lawsuit .................................................................. 13

        1.  Sex Discrimination Claim .................................................................... 13

        2.  Retaliation Claim ............................................................................... 15

III.  ARGUMENT AND AUTHORITIES ............................................................... 16

    A.  EquipmentShare Is Entitled to Summary Judgment on Anderson's Sex Discrimination Claim .................................................................................. 16

        1.  Anderson Cannot Establish A Prima Facie Case of Sex Discrimination ..................................................................................... 16

        2.  Anderson Was Discharged for Legitimate, Non-Discriminatory Reasons That She Cannot Rebut with Evidence of Pretext .................. 20

    B.  EquipmentShare Is Entitled to Summary Judgment on Anderson's Retaliation Claim ......................................................................................... 23

        1.  Anderson Cannot Establish A Prima Facie Case of Retaliation .......... 23

            a.  Anderson Did Not Engage in Protected Activity within the Meaning of Title VII. ................................................................. 24

i

12802873v3

b.    Anderson Offers No Evidence Linking Her Purported Protected Activity and Termination...........................................26

2.    Anderson Cannot Rebut EquipmentShare's Legitimate, Non-Discriminatory, Non-Retaliatory Reason for her Termination with Evidence of Pretext. ............................................................................26

C.    Anderson Presents No Evidence Entitling Her to Punitive Damages..............27

IV.    CONCLUSION..........................................................................................................28

12802873v3

# TABLE OF AUTHORITIES

**Cases**

*Anuforo v. Comm'r,*
   614 F.3d 799 (8th Cir. 2010) ................................................................................... 19

*Arraleh v. Cnty. of Ramsey,*
   461 F.3d 967 (8th Cir. 2006) ................................................................................... 22

*Askari v. L.A. Fitness Int'l, LLC,*
   2010 WL 3938320 (D. Minn. Oct. 5, 2010) ............................................................ 23

*Bell v. Minneapolis Pub. Sch.,*
   No. 03-cv-6320, 2006 WL 695646 (D. Minn. Mar. 20, 2006) .......................... 20, 26

*Brown v. Saul,*
   No. 4:18-cv-00617-DGK, 2020 WL 1856458 (W.D. Mo. Apr. 13, 2020) .............. 16

*Browning v. Pres. Riverboat Casino-Mo., Inc.,*
   139 F.3d 631 (8th Cir. 1998) ................................................................................... 28

*Clark v. Runyon,*
   218 F.3d 915 (8th Cir. 2000) ................................................................................... 17

*Colenburg v. Starcon Int'l Inc.,*
   656 F.Supp.2d 947 (D. Minn. 2009) .................................................................. 22, 23

*Dammen v. UniMed Med. Ctr.,*
   236 F.3d 978 (8th Cir. 2001) ................................................................................... 16

*DePriest v. Milligan,*
   823 F.3d 1179 (8th Cir. 2016) ................................................................................. 16

*Dorsey v. Pinnacle Automat. Co.,*
   278 F.3d 830 (8th Cir. 2002) ................................................................................... 22

*EEOC v. Kohler Co.,*
   335 F.3d 766 (8th Cir. 2003) ................................................................................... 17

*Elam v. Regions Fin. Corp.,*
   601 F.3d 873 (8th Cir. 2010) ............................................................................. 17, 18

*Evance v. Trumann Health Servs., LLC,*
   719 F.3d 673 (8th Cir. 2013) ................................................................................... 17

12802873v3

*Fields v. Shelter Mut. Ins. Co.*,
  520 F.3d 859 (8th Cir. 2008) ................................................................................. 25

*Gafford v. McDonald*,
  No. 4:14-cv-01603-JAR, 2016 WL 7242159 (E.D. Mo. Dec. 15, 2016) ................................ 24

*Johnson v. AT&T Corp.*,
  422 F.3d 756 (8th Cir. 2005) ................................................................................. 20

*Karcher v. Emerson Elec. Co.*,
  94 F.3d 502 (8th Cir. 1996) ................................................................................. 27

*Kimzey v. Wal-Mart Stores, Inc.*,
  107 F.3d 568 (8th Cir. 1997) ................................................................................. 28

*Kipp v. Mo. Hwy. & Transp. Comm'n*,
  280 F.3d 893 (8th Cir. 2002) ................................................................................. 26

*Kolstad v. American Dental Ass'n*,
  527 U.S. 526 (1999) ................................................................................. 27

*Lawrence v. CNF Transp., Inc.*,
  340 F.3d 486 (8th Cir. 2003) ................................................................................. 27

*Lopez v. Whirlpool Corp.*,
  989 F.3d 656 (8th Cir. 2021) ................................................................................. 24

*Macias Soto v. Core-Mark Intern., Inc.*,
  521 F.3d 837 (8th Cir. 2008) ................................................................................. 22

*Main v. Ozark Health, Inc.*,
  959 F.3d 319 (8th Cir. 2020) ................................................................................. 21

*Mason v. Correctional Med. Servs., Inc.*,
  559 F.3d 880 (8th Cir. 2009) ................................................................................. 18

*Nash v. Optomec, Inc.*,
  849 F.3d 780 (8th Cir. 2017) ................................................................................. 23

*Onyiah v. St. Cloud State Univ.*,
  684 F.3d 711 (8th Cir. 2012) ................................................................... 17, 19, 25

*Ottman v. City of Indep., Mo.*,
  341 F.3d 751 (8th Cir. 2003) ................................................................................. 20

iv

*Pedroza v. Cintas Corp. No. 2,*
  397 F.3d 1063 (8th Cir. 2005) ...................................................... 27

*Pulcinski v. Trinity Structural Towers, Inc.,*
  691 F.3d 996 (8th Cir. 2012) ....................................................... 21

*Reeves v. Sanderson Plumbing Prod., Inc.,*
  530 U.S. 133 (2000) ..................................................................... 20

*Robinson v. Union Pac. R.R.,*
  No. 19-00852-CV-W-FAG, 2020 WL 13682760 (W.D. Mo. Mar. 9, 2020) .......................... 22

*Roeben v. BG Excelsior Ltd.,*
  545 F.3d 639 (8th Cir. 2008) ....................................................... 21

*Smith v. Allen Health Sys., Inc.,*
  302 F.3d 827 (8th Cir. 2002) ....................................................... 20

*Smith v. Int'l Paper Co.,*
  523 F.3d 845, 849 (8th Cir. 2008) ......................................... 24, 25

*Stuart v. General Motors Corp.,*
  217 F.3d 621 (8th Cir. 2000) ....................................................... 21

*Univ. of Tex. Sw. Med. Ctr. v. Nassar,*
  570 U.S. 338 (2013) ..................................................................... 23

*Walker v. Mo. Dep't of Corrs.,*
  No. 20-cv-04251-NKL, 2022 WL 2007393 (W.D. Mo. June 6, 2022) ................................. 25

*Webner v. Titan Dist. Inc.,*
  267 F.3d 828 (8th Cir. 2001) ....................................................... 27

*Young v. Builders Steel Co.,*
  754 F.3d 573 (8th Cir. 2014) ....................................................... 23

**Statutes**

42 U.S.C. § 2000e-2 ........................................................................... 24

42 U.S.C. § 2000e-5(e)(1) ................................................................. 22

**Other Authorities**

EQUITABLE, Black's Law Dictionary
  (12th ed. 2024) ............................................................................ 24

v

# I.     INTRODUCTION

Plaintiff Kasey Anderson was discharged from EquipmentShare.com Inc. ("EquipmentShare" or "Company") in August 2023 when, despite numerous discussions with her supervisor and Human Resources about her professionalism and communication and numerous complaints from her subordinates, she sent yet another unprofessional and seemingly threatening message to her team that prompted additional complaints. Anderson nonetheless brings suit against EquipmentShare alleging she was discharged based on sex and alleged protected activity. All of Anderson's causes of action are meritless.

First, Anderson does not, and cannot, connect her termination to sex. Although she alleges she was somehow treated less favorably than one or more males, none of her examples are at all similar. Instead, Anderson points to circumstances involving highly distinct and even previously unknown conduct. Significantly, Anderson's supervisor—who made the decision to discharge her—hired her into his division and repeatedly promoted her, up to the supervisory role she held at the time of her termination, belying any discriminatory animus. The Human Resources representative who contributed to the termination decision was also female, further undercutting any inference of discrimination.

Anderson's retaliation claim is similarly unavailing. Her alleged complaints are not protected activity within the meaning of Title VII and instead involve gripes about, for example, nepotism. More significantly, she in no way connects these to her termination beyond the mere fact of complaining. However, even if Anderson's actions were deemed protected, her last such activity was approximately four months before her termination, which is wholly insufficient to demonstrate a connection, let alone "but for" causation.

Accordingly, for any or all of these reasons, EquipmentShare moves for dismissal of all claims asserted against it in Anderson's Complaint.

12802873v3

## II.    STATEMENT OF UNCONTROVERED MATERIAL FACTS[1]

### A.    Anderson's Employment History with EquipmentShare

1.    EquipmentShare is a tech-enabled construction solutions provider that offers, among other things, a rental fleet with a proprietary cloud-connected technology platform, T3, that offers visibility and connectivity to jobsite.  Exhibit 1, Declaration of Kris Dunn ¶ 3.

2.    EquipmentShare hired Kasey Anderson on November 5, 2018 as a Rental Coordinator.  Exhibit 2, Deposition of Kasey Anderson at 25:21-23, 26:11-14.

3.    On February 11, 2019, she was promoted, at least "in title," to Sales Support Manager with the Track Team, a different part of the Company.  *Id.* at 31:13-32:10, 33:21-34:3, 55:22-56:1.

4.    The Track Team, now known as T3 or the Telematics Division of EquipmentShare, is, according to Anderson, focused on selling devices and software/platforms for contractors and fleet companies to track and manage their assets.  *Id.* at 37:6-19.

5.    Eric Nichols and Kris Dunn interviewed Anderson for the role and were involved in the decision to hire her into the T3 group.  *Id.* at 35:15-21, 36:4-37:5.

6.    As a Sales Support Manager, Anderson assisted sales representatives by sending their contracts to customers and fulfilling orders by working with the operations team.  *Id.* at 37:20-38:8.

7.    Within months of becoming a Sales Support Manager, Anderson moved into a Customer Support Associate/Specialist position.  *Id.* at 40:9-41:8, 43:6-17.

---

[1] EquipmentShare admits these facts for purposes of summary judgment only and reserves the right to dispute or challenge these facts at trial, if any.  EquipmentShare has asserted the statement of uncontroverted facts consistent with the legal requirements that facts on summary judgment must be viewed in the light most favorable to the plaintiff.

8.      As a Customer Support Associate/Specialist, she answered customer questions through the chat function in the T3 platform, ensured device serial numbers were paired with customer assets, and answered support e-mails and calls. *Id.* at 44:11-24.

9.      On or before November 16, 2020, Anderson was promoted to Relationship Manager. *Id.* at 46:1-50:2.

10.     As a Relationship Manager, she interacted with customers, doing post-sale support and acting as a liaison to internal teams to assist customers with tracking and managing assets in T3. *Id.* at 56:2-17.

11.     On June 28 or July 1, 2021, Anderson was promoted to Manager of Key Accounts, and began reporting directly to Dunn. *Id.* at 54:4-55:5, 59:9-15.

12.     This position was similar to Relationship Manager but focused on specific accounts or types of accounts. *Id.* at 58:18-59:4.

13.     Dunn made the decision to promote Anderson to Manager of Key Accounts and increase her compensation. *Id.* at 59:5-8. By that time, Dunn was Senior Director of T3 Sales. *Id.* at 68:12-18.

14.     In January 2022, Anderson was promoted to Manager of Customer Success, still reporting to Dunn. *Id.* at 62:2-25, 63:1-10.

15.     This was the first position Anderson held at EquipmentShare in which she supervised anyone. *Id.* at 29:12-16, 57:1-10, 59:16-18, 64:21-23.

16.     Prior to working at EquipmentShare, Anderson—who graduated high school in 2009 and received a college degree in 2013—held a "managerial" role at one of her two pre-EquipmentShare employers, overseeing unpaid interns seeking school credit and a coordinator. *Id.* at 15:10-19, 16:14-21:17.

17.     The focus of the Manager of Customer Success work continued to be on post-sales interaction with customers.  *Id.* at 65:4-17.  At some point, customer success associates also joined some pre-sale calls with customers toward the end of the sales process to identify themselves as a customer's dedicated customer success associate and point of contact after the sale.  *Id.* at 65:14-66:14; *see also* Ex. 1 ¶ 30.

18.     Indeed, Customer Success was focused on getting new customers set up in the T3 platform.  Ex. 1 ¶ 30.  Their only role in sales would typically be if an existing customer asked about adding another asset to the T3 platform.  *Id.*  Customer Success was generally not a direct revenue-driving role.  *Id.*

19.     Dunn again made the decision to promote Anderson to Manager of Customer Success and further increase her compensation.  Ex. 2 at 62:2-25, 63:11-25.

20.     Anderson was pleased to move into this role.  *Id.* at 63:23-25.

21.     Anderson held this position until her separation.  *Id.* at 71:19-23.

22.     No one else held a Manager of Customer Success position while Anderson was in the role.  *Id.* at 67:11-14.

23.     No one else performed the same work Anderson did in the Manager of Customer Success position.  *Id.* at 67:15-68:11.

24.     Sometime between March and July 2022, Jerry Lasley became Anderson's supervisor when Dunn moved him from Director of Sales to Director of Sales Success and Customer Success.  *Id.* at 72:3-74:1.

25.     Lasley started with EquipmentShare in 2016 as a Director and had decades of experience in sales and customer interactions.  Ex. 1 ¶ 26.

26.    On October 31, 2022, Lasley increased Anderson's salary from $75,950 to $80,200 annually.  Ex. 2 at 77:5-12.

27.    Anderson reported to Dunn again when Lasley's employment ended in February 2023.  *Id.* at 80:13-81:10.

28.    Lasley's role was never filled and was eliminated when he was separated.  *Id.* at 316:2-8; Ex. 1 ¶ 27.

**B.    Anderson's Performance Issues and Termination**

29.    Performance concerns were brought to Anderson's attention at various times during her tenure as Manager of Customer Success.  Ex. 2 at 248:7-15, *see infra* Statement of Facts ("SOF") # 30-38; Ex. 1 ¶¶ 7-9.

30.    In September 2022, Lasley discussed with Anderson concerns surrounding her communication and interpersonal skills, involving condescension, abrasiveness, etc.  Ex. 2 at 160:21-161:7, 248:7-15, 249:3-8.

31.    In January or February 2023, Lasley also discussed with Anderson—and had prepared a document or "performance improvement plan" to be presented to her addressing—her relationships, being condescending, and complaints about Anderson; however, he ultimately tore up the document and did not issue it.  *Id.* at 128:12-138:16.

32.    Anderson was never actually placed on a performance improvement plan.  *Id.* at 124:19-125:5, 150:21-151:5, 150:21-151:2.

33.    Following Lasley's discussion of the performance improvement plan Human Resources ("HR") Lead Cindy Hudson and Dunn spoke to Anderson about being professional and her tone.  *Id.* at 248:7-21, 249:11-250:3; Ex. 1 ¶¶ 7-9.

5

34.     Between February and May 2023, Dunn again spoke to Anderson about her leadership and communication.  Ex. 2 at 254:25-260:6; Ex. 1 ¶¶ 7-9.

35.     Indeed, after promoting Anderson into the position of Manager of Customer Success, Dunn became aware of numerous and repeated complaints from Anderson's subordinates concerning her behavior toward them, including relating to professionalism and communication. Ex. 1 ¶¶ 7-10.

36.     Among other concerns, employees complained to Dunn, and Dunn observed, Anderson call her reports out in group settings that he believed, and they suggested, should be handled privately.  *Id.*  Additionally, employees complained about, and Dunn observed, Anderson communicate to them condescendingly.  *Id.*

37.     In May 2023, Anderson had a conversation with a female subordinate, Tallese Alvarez, which Anderson described as "constructive feedback," after which Alvarez complained. Ex. 2 at 254:25-256:16, 263:9-264:10, 265:1-8, 277:24-284:25.

38.     Dunn and Hudson indicated Alvarez complained that Anderson was condescending, bullying, and demeaning.  *Id.* at 277:24-284:25.

39.     Anderson and Alvarez were required to undergo an exercise to better understand how to communicate with one another.  *Id.* at 248:7-249:2, 255:7-256:16, 256:20-257:5.

40.     In May 2023, another one of Anderson's female subordinates, Cynthia Butler complained about Anderson's communication with her.  *Id.* at 263:9-264:10, 264:17-24, 272:20-277:19.

41.     In June 2023, another of Anderson's female subordinates, Jentrie Campbell complained to HR that she was passed over for a lead position and the individual Anderson selected

12802873v3

had not been in her existing job for a year, contrary to policy. *Id.* at 263:9-264:16, 267:4-270:10, 271:5-18, 272:14-19.

42.     On July 27, 2023, Anderson sent a message to everyone on the Sales Success and Customer Success teams. *Id.* at 285:1-25; Ex. 1 ¶¶ 11-14; Exhibit 3, Slack Messages [Plaintiff's Deposition Exhibits 11-13].

43.     The message was intended to address timekeeping and punctuality concerns. Ex. 2 at 286:1-287:4. It included various links to Instagram videos, gifs, or memes. *Id.* at 288:9-13.

44.     The message also included language like "Keep slack open at all times on that extra monitor you got [emoji] Or else – I see you." Ex. 3.

45.     It further stated "When you request time-off we need a reason. Do not leave the reason blank. Do not just say 'thank you'. I will decline your request just for fun so you have to do it again." Ex. 3. Anderson acknowledged this statement is inconsistent with Company policy concerning time off. Ex. 2 at 293:25-296:10, 297:3-7.

46.     She "can't say for sure" if it was professional to say she "will decline your request just for fun so you have to do it again." *Id.* at 297:8-21. However, she agrees her message did not reflect the principles of EquipmentShare. *Id.* at 297:25-298:2.

47.     Nonetheless, Anderson represented in the message this was "per HR." Ex. 1 ¶ 12; Ex. 3.

48.     Neither Dunn nor HR approved the communication. Ex. 1 ¶ 13.

49.     Employees subsequently complained about Anderson's message. Ex. 2 at 298:6-299:9; Ex. 1 ¶ 14.

7

50.     Indeed, Hudson and Dunn received multiple complaints from Anderson's subordinates that the message was unprofessional and threatening.  Ex. 1 ¶ 14.  One or more employees were concerned that she suggested HR approved the communication.  *Id.*

51.     Based on Anderson's Slack message and her prior issues and discussions concerning professionalism and communication, Dunn made the decision, in consultation with Hudson, to terminate Anderson's employment.  *Id.* ¶ 15; Ex. 2 at 314:2-315:12.

52.     Anderson's employment was terminated in a meeting with Hudson and Dunn on August 2, 2023.  Ex. 2 at 311:12-23; Ex. 1 ¶ 16.

53.     Hudson relayed they previously had addressed Anderson's performance and her leadership style did not align with EquipmentShare.  Ex. 2 at 311:2-7.

54.     Her position was never filled.  *Id.* at 315:24-316:1.

55.     Anderson's division was eliminated within a month or two of her leaving, resulting in layoffs.  *Id.* at 315:13-23.

C.      **Anderson's "Complaints"**

1.      **Performance Improvement Plan Concern**

56.     Sometime between November 2022 and February 2023, Anderson informed Lasley she would be speaking to HR about nepotism toward Lasley's son (who was on the team) and she subsequently spoke to Dunn and then Hudson about it.  *Id.* at 139:10-141:16.

57.     Within a couple of days of Lasley discussing the (never-implemented) performance improvement plan with Anderson in January or February 2023, she told Dunn and Hudson she felt it was "retaliation" for her reporting Lasley for alleged nepotism/preferential treatment of his son, who worked for EquipmentShare.  *Id.* at 128:12-138:16, 151:19-157:2, 164:3-8.

12802873v3

58.     During her conversations with Dunn and Hudson, Anderson asked if there was a policy related to tone and whether it would be an issue if she were male.  *Id.* at 161:11-162:10.

59.     Anderson also relayed she was bothered that Lasley—her supervisor at the time—spoke to only certain members of her team—rather than every single one—about their concerns with her, which she further believed was retaliation for her nepotism concerns.  *Id.* at 185:17-193:20.

60.     Dunn did not believe and has never believed there was any nepotism from Lasley toward his son.  Ex. 1 ¶¶ 22-23.

**2.     Employee Hygiene Concern**

61.     In late 2022 or January 2023, reports were made to Lasley or to both Anderson and Lasley that one of their male team members had dandruff and smelled poorly.  Ex. 2 at 165:9-171:13.  Lasley suggested to Anderson he would talk to the employee because it might be better received from another male or "father figure."  *Id.* at 168:9-171:13.  Anderson initially did not argue but when the issue arose again and Lasley indicated he would have a second conversation, Anderson said she would handle.  *Id.* at 168:9-171:13.

62.     In or before February 2023, and perhaps while speaking to Hudson and Dunn about the unissued performance improvement plan, Anderson told them she also "didn't love it when [Lasley] presented the idea that it would be better if a male presented this information . . . instead of me because he would receive it better."  *Id.* at 177:6:-184:15.

63.     Dunn agreed Anderson should be able to handle.  *Id.* at 184:15.

**3.     Compensation Concern**

64.     Anderson claims in 2023 she saw a tax document on a printer for a "Jon" showing a salary of $100,000 or more.  *Id.* at 93:11-94:15, 98:5.  Anderson does not know Jon's last name

9

but believes he was a Sales Manager. *Id.* at 95:6-25. Anderson does not know how long he worked in sales, how old he was, his educational background, or who would have set his compensation. *Id.* at 98:23-100:1.

65. Anderson made Dunn aware she found the paperwork and "discarded it safely so that no other employee could see this private information." *Id.* at 93:11-94:10.

66. Anderson never held a Sales Manager position but believes it to involve "someone who has been in a sales position before who can train sales representatives on how to sell . . . and support them in . . . doing that." *Id.* at 98:6-22.

67. Anderson claims part of her team's role was involved with sales in that "we would come to be responsible for inputting add-on orders. . . . [I]f a customer asked a customer success associate to add more lines, we would be the ones responsible for that sales function. And then we were also encouraged to ups[ell]." *Id.* at 96:22-97:25. But where sales actually brought on new customers, some of her team might occasionally try to increase sales to existing customers. *Id.* at 97:4-25.

68. In fact, Jon Frazier is, and was in 2023, a Sales Manager. Ex. 1 ¶ 28. He led and leads part of the T3 national sales team and is focused on the Western half of the United States. *Id.* He is and was salaried and paid on a commission basis and had and has certain revenue targets. *Id.* Frazier is involved with making sales to new customers and works with and assists sales representatives on this team to also obtain new customers. *Id.* Frazier has more than 25 years of leadership and sales experience. *Id.* As a Sales Manager, he worked and works in a direct revenue-driving role. *Id.*

69. Anderson further claims that while interviewing sales engineer candidates with Manager of Sales Engineering Jerry Johanning in March or April 2023, Johanning told a candidate starting pay for the role was $90,000. Ex. 2 at 93:11-95:5, 100:12-102:12.

70. Anderson believes sales engineer's "primary job and responsibility was to join sales calls with the sales rep" and talk technically about platforms' offerings. *Id.* at 103:3-104:16. These roles also involve bringing on new customers rather than dealing with existing customers. *Id.* at 103:3-104:16.

71. In fact, as of 2023 and now, Sales Engineers are focused on closing sales with prospective customers. Ex. 1 ¶ 29. Whereas Sales Representatives also seek out leads, Sales Engineers work with Sales Representatives to close prospective customers. *Id.* Sales Engineers are generally involved in all sales meetings with prospective customers. *Id.* Sales Engineers worked and work in a direct revenue-driving role. *Id.*

72. On April 20, 2023, Anderson messaged Dunn requesting her salary be increased. Ex. 2 at 81:20-82:20; Exhibit 4, Messages concerning salary [Plaintiff's Deposition Exhibit 7].

73. On April 24, 2023, she messaged Dunn about her salary being increased from $80,000 to $90,220. Ex. 2 at 106:17-107:1; Ex. 4.

74. The next day, Dunn notified Anderson he submitted the increase request. Ex. 2 at 107:2-4; Ex. 4.

75. None of Anderson's messages referred to other EquipmentShare employees' salaries or sex. Ex. 2 at 215:24-217:21; Ex. 4.

76. However, Anderson claims that one to three days before April 20, 2023, she spoke to Dunn about whether her compensation was "equitable" and advocated for more personnel/support. Ex. 2 at 208:16-209:23, 211:16-214:2.

77. Dunn came off understanding and not frustrated or upset. *Id.* at 210:4-211:15. Dunn asked Anderson to put together a proposal. *Id.* at 211:16-21. Anderson claims she told Dunn about what Johanning shared with the sales engineer candidate and noted she was the only female leader on Dunn's team. *Id.* at 210:4-211:15.

78. Between April 20 and 24, 2023, Anderson and Dunn had a call during which Dunn suggested the $90,220 figure. *Id.* at 109:2-23.

79. Additionally, Anderson claims that in March or April 2023, she messaged and had a call with Hudson about compensation. *Id.* at 193:21-23, 194:14-196:23, 197:16-198:25, 208:1-208:15.

80. Anderson told Hudson she "th[ought it] might be happening" that she was paid "inequitably," and referred to the tax form she found and what Johanning shared with the sales engineer candidate. *Id.* at 199:2-200:8, 205:17-207:25.

81. Hudson shared with Anderson that the jobs were not the same but were distinct and gave advice on how to approach Dunn about a raise. *Id.* at 200:9-202:12, 207:23-25.

82. In April 2023, Hudson spoke to Anderson about not talking with subordinates about pay equity. *Id.* at 248:16-24, 250:4-252:8, 252:11-12.

### 4. Concerns with Lasley's Selection

83. On or near April 21, 2023, Anderson suggested to Hudson that Lasley, who by then had been gone from EquipmentShare for months, had been selected for the Director of Sales Success and Customer Success because he was male. *Id.* at 235:11-238:25. She also relayed she felt "passed over." *Id.*

**D.** **Anderson's Claims in this Lawsuit**

84.    On October 24, 2023, Anderson filed a charge of discrimination.  Ex. 2 at 349:14-350:19.

85.    Anderson asserts causes of action for sex discrimination and retaliation.  *Id.* at 111:19-112:16; Compl.

**1.** **Sex Discrimination Claim**

86.    Specifically, Anderson alleges her termination was related to sex.  Ex. 2 at 316:24-317:6.  She alleges no other forms of sex discrimination.  *Id.* at 336:9-15.

87.    She believes her termination was related to sex because she disagrees she was actually "demeaning," "condescending," or "bullying," and would not "have ever been reported if [she] had been a male."  *Id.* at 317:7-319:17.

88.    She further claims her termination was related to sex because she "worked as hard" as male employees, with performance issues, but "wasn't rewarded for [it] in getting to [a] director level."  *Id.* at 319:22-322:9.

89.    Finally, she claims her termination was related to sex because "other male team members" were allegedly also reported to HR but not discharged.  *Id.* at 322:10-324:10.

90.    Specifically, she claims that while at a conference in March 2023, she witnessed Jared Johanning use the "f word" with Cynthia Butler in saying Anderson was "great" and Butler needed to "shut up," when Butler asked Anderson "where is my raise and title change."  *Id.* at 324:3-328:22, 330:15-21.  Anderson believes Johanning thought she and Butler were fighting but were not.  *Id.* at 324:3-328:22.

91.    Butler told Anderson "let's just let it go."  *Id.* at 328:1-5.

92.     Anderson was present when Johanning subsequently apologized to Butler. *Id.* at 326:6-20, 328:1-18.

93.     Anderson has no evidence anyone from HR was, in fact, aware of the situation. *Id.* at 329:13-18.

94.     Anderson believes Dunn was aware because he asked about how Anderson handled the situation. *Id.* at 325:22-326:20.

95.     At some point, Dunn became aware of what was described to him as an "unfavorable" interaction between Jared Johanning and Cynthia Butler. Ex. 1 ¶ 17. He asked Butler about it and her feedback was that it was not an issue. *Id.* He also reached out to Johanning, who said the same thing. *Id.* He was not aware of anyone cursing or the details of the situation. *Id.*

96.     Anderson also claims Johanning told her he was reported by a female employee for being demeaning on a call. Ex. 2 at 334:16-336:12.

97.     At some point, Dunn was indeed informed that an unidentified Product Manager believed Johanning was unkind to her during a telephone conversation. Ex. 1 ¶ 19. Dunn was never provided the name of the individual or the details or circumstances. *Id.* Dunn contacted Johanning and he did not know either. *Id.*

98.     Additionally, Anderson claims that Butler told her she thought Lasley treated Anderson unfairly and was not doing his job and that she told Dunn. Ex. 2 at 330:22-333:3.

99.     However, Dunn is not aware of Butler complaining to him about Jerry Lasley. Ex. 1 ¶ 18.

100.     Finally, when Anderson was on the customer support team, one or more employees indicated there may have been a complaint about employee RC Davis concerning nepotism related to his sister-in-law.  Ex. 2 at 333:6-334:19.

101.     Dunn was not aware of nepotism concerns but also had no authority over RC Davis at this time.  Ex. 1 ¶ 20.

## 2.     Retaliation Claim

102.     Anderson believes she was retaliated against because in March or April 2023 she reported her belief to Dunn (and previously to Lasley) that Jesse Johnsey's sales metrics were inaccurate and inflated.  336:16-338:15; Ex. 2 at 218:11-222:14

103.     Anderson acknowledges her report concerning Johnsey is unrelated to sex.  *Id.* at 218:3-10, 223:7-224:2.

104.     Anderson further believes she was retaliated against because Hudson was aware she was talking about pay equity with subordinates and rather than demote her "like other male team members who had conduct issues or performance issues," she was fired.  *Id.* at 338:16-339:21.

105.     Anderson claims RC Davis was in a director level role and was demoted to Sales Engineer "with the explanation he is doing work life balance" but Dunn told her there were performance issues.  *Id.* at 242:6-244:21.

106.     Dunn did not make the decision to move Davis from his Director of Support role.  Ex. 1 ¶ 21.

107.     Dunn understood, however, Davis was moved because it was believed customer experience and support needed to be improved.  *Id.*

108. Anderson claims Lasley was moved because of performance. Ex. 2 at 242:6-243:21. Dunn told her Lasley was not performing and she observed the sales metrics. *Id.* at 242:6-243:21.

109. Dunn indeed determined the direction of inside sales needed to change in a direction that was not within Lasley's skillset. Ex. 1 ¶ 24.

## III. ARGUMENT AND AUTHORITIES[2]

### A. EquipmentShare Is Entitled to Summary Judgment on Anderson's Sex Discrimination Claim.

A *prima facie* case of sex discrimination under Title VII requires the plaintiff show (1) membership in a protected group, (2) she was qualified to do her job, (3) she suffered an adverse employment action, and (4) circumstances giving rise to an inference of unlawful discrimination based on gender. *DePriest v. Milligan*, 823 F.3d 1179, 1185-86 (8th Cir. 2016). If the plaintiff makes this showing, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action at issue. *Id.* If the defendant makes this showing, the burden shifts back to the plaintiff to demonstrate pretext. *Id.* "Although intermediate evidentiary burdens shift back and forth … the ultimate burden of persuading the trier of fact that defendant discriminated against the plaintiff remains at all times with the plaintiff." *Dammen v. UniMed Med. Ctr.*, 236 F.3d 978, 980 (8th Cir. 2001).

#### 1. Anderson Cannot Establish A Prima Facie Case of Sex Discrimination.

Anderson alleges she suffered sex discrimination in that she was terminated. However, she cannot even make out a *prima facie* case because she in no way connects her termination to

---

[2] EquipmentShare incorporates the standard for summary judgment set forth in *Brown v. Saul*, No. 4:18-cv-00617-DGK, 2020 WL 1856458, at *2 (W.D. Mo. Apr. 13, 2020).

sex. Although she suggests males were somehow treated more favorably, she fails to identify similar circumstances or individuals.

"The test to determine whether employees are 'similarly situated' to warrant a comparison to a plaintiff is a 'rigorous' one." *EEOC v. Kohler Co.*, 335 F.3d 766, 775 (8th Cir. 2003). Comparators must be "similarly situated in all relevant respects" and "have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances." *Clark v. Runyon*, 218 F.3d 915, 918 (8th Cir. 2000); *Evance v. Trumann Health Servs., LLC*, 719 F.3d 673, 678 (8th Cir. 2013) (employees with "different job titles and supervisors" not similarly situated). Alleged "comparators" with less numerous or frequent violations or whose alleged misconduct was unknown to a decision-maker are not similarly situated. *Elam v. Regions Fin. Corp.*, 601 F.3d 873, 881 (8th Cir. 2010). Further, decisions are rarely similarly situated in all relevant respects when different decision-makers are involved. *Onyiah v. St. Cloud State Univ.*, 684 F.3d 711, 717-18 (8th Cir. 2012).

Here, Anderson was the subject of numerous complaints from her subordinates and involved with many conversations with Dunn and Hudson about her professionalism and communication. Statement of Uncontroverted Materials Facts ("SUMF") ¶¶ 29-41. Even after that, Anderson circulated a message to her team that she represented was "per HR" that many of her subordinates complained—and Dunn and Hudson believed—was inappropriate, threatening, and inconsistent with prior discussions and EquipmentShare's policies and values. SUMF ¶¶ 42-53.

Despite this backdrop, Anderson identifies the below circumstances as comparative.

- *Johanning once cursed during a conversation with an employee (Butler);*
- *Johanning told Anderson that Dunn informed him he was reported for being demeaning on one call;*

First, Johanning once cursing and an individual claiming he was unkind on a phone call is not at all like Anderson's ongoing professionalism and communication issues and numerous complaints about her. *Elam*, 601 F.3d at 881. Moreover, Dunn had limited knowledge of these two alleged incidents involving Johanning. *Id.*; SUMF ¶¶ 89-97. Dunn knew only that an "unfavorable" interaction took place between Butler and Johanning and both of them indicated it was a non-issue; he had no knowledge of anyone cursing. SUMF ¶ 95. Similarly, Dunn was informed only that a Product Manager believed Johanning was unkind to her during a telephone conversation. SUMF ¶ 97. He did not know the individual, details, or circumstances despite looking into it. SUMF ¶ 97. Anderson's example thus involves distinct conduct, numerosity/frequency, and decision-maker knowledge.

- *Butler told Anderson she informed Dunn that Lasley mistreated Anderson;*

As a non-management employee reporting to Anderson, Butler's comment is hearsay that must be disregarded. *Mason v. Correctional Med. Servs., Inc.*, 559 F.3d 880, 885 (8th Cir. 2009) (explaining that a party "cannot rely on hearsay to avoid summary judgment"). That said, such a single, vague report about Lasley—denied by Dunn—is entirely dissimilar to Anderson's circumstances. SUMF ¶¶ 98-99.

- *Anderson reported Lasley for nepotism;*

Nepotism is not at all the same conduct for which Anderson was discharged. Separately, Dunn did not believe or substantiate Lasley engaged in any nepotism toward his son. SUMF ¶ 60. Anderson's example involves distinct conduct and numerosity/frequency.

- *Employees indicated to Anderson that there may have been a complaint about Davis concerning nepotism;*

This too is based on hearsay that must be disregarded. *Mason*, 559 F.3d at 885. Again, though, nepotism is not at all the same conduct for which Anderson was discharged. Additionally,

Dunn was not in any supervisory role above Davis at the time (and Hudson was not even employed). SUMF ¶¶ 100-01; *see Oniyah*, 684 F.3d at 717-18. Anderson's example involves distinct conduct and decision-makers.

- *Davis was demoted for "performance issues" but not terminated;*

Perhaps most significantly, Dunn did not make the decision to demote Davis. *Onyiah*, 684 F.3d at 717-18. Moreover, simply because two individuals had "performance issues" does not mean they are similarly situated or had the same performance issues. Although Dunn did not demote Davis, he understood the concern to be that customer experience needed to be improved, not that Davis had significant professionalism or communication issues. SUMF ¶¶ 105-06. Ultimately, Anderson has no knowledge of the situation and bases her assertions entirely on speculation. *See, e.g., Anuforo v. Comm'r*, 614 F.3d 799, 807 (8th Cir. 2010) ("[U]nsupported, self-serving allegations and denials are insufficient to create a genuine issue of material fact"). Anderson's example involves distinct conduct and decision-makers.

- *Lasley was moved to supervising Anderson because of "performance issues" but was not terminated.*

Here again, simply because two individuals had "performance issues" does not mean they are similarly situated or had the same performance issues. Dunn moved Lasley to reconfigure inside sales in an effort to increase revenues, not because of significant professionalism or communication issues. SUMF ¶¶ 108-09. Here too, Anderson's example is based on speculation about which she has no personal knowledge and, moreover, involves distinct conduct, numerosity/frequency, and circumstances.

***

12802873v3

Because Anderson fails to identify any similarly situated individual outside her protected class who was treated more favorably and otherwise offers no evidence demonstrating her sex was a motivating factor in her termination, she cannot establish a *prima facie* case.

### 2. Anderson Was Discharged for Legitimate, Non-Discriminatory Reasons That She Cannot Rebut with Evidence of Pretext

Even if Anderson could establish a *prima facie* case of sex discrimination, which she cannot, EquipmentShare's decision was legitimate and non-discriminatory. Indeed, as discussed above, Anderson was the subject of numerous complaints from her subordinates and there had been many conversations with Dunn and Hudson about her professionalism and communication. SUMF ¶¶ 29-41. Despite this, she circulated a message to her team that she represented was "per HR" and many of her subordinates complained—and Dunn and Hudson believed—was inappropriate, threatening, and inconsistent with prior discussions and EquipmentShare's policies and values. SUMF ¶¶ 42-53. Ultimately, interpersonal and communication issues are legitimate, non-discriminatory, non-retaliatory bases for termination. *Bell v. Minneapolis Pub. Sch.*, No. 03-cv-6320, 2006 WL 695646, at *5 (D. Minn. Mar. 20, 2006); *see also Ottman v. City of Indep., Mo.*, 341 F.3d 751, 758 (8th Cir. 2003) (explaining the employer's "burden is exceedingly light" and involves simply proffering a non-discriminatory rationale, not proving it); *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 143 (2000) (the burden is of production only, not persuasion; it involves no credibility assessment).

In order to rebut the explanation, Anderson must present evidence that both creates a question of fact as to whether the proffered reason is pretextual *and* creates a reasonable inference that the real motive was unlawful discrimination. *Smith v. Allen Health Sys., Inc.*, 302 F.3d 827, 833 (8th Cir. 2002); *Johnson v. AT&T Corp.*, 422 F.3d 756, 763 (8th Cir. 2005) (explaining that "the showing or pretext necessary to survive summary judgment requires more than merely

20

discrediting an employer's asserted reasoning for terminating an employee" but also requires evidence "that the circumstances permit a reasonable inference to be drawn that the real reason . . . was because of his [protected status]"); *Roeben v. BG Excelsior Ltd.*, 545 F.3d 639, 643 (8th Cir. 2008) (same). "An employee's attempt to prove pretext or actual discrimination requires more substantial evidence than it takes to make a prima facie case, however, because unlike evidence establishing the prima facie case, evidence of pretext and discrimination is viewed in light of the employer's justification." *Stuart v. General Motors Corp.*, 217 F.3d 621, 634 (8th Cir. 2000). "[T]o show an employer's explanation is unworthy of credence, an employee must show the employer did not truly believe that the employee engaged in the conduct justifying termination." *Main v. Ozark Health, Inc.*, 959 F.3d 319, 325 (8th Cir. 2020) ("We have repeatedly explained that 'it is not our province to decide whether [the employer's] reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination." (modifications in original and citations omitted)); *see also Pulcinski v. Trinity Structural Towers, Inc.*, 691 F.3d 996, 1003 (8th Cir. 2012) (same and explaining "[a] showing that the employer made a mistaken and unreasonable determination that an employee violated company rules does not prove that the employer was motivated by [protected status]").

Nonetheless, it appears Anderson will attempt to argue pretext by claiming she was "not demeaning," "condescending," or "bullying." While multiple individuals suggested otherwise, Anderson's opinion here is irrelevant. Even if she presented evidence she did not demean, condescend, or bully her subordinates—which is also not precisely the basis of her separation— this would not equate to pretext. "In determining whether a plaintiff has produced sufficient evidence of pretext, the key question is not whether the stated basis for termination actually occurred, but whether the defendant believed it to have occurred." *Macias Soto v. Core-Mark*

*Intern., Inc.*, 521 F.3d 837 (8th Cir. 2008). Here, there is no dispute that Dunn and Hudson took issue with Anderson's professionalism and communication. SUMF ¶¶ 50-51; *Dorsey v. Pinnacle Automat. Co.*, 278 F.3d 830, 837 (8th Cir. 2002) (federal courts "do not sit as superpersonnel departments to second-guess the business decisions of employers [rather] the threshold question is . . . whether [the employer's] reasons for its employment actions are true, not if they are wise, fair, or correct"). Moreover, Anderson acknowledged her final message to her team was not consistent with Company policy or values. SUMF ¶¶ 45-46.

Anderson will also likely argue pretext in that she somehow was not "rewarded for her work in getting to a director level," in the way, e.g., Lasley was. Anderson's point in this regard is puzzling. To begin with, Lasley was hired into the organization years before Anderson (or Dunn) at a director level and had vastly more experience than she did. SUMF ¶ 25. Also, Dunn—with full awareness of Anderson's sex—was involved in the decision to bring Anderson into T3 and made the decision to promote Anderson and increase her compensation *multiple times over*.[3] SUMF ¶¶ 5, 13, 19, 74; *Arraleh v. Cnty. of Ramsey*, 461 F.3d 967, 976 (8th Cir. 2006) (strong inference that no discrimination occurred exists when same actor hires and fires employee in short time period); *see also Colenburg v. Starcon Int'l Inc.*, 656 F.Supp.2d 947, 961 (D. Minn. 2009)

---

[3] Anderson did not purport to assert a failure-to-promote claim in connection with the Director of Sales Success and Customer Success position, presumably because of its absurdity. Lasley took this role between March and July 2022. At that time, Anderson had only been in a supervisory role since January 2022. Meanwhile, Lasley joined EquipmentShare years before Anderson and came into the organization in a director role. He also had decades more experience in sales and customer interaction than Anderson, who graduated college less than nine years earlier. In addition to being more qualified, the claim would be time-barred as it occurred in early 2022 and all claims prior to December 28, 2022 are precluded by the statute of limitations. 42 U.S.C. § 2000e-5(e)(1); *see also Robinson v. Union Pac. R.R.*, No. 19-00852-CV-W-FAG, 2020 WL 13682760 (W.D. Mo. Mar. 9, 2020), at *2 (failure to promote claim time-barred for failing to "file . . . Charge of Discrimination with the EEOC within 300 days of the denial of the promotion"). Nor was such a claim exhausted in Anderson's Charge, untimely or otherwise.

12802873v3

(applying the same decision-maker inference where the supervisor who terminated the employee was also responsible for promoting him.).

Indeed, this affirmative evidence cuts against any inference of discrimination. As outlined in the case law, it is illogical Dunn would repeatedly promote Anderson, up to her first supervisory role, only to discriminate against her based on sex. *Id.* Similarly, Hudson was involved in the decision to terminate and is herself female, further belying discriminatory animus. SUMF ¶¶ 51; *Nash v. Optomec, Inc.*, 849 F.3d 780, 783 (8th Cir. 2017) (finding that decisionmakers of the same protected class "run[s] counter to any reasonable inference of discrimination"); *see also Askari v. L.A. Fitness Int'l, LLC*, 2010 WL 3938320, at *5 (D. Minn. Oct. 5, 2010) ("[A] plaintiff faces a difficult burden of establishing discrimination when the decision-maker is a member of the same protected class as the plaintiff.").

**B.      EquipmentShare Is Entitled to Summary Judgment on Anderson's Retaliation Claim.**

To establish a *prima facie* case of retaliation, an employee has the initial burden of establishing retaliation by showing (1) she engaged in protected conduct, (2) she suffered a materially adverse employment action, and (3) the adverse action was causally linked to the protected conduct. *Young v. Builders Steel Co.*, 754 F.3d 573, 579 (8th Cir. 2014). Further, retaliation must be the "but for" cause of the adverse employment action. *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 343 (2013).

**1.      Anderson Cannot Establish A Prima Facie Case of Retaliation.**

Anderson also claims her termination was retaliation for protected activity. Here too she cannot make out a *prima facie* case because she did not engage in protected activity and, moreover, cannot link any purported protected activity to her termination.

a.    **Anderson Did Not Engage in Protected Activity within the Meaning of Title VII.**

Anderson specifically alleges she was discharged in August 2023 because in March or April 2023 she reported an individual's sales metrics being inaccurate and in April 2023 Hudson was displeased Anderson discussed pay equity issues with subordinates.  SUMF ¶¶ 102-04.  To prove protected activity, the plaintiff must show she either "opposed an act of discrimination made unlawful by Title VII ('the opposition clause'), or participated in an investigation under Title VII ('the participation clause')."  *Lopez v. Whirlpool Corp.*, 989 F.3d 656, 664 (8th Cir. 2021) (cleaned up).

However, suggesting an individual misrepresented sales figures has no relationship to Title VII or its protections for protected statuses.  Indeed, Anderson herself acknowledged there was no connection to sex, retaliation, or other protected status.  SUMF ¶ 103.  Additionally, complaining about "equitableness," on its own, without regard to a specific protected status, is not protected activity and is the equivalent to complaining about fairness.   EQUITABLE, Black's Law Dictionary (12th ed. 2024); *Smith v. Int'l Paper Co.*, 523 F.3d 845, 849 (8th Cir. 2008) (employee complaints that did not reference protected status were not protected under Title VII).

Nor would any of the other concerns Anderson raised during her employment constitute protected activity.  For example, Anderson's purported complaints about nepotism or suggesting her unissued performance improvement plan was because of complaints about nepotism between November 2022 and February 2023 are not protected activity.  SUMF ¶¶ 56-57, 59.  Title VII has nothing to do with nepotism.  42 U.S.C. § 2000e-2 (prohibiting employment discrimination based on race, color, religion, sex, and national origin); *Gafford v. McDonald*, No. 4:14-cv-01603-JAR, 2016 WL 7242159, at *7 (E.D. Mo. Dec. 15, 2016) (explaining that "complain[ts] about alleged

favoritism clearly [are] not protected by Title VII, which by its plain terms prohibits only employment discrimination that is based on race, color, religion, sex, or national origin).

Further, asking in or around February 2023 whether there was a policy related to tone and if her tone would be an issue if she were male is not protected activity as it no way imparts a complaint of discrimination. SUMF ¶¶ 57-58. The same is true of saying in February 2023 that she did not like it that Lasley said it might be better received if a male addressed a male employee about hygiene issues, which is not protected activity. SUMF ¶¶ 61-62.

Moreover, Anderson's direct discussions with Dunn and Hudson in April 2023 about whether her compensation was "equitable," are similarly not protected activity.[4] SUMF ¶¶ 76, 80. Again, equitableness or fairness does not refer to a specific protected status. *Smith*, 523 F.3d at 849.

---

[4] Anderson also did not purport to assert a claim for pay discrimination based on sex, which would also be nonsensical because the two "comparators" she identified and about whom she questioned Hudson in April 2023, are entirely dissimilar. *See, e.g., Fields v. Shelter Mut. Ins. Co.*, 520 F.3d 859, 864 (8th Cir. 2008) (finding employees with significantly more experience weren't similarly situated to the plaintiff). *Onyiah v. St. Cloud State Univ.*, 684 F.3d 711, 717-18 (8th Cir. 2012); *Fields*, 520 F.3d at 864; *Walker v. Mo. Dep't of Corrs.*, No. 20-cv-04251-NKL, 2022 WL 2007393, at *6-*7 (W.D. Mo. June 6, 2022) (finding plaintiff with different job titles and job duties to comparators wasn't similarly situated). Indeed, Anderson other claimed she learned from a tax document in 2023 that Jon Frazier earned more than her. However, Frazier was a Sales Manager leading the Western half of the T3 national sales team who was involved with making sales to new customers and working with and assisting sales representatives on his team to obtain new customers. Additionally, Frazier had more than 25 years of leadership and sales experience, unlike Anderson. Most significantly, as an entirely sales-focused individual, Frazier worked and works in a direct revenue-driving role. Anderson, meanwhile, was an extremely brief-tenured manager in customer success, was not really involved with sales/driving revenue and only occasionally would increase sales to existing customers. Anderson's other point of contention was that Sales Engineers started at a higher salary than she did. Here again, Sales Engineers' focus is on closing sales with prospective customers and are generally involved in every sales meeting with a prospective customer and are in a direct revenue-driving role.

**b.**     **Anderson Offers No Evidence Linking Her Purported Protected Activity and Termination**

That said, even if Anderson's "complaints" constituted protected activity, they in no way connect to her termination, let alone the high "but for" threshold. Indeed, Anderson offers no evidence other than the mere fact of her complaint or complaints and termination many months later. This is insufficient. Generally "more than a temporal connection . . . is required to present a genuine factual issue on retaliation." *Kipp v. Mo. Hwy. & Transp. Comm'n*, 280 F.3d 893, 897 (8th Cir. 2002) (finding two months between a protected activity and termination, without more, insufficient to establish an inference of causation). Notably here, the last of Anderson's alleged complaints was made in April 2023, though she was discharged on August 2, 2023, between three and four months later. SUMF ¶¶ 52, 83. Accordingly, Anderson cannot even point to temporal proximity (which is on its own insufficient to establish a *prima facie*), let alone any other evidence connecting her termination to alleged complaints.

**2.**     **Anderson Cannot Rebut EquipmentShare's Legitimate, Non-Discriminatory, Non-Retaliatory Reason for her Termination with Evidence of Pretext.**

Even if Anderson could establish a *prima facie* case of retaliation, again, EquipmentShare's decision was legitimate and non-retaliatory and cannot be rebutted with evidence of pretext. As discussed above, interpersonal and communication issues are a legitimate and non-retaliatory basis for termination. *Bell v. Minneapolis Pub. Sch.*, No. 03-cv-6320, 2006 WL 695646, at *5 (D. Minn. Mar. 20, 2006). Further, as explained in Part III.A.2, Anderson cannot offer any evidence (1) discrediting EquipmentShare's basis for termination and (2) reflecting, to the contrary, it was because of an alleged protected activity.

### C.     Anderson Presents No Evidence Entitling Her to Punitive Damages.

"Plaintiffs who seek punitive damages in employment discrimination cases face a formidable burden." *Webner v. Titan Dist. Inc*., 267 F.3d 828, 837 (8th Cir. 2001). Punitive damages may only be recovered in "the narrow class of cases where the employer acts with malice or reckless indifference to the federally protected rights of its employees." *Pedroza v. Cintas Corp. No. 2*, 397 F.3d 1063, 1071 (8th Cir. 2005) (finding punitive damages award wouldn't be appropriate even if the plaintiff's underlying claims survived summary judgment) (internal quotations omitted); *see also Lawrence v. CNF Transp., Inc.*, 340 F.3d 486, 496-97 (8th Cir. 2003) (setting aside punitive damages award); *Karcher v. Emerson Elec. Co.*, 94 F.3d 502, 509 (8th Cir. 1996).

In *Kolstad,* the Supreme Court sought "to resolve a conflict among the Federal Courts of Appeals concerning the circumstances under which a jury may consider a request for punitive damages" in Title VII cases. *Kolstad v. American Dental Ass'n,* 527 U.S. 526, 533 (1999). The *Kolstad* Court found employers may be liable for punitive damages only when it is shown they acted with "malice or reckless indifference" to the plaintiff's rights." *Id*. at 535 (quoting §1981a(b)(1)). In doing so, the *Kolstad* Court stated, "Congress plainly sought to impose two standards of liability—one for establishing a right to compensatory damages and *another, higher* standard that a plaintiff must satisfy to qualify for a punitive award." *Id*. at 534 (emphasis added). Thus, a plaintiff must prove their employer engaged in intentional discrimination *and* that they did so with malice or "in the face of" a perceived risk that its actions would violate federal law in order to justify a punitive damages award. *Id*. at 536. "There will be circumstances where intentional discrimination does not give rise to punitive damages liability under this standard." *Id*. at 536-37.

27

Anderson fails to present any evidence suggesting EquipmentShare intentionally discriminated against her with malice or reckless disregard to her rights. Instead, the undisputed facts demonstrate that Anderson was the subject of numerous complaints from her subordinates and involved with many conversations with Dunn and Hudson about her professionalism and communication. SUMF ¶¶ 29-41. Even after that, Anderson circulated a message to her team that she represented was "per HR" that many of her subordinates complained—and Dunn and Hudson believed—was inappropriate, threatening, and inconsistent with prior discussions and EquipmentShare's policies and values. SUMF ¶¶ 42-53. These circumstances are "in stark contrast to the type of evidence that this court has found will support an award of punitive damages." *Browning v. Pres. Riverboat Casino-Mo., Inc.*, 139 F.3d 631, 637 (8th Cir. 1998) (citing *Kimzey v. Wal-Mart Stores, Inc.*, 107 F.3d 568, 575-76 (8th Cir. 1997) (affirming punitive damages award where plaintiff's superiors (1) repeatedly made crude and sexist comments to her; (2) called her highly offensive names; (3) kicked her; and (4) failed to take any action in response to her complaints)). As such, EquipmentShare is entitled to summary judgment on Anderson's claim for punitive damages.

## IV. CONCLUSION

For the reasons set forth above, EquipmentShare respectfully requests the Court sustain its motion, dismiss with prejudice Anderson's Complaint against it, enter judgment in its favor, award its fees and costs, and for any further relief the Court deems just and proper.

Respectfully submitted this 16th day of May, 2025.

/s/ R. Evan Jarrold
R. Evan Jarrold, MO Bar No. 64936
Constangy, Brooks, Smith & Prophete, LLP
1201 Walnut St., Suite 2350
Kansas City, Missouri 64106
Telephone: (816) 472-6400
Facsimile: (816) 472-6401
ejarrold@constangy.com

ATTORNEY FOR DEFENDANT

## CERTIFICATE OF SERVICE

I hereby certify that on the 16th day of May, 2025, a true and correct copy of the above and

foregoing was served via the Court's electronic case filing system, on the following:

Lauren Perkins Allen
Lauren Allen, LLC
4717 Grand Avenue, Suite 130
Kansas City, Missouri 64112
Telephone: (816) 877-8120
Facsimile: (816) 817-1120
lpa@laurenallenllc.com

and

Erik P. Klinkenborg
Jonathan Buschmann
North KC Law
1236 Swift Avenue
North Kansas City, Missouri
Telephone: (816) 472-4440
Facsimile: (816) 472-4442
erik@northkclaw.com
jonathan@northkclaw.com

ATTORNEYS FOR PLAINTIFF

/s/ R. Evan Jarrold
Attorney for Defendant