# **EXHIBIT 2**

1        IN THE UNITED STATES DISTRICT COURT

          FOR THE WESTERN DISTRICT OF MISSOURI

2

3  KASEY ANDERSON,             )

                          )

4          Plaintiff,     )

                          )Case No.

5    vs.               )4:24-cv-00531-BCW

                          )

6  EQUIPMENTSHARE.COM, INC.,  )

                          )

7          Defendant.     )

8

9

10

11          VIDEOTAPED DEPOSITION OF

12             KASEY ANDERSON

13       TAKEN ON BEHALF OF THE DEFENDANT

14           APRIL 10, 2025

15

16

17

18

19

20

21

22

23

24

25

1                    INDEX
2 QUESTIONS BY:                    PAGE
3 MR. JARROLD                    6
4
5           E X H I B I T S
6 EXHIBIT   DESCRIPTION                    PAGE
7 Exhibit 1 - Offer letter          23
8 Exhibit 2 - Email string - Bares 3          31
9 Exhibit 3 - Position/Pay Change Form-11/16/20  46
10 Exhibit 4 - Position/Pay Change Form-mgr key  53
11       accounts
12 Exhibit 5 - Position/Pay Change Form-mgr     61
13       customer success
14 Exhibit 6 - Pay Change Form - Bates 53     75
15 Exhibit 7 - Slack messages - Bates 191-194   81
16 Exhibit 8 - Answers to Interrogatories      112
17 Exhibit 9 - 4/21 notes by C. Hudson      194
18 Exhibit 10 - Complaint by J. Campbell       266
19 Exhibit 11 - 7/27/23 Slack message        285
20 Exhibit 12 - Bates 197-202 - links        298
21 Exhibit 13 - Slack messages with K. Dunn    300
22 Exhibit 14 - Hudson termination notes       308
23 Exhibit 15 - Employee Handbook acknowledgment  340
24
25

1            INDEX (cont'd.)
2
3          E X H I B I T S
4 EXHIBIT   DESCRIPTION                    PAGE
5 Exhibit 16 - Ethical Workplace Policies      340
6       acknowledgment
7 Exhibit 17 - Page from biannual review      341
8 Exhibit 18 - Charge of discrimination      349
9
10
11
12
13
14
15 Reporter's Note: Exhibits attached to original
16 transcript.
17
18
19
20
21
22
23
24
25

1     IN THE UNITED STATES DISTRICT COURT
      FOR THE WESTERN DISTRICT OF MISSOURI
2
3 KASEY ANDERSON,          )
                           )
4       Plaintiff,   )
                           )Case No.
5       vs.          )4:24-cv-00531-BCW
                           )
6 EQUIPMENTSHARE.COM, INC.,   )
                           )
7       Defendant.   )
8
9     VIDEOTAPED DEPOSITION OF KASEY ANDERSON,
10 produced, sworn and examined on April 10, 2025, at
11 the offices of Constangy, Brooks, Smith &
12 Prophete, 1201 Walnut Street, Suite 2350, Kansas
13 City, Missouri 64106 before Lea Ann Martin, a
14 Registered Professional Reporter, and Certified
15 Court Reporter within and for the states of Kansas
16 and Missouri, in a certain cause now pending in
17 the United States District Court, Western District
18 of Missouri, in re: KASEY ANDERSON v.
19 EQUIPMENTSHARE.COM, INC., on behalf of Defendant.
20
21
22
23
24
25

1        A P P E A R A N C E S
2 For the Plaintiff:
3 Mr. Erik P. Klinkenborg
   NORTH KC LAW
4       1236 Swift Avenue
       Kansas City, MO 64116
5     (816) 472-4440
       erik@northkclaw.com
6
   Ms. Lauren Perkins Allen
7 LAUREN ALLEN, LLC
       4717 Grand Avenue
8       Suite 130
       Kansas City, MO 64112
9     (816) 877-8120
       lpa@laurenallenllc.com
10
   For the Defendant :
11
   Mr. R. Evan Jarrold
12 CONSTANGY, BROOKS, SMITH & PROPHETE
       1201 Walnut Street
13       Suite 2350
       Kansas City, MO 64106
14     (816) 472-6400
       ejarrold@constangy.com
15
   The Videographer:
16
   Justin Bond
17
18
19
20
21
22
23
24
25

2 (Pages 2 - 5)

Case 4:24-cv-00531-BCW    Document 30-2    Filed 05/16/25    Page 3 of 91

1  THE VIDEOGRAPHER: Good morning.
2  Today is April 10th, 2025, and we are on the
3  record at 9:39 a.m.
4  Today we'll take a videotape deposition
5  of Kasey Anderson in the matter of Kasey Anderson
6  versus EquipmentShare.com, Incorporated.
7  Counsel, please state your appearance for
8  the record.
9  MR. KLINKENBORG: Erik Klinkenborg
10  on behalf of the plaintiff Kasey Anderson.
11  MS. PERKINS ALLEN: And Lauren
12  Allen on behalf of plaintiff Kasey Anderson.
13  MR. JARROLD: Evan Jarrold on
14  behalf of defendant EquipmentShare.com, Inc.
15  THE VIDEOGRAPHER: Thank you.
16  Would you please swear in the witness.
17  KASEY ANDERSON,
18  being first duly sworn, testified under oath as
19  follows:
20  MR. JARROLD: All right. We good
21  to go? Okay.
22  EXAMINATION
23  BY MR. JARROLD:
24  Q. Well, Ms. Anderson, I know we -- we just
25  introduced ourselves, but for the record my name

1  is Evan Jarrold. I'm counsel for
2  EquipmentShare.com, Inc., in connection with the
3  lawsuit that you -- you filed against them.
4  A. Okay.
5  Q. You understand that you're under oath?
6  A. Yes, sir.
7  Q. Okay. And have you ever given a
8  deposition before?
9  A. No.
10  Q. Okay.
11  A. Just a lot of Suits episodes.
12  Q. Well, it won't be quite like that.
13  A. Right.
14  Q. Let me give you just some basic -- some
15  basic ground rules.
16  A. Okay.
17  Q. We do have video today, but for the
18  record please make sure that all of your responses
19  are verbal --
20  A. Okay.
21  Q. -- rather than shaking your head or
22  uh-huh or huh-uh. That helps the court reporter
23  as she writes down everything that's said.
24  The other thing is, it's important that
25  you and I don't talk over one another. So if you

1  can let me finish my question, I'll try and let
2  you finish any sort of response to my question.
3  That also makes her life much, much easier and the
4  transcript much cleaner.
5  A. Understood.
6  Q. I'd also ask -- you know, this is my one
7  opportunity and I've limited oppor -- like limited
8  time to -- to question you today. So please only
9  answer what -- what's asked.
10  A. Okay.
11  Q. If I interrupt you at some point because
12  we're -- we're going off subject, please
13  understand I'm not trying to be rude --
14  A. Okay.
15  Q. -- I'm just trying to get -- get an
16  answer to the question that -- that I'm asking.
17  A. Okay.
18  Q. If you don't understand a question
19  because I'm inevitably going to ask some bad
20  questions today or that don't make sense, please
21  let me know and I'll try and rephrase it.
22  Your counsel here may make some
23  objections today.
24  A. Okay.
25  Q. Unless you don't understand the question

1  or he specifically instructs you not to answer,
2  please go ahead and answer that question.
3  A. Okay.
4  Q. Also, I expect we'll go into the
5  afternoon but probably not all day. We will take
6  breaks --
7  A. Okay.
8  Q. -- about every hour or so. If you need a
9  break earlier than that, please let me know. The
10  only thing I ask is that if I have a question
11  pending, that you answer that question and then we
12  can go ahead and take a break, okay?
13  A. Okay.
14  Q. Is there any reason that you cannot give
15  full and truthful testimony today?
16  A. No.
17  Q. Okay. Are you taking any sort of
18  medications that might affect your ability to give
19  full and truthful testimony?
20  A. No.
21  Q. Okay. What's your date of birth?
22  A. July 11th, 1990.
23  Q. Okay. And are you married?
24  A. I am not.
25  Q. Okay. Have you ever been married?

1    A.  I have.
2    Q.  Okay.  When did -- and have you only been
3  married once?
4    A.  Yes.
5    Q.  And when did that marriage end?
6    A.  2016 is when it was officially ordered by
7  the Court, dissolution.
8    Q.  Okay.
9    A.  Yes.
10    Q.  And what was your spouse's name?
11    A.  Adam Anderson.
12    Q.  Okay.  Do you have any children?
13    A.  I do, yes.
14    Q.  How many children do you have?
15    A.  I have three.
16    Q.  Okay.  And what are your children's ages?
17    A.  Emma is 14, Jacob is 9, and Lankston is
18  10 months.
19    Q.  Okay.
20    A.  Uh-huh.
21    Q.  Are all their last names Anderson?
22    A.  They are not.
23    Q.  Okay.
24    A.  Emma's last name is Anderson, Jacob's
25  last name is Anderson, and Lankston's last name is

1  Taylor.
2    Q.  Okay.
3    A.  He takes my fiancé's name.
4    Q.  Okay.
5    A.  Yeah.
6    Q.  Congratulations.
7    A.  Thank you.
8    Q.  What is your current address?
9    A.  7305 North Euclid Avenue, Kansas City,
10  Missouri 64118.
11    Q.  And have you ever filed for bankruptcy?
12    A.  I have.
13    Q.  When was that?
14    A.  I don't recall the year, but I want to
15  say four or five years ago.
16    Q.  Okay.
17    A.  Maybe more, maybe less.
18    Q.  Do you know what chapter you filed under?
19    A.  Well, it's 7 or 13.  One of them you have
20  to pay your loans back, the other one you do not,
21  it's a total forgiveness.  That is the one that I
22  filed for and was granted.
23    Q.  Do you know when the bankruptcy was
24  closed?
25    A.  I don't recall the date.

1    Q.  Have you ever been convicted of a crime
2  other than traffic violations?
3    A.  I had a DUI.
4    Q.  Okay.
5    A.  Yeah.
6    Q.  When was that?
7    A.  I would say also maybe four years ago.
8    Q.  Other than the DUI, have you had any
9  other criminal convictions?
10    A.  No.
11    Q.  And what was the disposition or outcome
12  of the DUI charge?
13    A.  The charge as far as the -- could you
14  clarify?
15    Q.  Yeah, what was --
16    A.  Like what I had to do?
17    Q.  Yes.
18    A.  Yeah, so I did -- I didn't take the
19  30-day suspension 'cause I had two children that I
20  had to drive to school every day.  So I did a
21  90-day Breathalyzer.  I completed the two courses
22  on drinking and driving, community service hours,
23  and of course, payment to the Court.
24    Q.  Got it.  Have you ever been a party to a
25  lawsuit other than this one?

1    A.  No.
2    Q.  Have you ever filed a Charge of
3  Discrimination against any company other than
4  EquipmentShare?
5    A.  No.
6    Q.  What did you do to prepare for this
7  deposition?
8    A.  I reviewed all of -- I have a Google
9  drive of all of post-termination communication, my
10  semiannual review, my annual review, the
11  presentation of T3 manager presented by my team
12  and all of their comments.  I reviewed the EEOC
13  docs.  I reviewed all of my employment
14  applications and all of the spreadsheets and cover
15  letters that went with it and things like that.
16  Like, I compiled all of that just to review and
17  just kind of did a little research on making sure
18  that I'm presenting today the way that is expected
19  by consulting with my attorneys.
20    Q.  Okay.  The documents that you reviewed,
21  have all of the documents that you reviewed been
22  produced in this matter, if you know?
23        MR. KLINKENBORG:  Objection.  Just
24  to the best of her knowledge.
25    Q.  (By Mr. Jarrold)  Have all the documents

1  that you reviewed been turned over to your
2  attorneys?
3      A.  Yes.
4      Q.  Okay.  And you indicated that you -- or
5  maybe not.  You met with your attorneys?
6      A.  Yes.
7      Q.  Okay.  Did you discuss this deposition
8  with anyone other than your attorneys?
9      A.  I have mentioned -- yeah, I've mentioned
10  to friends and family members about this upcoming
11  deposition.
12      Q.  Okay.  Who did you talk to other than
13  your attorneys about this deposition?
14      A.  I let my fiancé know that it was
15  happening.  I let my two children know that it was
16  happening.  I let friend Mary Tittlemier know that
17  this was happening.  I don't think -- I -- well, I
18  would keep my family and friends updated on, like,
19  the -- like, what upcoming things.  But, like, as
20  far as, like, it being today, those would be the
21  only people that I told like, hey, this is
22  happening is my children, my fiancé and Mary.
23      Q.  Understood.  And -- and how many times
24  did you meet with your attorneys in preparation
25  for the deposition?

1      A.  Once.
2      Q.  Okay.  And when was that?
3      A.  Yesterday.
4      Q.  And how long did you meet with your
5  attorneys?
6      A.  Less than an hour.
7      Q.  Okay.  I want to talk to you just briefly
8  about your education.
9      A.  Okay.
10      Q.  You graduated high school in 2009; is
11  that correct?
12      A.  Yes.
13      Q.  And you hold a college degree?
14      A.  I do.
15      Q.  Where is that degree from?
16      A.  Univer -- University of Missouri - Kansas
17  City.
18      Q.  And when did you graduate?
19      A.  2013.
20      Q.  What was the focus of your degree?
21      A.  All the things but, in the end, a liberal
22  arts degree.
23      Q.  Okay.  Do you hold any other degrees
24  other than the high school diploma and college
25  degree from UMKC?

1      A.  Not yet.  No.
2      Q.  But you're seeking other degrees?
3      A.  I am.
4      Q.  What are you seeking?
5      A.  Yeah, I reenrolled into the master of
6  public administration program that I had continued
7  from 2013.  And yeah, in May, I'm finishing up two
8  courses and will have that degree.
9      Q.  Okay.  Great.
10      A.  Yeah.
11      Q.  And where are you going for that degree
12  or where will that degree come from?
13      A.  University of Missouri - Kansas City.
14      Q.  Okay.  And I want to talk to you briefly,
15  too, about the positions that you held before your
16  hiring at EquipmentShare.
17      A.  Okay.
18      Q.  Before you worked at EquipmentShare.  And
19  I'm not so concerned with jobs that you held in
20  high school.
21      A.  Okay.
22      Q.  More so the jobs that you had --
23      A.  Yeah.
24      Q.  -- after graduating from college, okay?
25          What was the first position or job that

1  you held out of college?
2      A.  I'm trying to think.  Would you consider
3  a paid internship for one semester a job?
4      Q.  After college?  After college graduation?
5      A.  I'm trying to think when I was an intern
6  whether I was still -- I think I was still in
7  school, so we'll just -- okay.
8      Q.  Okay.
9      A.  The Greater Kansas City Chamber of
10  Commerce, I was a coordinator.  I think public
11  policy coordinator -- public policy department
12  coordinator was my position at the Greater Kansas
13  City Chamber of Commerce.
14      Q.  Okay.  And when did you start in that
15  role, was that in May of 2014?
16      A.  Yes.
17      Q.  And what did you do in that job?
18      A.  So I helped coordinate with the senior
19  vice president of public policy committee meetings
20  and events for -- so we had various numbers of
21  public policy committees.  There could be the
22  Missouri State Fairs Committee, Kansas State Fairs
23  Committee, so on and so forth.
24          So I would help coordinate those
25  launches, organize speakers from the local state

1 federal levels to come in and speak to our members
2 who are a part of those committees. I would help
3 with all the logistical aspects of the events
4 themselves. As far as ordering them lunch, taking
5 attendance, name tags, those sort of things. I
6 helped update our legislative agendas. I helped
7 manage membership relationships and take care of
8 members who were part of a business political
9 action committee, BizPAC, and helped coordinate
10 that continuing.
11     Q.  And that was for the Chamber of Commerce
12 at large, not just Centurions?
13     A.  Correct.  That -- I got promoted to a --
14 that came after --
15     Q.  Okay.
16     A.  -- while at.
17     Q.  Okay.
18     A.  Yeah.
19     Q.  So what was that next role that you held
20 with Chamber of Commerce?
21     A.  Yeah, my senior vice president presented
22 me with an opportunity to be promoted into the
23 manager -- manager of the Centurions leadership
24 role.  So I was a program manager essentially.  I
25 handled all aspects of the program from the budget

1 to the committees that were represented,
2 recruiting efforts, all the events that we held,
3 socials.  Helping coordinate speakers, helping
4 again with logistics, helping -- because these
5 leadership team members, they're essentially
6 helping run the program.  And I am their resource
7 to execute upon that whether it's organizing
8 speakers, lunches, agendas and connecting them
9 with connections in the community and other
10 members in order to execute upon like the program
11 topics and discussions.
12     Q.  Other than those two roles, did you hold
13 any other with the Chamber of Commerce?
14     A.  No.
15     Q.  Okay.  And do you recall when you were
16 promoted into Centurions role?
17     A.  I do not.
18     Q.  Okay.  In either position did you manage
19 any employees?
20     A.  I did.  In the public policy coordinator
21 position, I managed interns but they were unpaid
22 and were seeking school credit.  In the manager of
23 the Centurions leadership program, I managed one
24 coordinator and also interns.
25     Q.  And at the end of your employment you

1 were earning approximately $41,000 a year; is that
2 correct?
3     A.  That is correct.
4     Q.  You left the Chamber of Commerce in
5 June 2018; is that correct?
6     A.  Correct.
7     Q.  And -- and why did you leave that -- that
8 job?
9     A.  Yeah, I was recruited by Kansas City Area
10 Development Council which was my previous
11 internship.  My previous manager had a vacant
12 position and asked if I'd like to join the team.
13 And it was going to be a little bit more money and
14 I was ready to do something different and so I
15 said yes.
16     Q.  Okay.  And so did you start there in June
17 2018?
18     A.  Yes.
19     Q.  And what was your position with KCADC?
20     A.  Research and real estate specialist.
21     Q.  And what did that involve?
22     A.  I would do research about just economic
23 data.  I mean, anything that was going to help
24 attract new businesses to Kansas City.  So it
25 could be information about, like, very specific to

1 the account that the KCADC was meeting with.  And
2 so if they're a pet company -- a pet food company
3 and they're looking for a certain workforce, I'm
4 researching workforce numbers, graduates that are
5 coming out of Missouri, those kind of things.  A
6 lot of economic data, a lot of employment and
7 talent data, cost of living, those kind of things.
8 So that would be the research side.
9         And then for real estate, I helped work
10 with our real estate and other economic
11 development partners in the region on commercial
12 properties or Class A business offices and had --
13 had to have a good handle on what was available,
14 again, for attracting and retaining new business.
15     Q.  Did you supervise anyone in -- in your
16 work at KCADC?
17     A.  I did not.
18     Q.  And at the end of your employment there
19 you were earning about $43,000 a year; is that
20 right?
21     A.  Yes, that's correct.  Sorry, I
22 interrupted you.
23     Q.  That's all right.
24         And when did your employment end there?
25     A.  Oh, man, only just a couple months later,

1 right? Well, when I went to EquipmentShare, so I
2 guess November. End of October, November.
3    Q. November 2018 is that --
4    A. Yeah, yeah.
5    Q. -- when you left --
6    A. Yes.
7    Q. -- KCADC?
8    A. Yes. Thank you.
9    Q. And why did you leave KCADC?
10    A. I was recruited by EquipmentShare. And
11 frankly, it was an opportunity to make more money.
12 And I felt like this was going to be my chance
13 to -- as a single -- newly-single mother within
14 those last couple years provide a better life for
15 my children than I had.
16    Q. Okay. How were you recruited by
17 EquipmentShare?
18    A. I have a high school friend named Alexis
19 and she owns her own waste management company.
20 And so she was at a networking event with Aaron
21 Eoff. And Aaron had asked her, "Hey, do you know
22 anybody who would be great at a customer facing
23 position, we're hiring, we're creating a branch
24 here in Kansas City."
25       And she called me and said, "I

1 immediately thought of you," and she provided my
2 name. And I went and met with them for -- him and
3 Josh Ehelers for an interview.
4    Q. So your friend Alexis --
5    A. Uh-huh.
6    Q. What's Alexis' last name?
7    A. She's married now and moved away, so
8 we're not as connected. I don't recall her last
9 name.
10    Q. Okay. But Alexis did not work at
11 EquipmentShare?
12    A. She did not. She owned her own waste
13 management company.
14    Q. Okay. But Alexis gave your name to Aaron
15 Eoff?
16    A. Yes.
17    Q. And who contacted you from
18 EquipmentShare?
19    A. It would have been Aaron or Josh Ehelers.
20    Q. Okay.
21       MR. JARROLD: And can we mark this
22 as Exhibit 1.
23       (Exhibit 1 marked for
24       identification.)
25    A. Albright was her maiden name.

1    Q. (By Mr. Jarrold) Albright was Alexis'
2 maiden name?
3    A. Yeah. She's married now.
4    Q. Okay. Did you know anyone that worked at
5 EquipmentShare before you were hired there?
6    A. No.
7    Q. Okay. And who did you say you
8 interviewed with for your first position there?
9    A. It was both Aaron Eoff and Josh Ehelers.
10    Q. And is Aaron a man?
11    A. He is.
12    Q. Okay.
13    A. Fair -- fair question. Yeah.
14    Q. And do you know who ultimately -- did you
15 interview with anyone else --
16    A. No.
17    Q. -- other than Aaron and Josh?
18    A. No.
19    Q. Do you know who ultimately made the
20 decision to offer you a -- a job with
21 EquipmentShare?
22    A. I believe it was Josh Ehelers.
23    Q. Okay. And I've shown you -- or you have
24 what's in front of you marked as Exhibit 1. If
25 you look at the bottom of the document --

1    A. Uh-huh.
2    Q. -- you'll see there are numbers there.
3 It says Equipmentshare/Anderson and then a series
4 of zeros and a number.
5    A. Okay.
6    Q. If you'll look at pages 5 and 6.
7    A. Okay.
8    Q. Do you recognize what's on pages 5 and 6?
9    A. Yes.
10    Q. And what -- what is that document?
11    A. An offer letter.
12    Q. And is this the offer letter to you to
13 work at EquipmentShare?
14    A. Yes.
15    Q. And on page 6, is that your electronic
16 signature there at the bottom?
17    A. Yes.
18    Q. Dated October 24th, 2028 -- 2018, excuse
19 me?
20    A. Yes.
21    Q. And so you were hired into a position as
22 rental coordinator; is that correct?
23    A. Yes.
24    Q. Reporting to Josh Ehelers?
25    A. Yes.

7 (Pages 22 - 25)

Veritext Legal Solutions
www.veritext.com                                                    888-391-3376
Case 4:24-cv-00531-BCW    Document 30-2    Filed 05/16/25    Page 8 of 91

1    Q.   Did you physically report to a location
2 as a rental coordinator --
3    A.   Yes.
4    Q.   -- or were you at all remote?
5    A.   I reported to a location.
6    Q.   And where was that?
7    A.   EquipmentShare was located off of Front
8 Street.
9    Q.   In Kansas City, Missouri?
10    A.   In Kansas City, Missouri.
11    Q.   And so your first day with EquipmentShare
12 would have been November 5th, 2018; is that
13 correct?
14    A.   Yes.
15    Q.   Okay.  Tell me what the job was as a
16 rental coordinator.
17    A.   Okay.  Not what it -- what it was when I
18 was months in or when I was day one --
19    Q.   Just while you --
20    A.   -- when I started?
21    Q.   What -- what were your job
22 responsibilities when you were a rental
23 coordinator?
24    A.   When I was --
25    Q.   Did it change -- sorry, did it change

1 while you held the position?
2    A.   Yes.
3    Q.   Okay.  And when did it change?
4    A.   Probably a month in.
5    Q.   Was there a reason why it changed?
6    A.   Yes.
7    Q.   Why was that?
8    A.   For full transparency, I didn't really
9 understand the position I was applying for.  I
10 came in thinking it was going to be public facing,
11 I was excited about that.  That would -- Josh --
12 Taylor Merriman and Aaron Eoff for the first month
13 of my employment would take me on to jobsites and
14 have me handout my business card to customers that
15 work -- that were their former customers while
16 they were at United -- Blue Line Rentals, which
17 was bought out by United Rentals.  The goal and
18 purpose of that was to prevent a trace of them in
19 a noncompete.
20       So in the first month, again, I would go
21 out and meet with their former customers, they
22 would use my business card to contact me for
23 rentals, and my name would go as the sales agent
24 on those rental agreements.  A month in after we
25 had secured -- and I should say I didn't know that

1 I was -- I did not -- I didn't understand at that
2 time that that was what was happening.  I later
3 put the pieces together when I was interviewed by
4 in-house counsel from EquipmentShare who was
5 facing a lawsuit from United Rentals for
6 breaking -- for being aware of a noncompete and
7 moving forward with it.  So I didn't understand
8 that world or anything like that.
9       But after about a month, Josh got
10 promoted into a, like, regional district manager
11 or some similar title.  And so then my role moved
12 into essentially branch management without the
13 title.  I was ordering tools and items for the
14 technicians.  I helped secure our business
15 license.  I helped set up utilities for this brand
16 new space.  After the -- I helped facilitate like
17 the floors getting remodeled and things like that.
18 And worked with our accounts payables team to set
19 up new vendors.  Essentially functioning as a
20 branch manager because Josh was traveling and
21 there wasn't really anyone there to manage the day
22 to day.
23       And then in addition to those
24 responsibilities came more of the rental
25 coordination, which is dispatching drivers to pick

1 up and drop off rentals.
2    Q.   How long did you hold that rental
3 coordinator position?
4    A.   About three months.  November, December,
5 January, February, March.  Or maybe -- I guess
6 maybe four or five I would say then.
7    Q.   Okay.
8    A.   I think February is when it transitioned.
9    Q.   And throughout that time did you report
10 to Josh?
11    A.   I did.
12    Q.   Did you oversee any -- did you have any
13 direct reports --
14    A.   No.
15    Q.   -- in that role?
16    A.   No.
17    Q.   Okay.  And while you were rental
18 coordinator, if we look at Exhibit 1 on that first
19 page --
20    A.   Uh-huh.
21    Q.   -- as well as the offer letter, it
22 appears to indicate that your compensation was
23 $24.25 an hour, does that sound correct?
24    A.   That does sound correct.
25    Q.   Okay.  What were -- or what was Aaron

1 Eoff's role within EquipmentShare while you were
2 rental coordinator, if you know?
3   A.  Sales manager.
4   Q.  And what about Taylor?
5   A.  Sales representative.  Territory account
6 manager would be the formal title.
7   Q.  Okay.  And did you have any reporting
8 relationship with them?
9   A.  Reporting relationship, no.
10   Q.  Did they work in the same department as
11 you or same division or --
12   A.  Yes.
13   Q.  Okay.  And what was that division?
14   A.  The EquipmentShare Kansas City rental
15 branch.
16   Q.  Okay.  And the rental branch, was there
17 just one physical location --
18   A.  Yes.
19   Q.  -- than multiple sites?
20   A.  No.  Later, yes.  They started to, like,
21 lay down like trench equipment, I believe, and
22 other things like that because our space wasn't
23 big enough.  They ended up buying another -- but I
24 think -- I don't know that they had committed
25 completely to another building while I was there.

1 I may have already transitioned.  But they -- they
2 could have been, like, in the works of buying and
3 purchasing another space for laydown equipment.
4   Q.  And sorry, can you repeat what
5 the -- what the name of that division was that you
6 were in?
7   A.  Yeah, the Kansas City -- so
8 EquipmentShare Kansas City rental branch.
9   Q.  We'll mark this as Exhibit 2.
10       (Exhibit 2 marked for
11       identification.)
12       THE WITNESS:  Thank you.
13   Q.  (By Mr. Jarrold)  I'm showing you what's
14 been marked as Exhibit 2.  It's
15 Equipmentshare/Anderson Bates number 3.  You may
16 not have seen this document before but I'm --
17 I'm --
18   A.  I reviewed it, yeah, last night.
19   Q.  Okay.
20   A.  Yeah.
21   Q.  Okay.  You mentioned that I think around
22 February you -- you transitioned --
23   A.  I did.
24   Q.  -- to a different role.  And was that
25 transition to the Track team?

1   A.  Yes.
2   Q.  Okay.  And -- and did that occur on
3 February 11th, 2019, to your knowledge?
4   A.  Yes.
5   Q.  Okay.  And did your position -- did your
6 title change?
7   A.  Yes.
8   Q.  What was the -- your new title as of
9 February 11th, 2019?
10   A.  Sales support manager.
11   Q.  And how did you come to be in that role?
12   A.  Our Kansas City rental branch and the
13 Track team came together for, I guess you could
14 call, like, a networking.  We were at like a -- we
15 were either at like a similar conference -- we
16 came together for some reason.  Like, there was
17 a -- there was something we came together for as
18 far as -- like something tangible like a
19 conference or something to that nature.
20       And in addition to that, we were making
21 concerted efforts to work -- work across the
22 aisle.  The rental with Track.  So this was a
23 chance -- opportunity for our rental team and our
24 Track team to get to know each other and spend
25 some time networking in person.

1       And I met Eric Nichols, RC Davis, and
2 Jerry Lasley at a dinner meeting.  And they
3 brought up in conversation that they were growing
4 the Track team.  And as someone who came from -- I
5 wanted -- I wanted to pursue something different
6 than being a rental coordinator.
7       Again, I didn't really understand what I
8 was getting into.  I didn't want to -- I wanted
9 something more challenging than dispatching
10 drivers to -- to and from their location.  And so
11 I looked at this as an opportunity when I
12 overheard them talking about their growth and I
13 basically pitched myself and said, "Hey, if you
14 need support, I would be interested.  It's more up
15 my alley of my experience if you need someone who
16 was going to be in direct contact working
17 face-to-face with customers."
18       And so they ended up following up and it
19 ended up coming into fruition that I was able to
20 go work on -- for the Track team.
21   Q.  Okay.  And that move to sales support
22 manager on the Track team, was that a promotion?
23   A.  I don't believe so.
24   Q.  Okay.  And why not?
25   A.  Because it was the same pay and it was

Case 4:24-cv-00531-BCW    Document 30-2    Filed 05/16/25    Page 10 of 91

1 kind of the same role of, like, being in a support
2 role. I suppose you could suggest that it's a
3 promotion based on title. Sure.
4    Q. But it was more in line with what you
5 wanted to do?
6    A. It was more in line of -- yeah -- yes.
7    Q. And so you met Eric Nichols, RC Davis,
8 Jerry Lasley at this dinner?
9    A. Yes.
10    Q. Yes? And you said they -- they followed
11 up. What -- what was the process --
12    A. I may have been the first one to reach
13 out. I may --
14    Q. You're okay. You're okay. I'm just
15 reminding you.
16       What was the process by which you ended
17 up in this job after the -- the -- the dinner in
18 which you pitched yourself?
19    A. I believe I may have emailed Eric Nichols
20 to get the conversation started. I believe I
21 would have -- I wrote an email something to the
22 effect of, I really enjoyed getting to know you
23 all. It would be such a great opportunity to work
24 with you guys. It sounds so exciting what's
25 happening at Track. If you have a position

1 available, I would be interested.
2       There was some sort of communication like
3 that and I think -- I believe to my recollection I
4 would have reached out to express my interest in a
5 more formal manner.
6    Q. Do you know if you also reached out to RC
7 or Jerry?
8    A. I do not know if I would have included
9 them.
10    Q. Was there an interview for that role?
11    A. Yes.
12    Q. And --
13    A. Oh, I met Kris Dunn, too. Kris Dunn was
14 there that evening. I apologize.
15    Q. Okay. Was there -- so -- so there was an
16 interest you interview for -- for this role as
17 sales support manager. Was there more than one
18 interview or -- or just one interview?
19    A. There was one formal interview.
20    Q. And who did you interview with?
21    A. Kris Dunn and Eric Nichols.
22    Q. Did you interview with RC or Jerry?
23    A. No.
24    Q. So one interview for the sales support
25 manager with Eric Nichols and Kris Dunn?

1    A. I believe that's correct.
2    Q. And you ultimately got that position?
3    A. I did.
4    Q. Do you know who made the decision?
5    A. I believe it was Eric Nichols. He was
6 the vice president of sales and the only team
7 member eligible to hire and make hiring decisions
8 on the Track team at that time.
9    Q. Do you know --
10    A. I suppose RC Davis was hiring support
11 representatives, so that's not entirely fair, but
12 that's not the -- Eric Nichols.
13    Q. Do you know if Kris was involved in that
14 decision?
15    A. I think he was --
16       MR. KLINKENBORG: Objection, calls
17 for speculation.
18       You can -- you can answer if you know.
19 If you have an answer. I -- I just stated the
20 objection for the record.
21    A. Eric ended up leaving the interview
22 early. We were, like, at a coffee shop or maybe a
23 brewery or something like that. And Kris stayed
24 behind. And so we -- he -- I got an email, I
25 think, or a message from Eric after that said,

1 "Kris thinks you're good people."
2    Q. (By Mr. Jarrold) Okay. You ultimately
3 weren't involved in the decision-making process to
4 select you for that role?
5    A. No, I was not.
6    Q. Okay. And -- and what is the Track team?
7    A. Well, it's now known as T3. But it's the
8 telematics division of the company. So Track
9 is -- focuses on selling GPS devices to
10 contractors and fleet companies who have an
11 interest in tracking and managing their assets on
12 jobs, over the road, and functions to create a
13 online platform whereby these assets can be,
14 again, tracked and managed. Track.
15    Q. And -- and Track is now the telematics
16 division --
17    A. Uh-huh.
18    Q. -- which is referred to as T3?
19    A. Correct.
20    Q. Okay. What was your -- what were your
21 job responsibilities as a sales support manager in
22 Track?
23    A. I supported the sales reps by sending out
24 their contracts to customers via Salesforce. And
25 there was another platform we used, but

1 essentially I sent out the contracts to the
2 customers for signature. And upon receipt of
3 signature, we would fulfill those orders working
4 with the operations team under Jerry Lasley's
5 leadership at that time. When I transitioned, it
6 was myself and one other, Tallese Alvarez. We
7 started on the same day and we reported to Jerry
8 Lasley. And so the three of us.
9   Q. Okay. And let me -- let me stop you
10 'cause I just wanted -- I -- I was going to ask
11 you what -- or who you reported to when you moved
12 into that sales support manager role --
13   A. Jerry Lasley.
14   Q. -- as of February 11th, 2019?
15   A. Jerry Lasley.
16   Q. Jerry Lasley. And we talked about a
17 number of these individuals: Eric Nichols, RC
18 Davis, Jerry Lasley, Kris Dunn. At that time as
19 of February 11, 2019, do you know what role Jerry
20 Lasley held?
21   A. I don't recall.
22   Q. Okay. Do you know who he reported to?
23   A. Yes.
24   Q. Who did he report to?
25   A. Eric Nichols.

1   Q. And do you recall what Eric Nichols'
2 position was as of February 2019?
3   A. Vice president of sales.
4   Q. Okay. Within T3?
5   A. Correct.
6   Q. And do you know who Eric reported to as
7 of February of 2019?
8   A. Yes.
9   Q. Who's that?
10   A. Willy Schlacks.
11   Q. Okay. Where did -- and we'll take these
12 one by one. Where did RC Davis fall into that
13 hierarchy, if anywhere?
14   A. He was the director of customer support
15 who also reported to Eric Nichols.
16   Q. Okay. So at that time --
17   A. I believe.
18   Q. So RC and Jerry at that time to your
19 knowledge were both reporting to Eric?
20   A. To my knowledge, yes.
21   Q. What about Kris Dunn, do you know what
22 role he held as of February 2019?
23   A. I believe he -- at that time he became a
24 sales representative for T3 reporting to Eric
25 Nichols.

1   Q. Okay. And you -- you believe that Kris
2 Dunn reported to Eric Nichols as of that -- as of
3 February 2019?
4   A. Yes.
5   Q. Okay. At some point your position as
6 sales support manager changed to a relationship
7 manager; is that correct?
8   A. Yes.
9   Q. Okay. And was there any other title that
10 you held between sales support manager and
11 relationship manager?
12   A. Yes.
13   Q. What was that?
14   A. I was in customer support. I don't
15 recall -- I think it -- I might have been a
16 customer support associate or a customer support
17 specialist or a customer support representative.
18 Something to that nature.
19   Q. Do you know when you moved into that
20 role?
21   A. I believe it was a couple months after
22 becoming a sales support manager. I then reported
23 to RC Davis.
24   Q. So a couple months after becoming a sales
25 support manager in February 2019, you moved to a

1 customer support associate or specialist role?
2   A. Yes.
3   Q. And in that role you began reporting to
4 RC Davis?
5   A. That's correct.
6   Q. Was that a -- did you interview for that
7 role?
8   A. No.
9   Q. How did you end up in that position?
10   A. Eric Nichols dismantled the sales support
11 team and had Tallese Alvarez go to operations,
12 myself to support, and I think -- I believe Jerry
13 back to sales.
14   Q. And earlier you said that Eric Nichols
15 left the organization. Do you know --
16   A. (Witness shakes head.)
17   Q. Oh, you didn't?
18   A. Huh-uh.
19   Q. Oh, okay. Well, thank you for correcting
20 me.
21   A. Eric Nichols was terminated from the
22 organization.
23   Q. So he left the organization?
24   A. Yes.
25   Q. So he -- when did Eric leave?

11 (Pages 38 - 41)

1    A.   It had to be probably December or January
2  of 2022.  Or fall of 2020 -- you know, fall 2021.
3  It had to be before January of 2022 or, like,
4  during that month because Kris Dunn took over.
5  That's how I can recall.
6    Q.   Okay.  And we -- we'll come back to that.
7  So your move to customer support associate or
8  specialist, was -- was that something that you --
9  did -- did you want to move into that position?
10    A.   No.
11    Q.   Okay.  That was something that Eric moved
12  you into because he was dismantling the department
13  you were in?
14    A.   Yes.
15    Q.   And otherwise, you would presumably not
16  have a position within the organization?
17    A.   I don't think that's true.  I think I
18  just would have stayed a sales support manager.
19    Q.   But he eliminated that position?
20    A.   I don't think he eliminated the position
21  necessarily because there are sales support
22  managers today at T3.  I just think that he -- I
23  know that he made a decision to place us
24  elsewhere.  That -- that function continued to
25  exist and was fulfilled by Tallese, but it was

1  under operations reporting to Ben Wilson.
2    Q.   Okay.
3    A.   Yeah.
4    Q.   So something of a reorganization?
5    A.   Yeah.
6    Q.   Okay.  And you think you moved into that
7  position as customer support associate specialist
8  a couple months after taking on the role as a
9  sales support manager?
10    A.   It could have been six months but within
11  months.
12    Q.   Okay.
13    A.   I don't feel -- I don't think I was in
14  that position a full year.  I don't think I could.
15    Q.   You don't think you were in the sales
16  support manager a full year?
17    A.   I don't know.  It could have been.
18    Q.   Okay.
19    A.   Because none of the -- the reason this is
20  really hard for me to recollect is because Eric
21  made changes every day to every position.  He kept
22  moving the goal posts, things -- things changed
23  all the time.  And it was a chaotic work
24  environment that was very difficult to -- one day
25  you'd be here and next day your goals would be

1  this and that and so we moved.  There was a lot of
2  change.  That's why it's kind of hard in that
3  timeline to know before I became a relationship
4  manager kind of how things --
5    Q.   And those changes -- Eric was making
6  those changes to everything under his direction?
7    A.   Yeah, everything under his direction,
8  yes.
9    Q.   Okay.
10    A.   Yes.
11    Q.   What were you doing in that customer
12  support associate specialist position?
13    A.   I would interface with customers
14  virtually through the intercom chat function which
15  is just within the T3 platform customers could
16  message in.  And we would take turns answering
17  those customer questions.  I also did what's known
18  as tying Trackers, which is essentially on the
19  back end, taking the serial number of a Tracker
20  and pairing it with the asset that's in the
21  system.  So marrying those two.  So -- and then
22  answering support emails that came in to our
23  support inbox.  Those were, the three main
24  functions of that job.  And phone calls.
25    Q.   Did you report to RC Davis the entire

1  time you were in that customer support associate
2  or specialist role?
3    A.   Yes.
4    Q.   When you moved to that position from
5  sales support manager, did your compensation
6  change?
7    A.   No.
8    Q.   And do you know for certain who made the
9  decision to move you to that customer support
10  associate position?
11    A.   Eric Nichols.
12    Q.   And how do you know that it was Eric?
13    A.   Because he held a meeting and told us he
14  was moving us.
15    Q.   Who did he hold a meeting with?  Was
16  that --
17    A.   My --
18    Q.   Go ahead.
19    A.   Myself, Tallese Alvarez and Jerry Lasley.
20    Q.   Did Eric have other direct reports?
21    A.   Yes.
22    Q.   Do you have any sense of how many direct
23  reports Eric had?
24    A.   Less -- I would say maybe close to 10.
25  Like, more than 5, but less than 10.

Veritext Legal Solutions
www.veritext.com                                                888-391-3376

1    Q.   So after the customer support associate
2  specialist position, you -- that's when you moved
3  to relationship manager, correct?
4    A.   Yes.
5    Q.   Do you know when you moved to that role
6  as relationship manager?
7    A.   I'm trying to recall and I'm having a
8  hard time, if it was before the pandemic or after
9  the pandemic.  It could have been 2021.
10   Q.   I'll show you an exhibit here and maybe
11 this will help.
12   A.   Okay.
13          MR. JARROLD:  Can you mark this as
14 Exhibit 3, please.
15          (Exhibit 3 marked for
16          identification.)
17   A.   All right.
18   Q.   (By Mr. Jarrold)  Okay.  I'm showing you
19 what's been marked as Exhibit 3, and have you seen
20 this document before?
21   A.   Yes.
22   Q.   Was that just part of your -- in your
23 review in preparation for your deposition?
24   A.   Yes.
25   Q.   You hadn't seen it prior to that?

1    A.   Only when I signed it.
2    Q.   Oh.  And what is this document?
3    A.   It is a position/pay change form.
4    Q.   Okay.  And it appears to -- it indicates
5  that as of November 16th, 2020, you held a
6  relationship manager position, yes?
7    A.   Uh-huh.  It looks -- it looks like, yeah,
8  I -- yeah, 11/16 of 2020 is when I became
9  relationship manager.
10   Q.   Okay.  And -- well, it says on this
11 document, if you look, current position/title.  Do
12 you see that?
13   A.   I do see where it says current position,
14 relationship manager; new position, relationship
15 manager.  And then it says -- so this is a manager
16 change form.  But maybe at the time -- yeah, I
17 mean, my -- my wages increased when I became a
18 relationship manager from 50 to 65.  So I guess
19 this in that sense is a pay change form, but also
20 a transfer of manager.
21   Q.   Okay.
22   A.   But it happened before this that I
23 reported to RC Davis.
24   Q.   Right.  I -- I -- you -- you said that
25 you reported to RC Davis while you held that

1  customer support associate or specialist role --
2    A.   Yeah.  Yeah.
3    Q.   -- correct?
4    A.   But when looking at this it appears as
5  though I always -- I was always reporting to Jerry
6  even in customer support and that it was
7  transferring me to RC Davis.
8    Q.   Well, I guess is it possible that you
9  moved into a relationship manager role prior to
10 November 16th, 2020?
11   A.   No.
12   Q.   Okay.
13   A.   Well, oh, okay.  Maybe.  But why would it
14 come here with -- so is this just -- I guess maybe
15 I'm confused.  It was -- so then was this filed
16 just to change who my manager was at the time?
17 This is -- so are you -- is this document
18 suggesting that there was no change other than who
19 I was reporting to?
20   Q.   This document appears to me to show that
21 your manager as a relationship manager was
22 changing from Jerry Lasley to RC Davis as of
23 November 16, 2020.  Does that sound --
24   A.   I will recognize that --
25   Q.   -- accurate?

1    A.   It does not sound accurate.
2    Q.   Okay.
3    A.   Okay.
4    Q.   And why not?
5    A.   Because I reported to RC Davis prior to
6  becoming a relationship manager, and I know that
7  to be true because my paid time off would be
8  approved by RC Davis, my training would come from
9  RC Davis.
10   Q.   Right.  But if your relationship -- if
11 your role changed to relationship manager prior to
12 November 16th, 2020 --
13   A.   Do we have anything that shows that?
14   Q.   I'm just asking --
15   A.   Oh --
16   Q.   -- the question.
17   A.   -- I can't recall if -- I can't recall.
18   Q.   So it's possible your relationship
19 manager -- you were moved to a relationship
20 manager position prior to November 16, 2020?
21   A.   It could be possible, yes.
22   Q.   Okay.  And how did you move into that
23 relationship manager position?
24   A.   Eric Nichols promoted me.
25   Q.   Okay.  And you're not certain exactly

1 when that occurred?
2    A. I am not.
3    Q. When you moved to relationship manager,
4 did your supervisor change from RC Davis to Jerry
5 Lasley?
6    A. No.
7    Q. So when you moved to relationship --
8    A. Not to my knowledge.
9    Q. When -- when you moved to the
10 relationship manager role initially, your
11 supervisor, did it remain RC Davis?
12    A. I'm not sure. If -- I -- I guess
13 according to this -- so I think -- okay, I think
14 what I am recalling -- because I had mentioned to
15 you that there was a lot of change, okay. I -- I
16 think this document, now that I'm recollecting, is
17 because I got to -- I got to keep my title, I
18 think, but I had to go -- I think I reported to
19 Eric Nichols prior as a relationship manager and
20 then he made -- he had me go back under RC Davis.
21 So it's like I was customer support, RC Davis.
22 Then I got to become a relationship manager in
23 sales under Eric. And then this is him sending me
24 back to be -- I bet you that's what this form is,
25 is that I had to report back. Because there was a

1 time that I had to go back to reporting to RC
2 Davis and -- but my pay did not change I remember
3 and my title didn't change. He just didn't -- he
4 just made another org restructure, so I think that
5 is what this is, yes.
6    So prior to this, I would have reported
7 as relationship manager not to Jerry Lasley as far
8 as my -- what my understanding was, but to -- but
9 to Eric Nichols.
10    Q. Do you know why Jerry Lasley would sign
11 this document?
12    A. It calls for speculation, but I think
13 Eric just was like "Do this paperwork for me,"
14 'cause that's kind of the type of guy Eric was.
15 But if it says manager signature, that means Jerry
16 was my manager, which meant did I ever report to
17 RC Davis officially? It calls -- it calls into
18 question. Now I wonder.
19    But we -- and EquipmentShare wasn't as
20 sophisticated early on in recordkeeping and having
21 an online platform where you could -- so I could
22 see where -- I just wasn't in the know. I was not
23 privy to direct reports. The only assumption I
24 would have officially is who am I requesting PTO
25 off from, who's approving those, who's giving me

1 direction, who's training me, what meetings am I a
2 part of, what team do I -- am I grouped in in
3 Slack.
4    Q. And you testified that your move to
5 relationship manager was a promotion, yes?
6    A. Yes.
7    Q. And your compensation went from $50,000
8 annually to $65,000 annually?
9    A. Yes. I cried.
10    Q. And that may have occurred sometime
11 before November 16th, 2020?
12    A. Yes.
13    Q. Do you know who made the decision to
14 promote you to relationship manager?
15      MR. KLINKENBORG: Objection, calls
16 for speculation.
17    Q. (By Mr. Jarrold) I'm just asking if you
18 know, not who made the decision.
19    A. But the question is confusing because I
20 can say I know because of the person who was in
21 the room who said, "I'm promoting you to this,"
22 and what is in direct conflict with potentially
23 this document, right? So who signed potentially
24 is different than who made the decision, so for
25 that reason I'm going to say that I don't know.

1    Q. You don't know. Who do you sus -- you
2 don't know who made the decision to promote you to
3 relationship manager?
4    A. I don't know who filed the paperwork to
5 HR approving on an official record --
6    Q. Uh-huh.
7    A. -- that Kasey Anderson is to be promoted
8 from customer support to relationship manager.
9 But I know that I was requested to have a meeting
10 with Eric Nichols where he announced to me that he
11 would be promoting me into the position of
12 relationship manager with an increased pay to
13 $65,000 a year and be reporting to him in the
14 sales department of T3.
15    Q. Did you interview for the relationship
16 manager role?
17    A. I did not. I...
18      MR. JARROLD: This is 4.
19      (Exhibit 4 marked for
20    identification.)
21    Q. (By Mr. Jarrold) And actually, before we
22 look at 4, let's back up and you have Exhibit 3 in
23 front of you.
24    A. I do.
25    Q. Okay. Looking at Exhibit 3, is that your

1 signature there toward the bottom where it says
2 "Kasey Anderson"?
3    A.   Yes.
4    Q.   Okay.  You can put all the exhibits,
5 other than Exhibit 4, to the side.
6        All right.  Take a second to look at
7 Exhibit 4, both pages.  That's
8 Equipmentshare/Anderson 50 to 51.  Do you
9 recognize this document?
10    A.   Yes.
11    Q.   And -- and what is it?
12    A.   It's a position/pay change form from
13 relationship manager to manager of key accounts.
14    Q.   Okay.  And it indicates that your salary
15 of $65,000 annually will increase to $70,000
16 annually?
17    A.   Correct.
18    Q.   And then it indicates that you will have
19 a new manager in Kris Dunn?
20    A.   That's correct.
21    Q.   So -- and it indicates there's a -- an
22 effective date of -- and there's potentially some
23 discrepancy here, but an effective date of either
24 July 1st, 2021 or June 28, 2021?
25    A.   That's what -- I see that as well.

1    Q.   Is that consistent with your
2 understanding of when you moved to the manager of
3 key accounts role, sometime in June or July of
4 2021?
5    A.   Yeah, that sounds accurate.
6    Q.   Okay.  Did you hold any other positions
7 between relationship manager and manager of key
8 accounts?
9    A.   No.
10    Q.   All right.  And when we were discussing
11 your role as a relationship manager, we talked
12 about you believe that you initially reported to
13 Eric Nichols, and then that changed to RC Davis?
14    A.   Uh-huh.
15    Q.   Did you have any other managers after RC
16 Davis while working as a relationship manager?
17 I'll rephrase it.
18    A.   No.
19    Q.   I'll rephrase it.  Was RC Davis the only
20 other manager you had as a relationship manager?
21    A.   I -- yes.
22    Q.   Okay.  And all the positions we've
23 discussed after your leaving the rental
24 coordinator role, those are all within T3 or
25 Track, correct?

1    A.   That's correct.
2    Q.   Tell me what -- what were you doing as a
3 relationship manager --
4    A.   Yeah.
5    Q.   -- prior to manager of key accounts?  As
6 a relationship manager.
7    A.   I was interfacing with some of the
8 largest T3 customers or otherwise known as
9 national accounts.  My very first account was JE
10 Dunn.  And so I exclusively worked for that
11 account for months before I would get new
12 accounts.  But in my role I would do post-sale
13 support essentially seeing through the customer
14 life cycle after the sale.  And being the internal
15 liaison and advocate for the customer to our
16 internal teams for anything that they might need
17 to track and manage their assets in T3.
18    Q.   And who were you liaising with internally
19 between JE Dunn and your --
20    A.   Yeah.
21    Q.   -- internal folks?
22    A.   Yeah.  Customer support --
23    Q.   Okay.
24    A.   -- sales support, product teams,
25 engineering teams, rental teams.

1    Q.   Did you have any direct reports as a
2 relationship manager?
3    A.   I did not.
4    Q.   Did you have any direct reports as a
5 sales support manager?
6    A.   I did not.
7    Q.   And I think you already answered this,
8 but did you have any direct reports as a customer
9 support associate or specialist?
10    A.   I did not.
11    Q.   We've been going about an hour.  Why
12 don't we take a five-minute break.
13    A.   Okay.
14        THE VIDEOGRAPHER:  Okay.  We're
15 off the record at 10:39.
16        (Recess.)
17        THE VIDEOGRAPHER:  Back on record
18 at 10:46.
19    Q.  (By Mr. Jarrold)  Okay.  Ms. Anderson, we
20 are back on the record after taking a -- a short
21 break.  Is there anything about your testimony
22 thus far that you feel you need to correct or is
23 inaccurate?
24    A.   No.
25    Q.   Okay.  Before we went on break we were

15 (Pages 54 - 57)

1 talking about your promotion from relationship
2 manager to manager of key accounts. How did you
3 come to receive that position, manager of key
4 accounts?
5   A.  I honestly don't recall.  I don't know.
6   Q.  Do you recall if you interviewed for it?
7   A.  I didn't.  I was promoted or had a title
8 change --
9   Q.  So you may have inter --
10   A.  -- effectively doing the same role.
11   Q.  Okay.  You may have interviewed, but you
12 don't recall?
13   A.  I don't think so because I don't -- it
14 was a tit -- effectively the same role but a title
15 change, I guess, and a pay increase.  But
16 effectively, the same job I was doing as a
17 relationship manager.
18   Q.  Were there any differences between the
19 relationship manager position and manager of key
20 account position?
21   A.  It might -- I would say the only
22 difference is it honed in on the type of accounts
23 that I would manage and hand off others that I --
24 that a sales rep would interface with as opposed
25 to me.

1   Q.  Okay.
2   A.  I think it just honed in on national
3 accounts for me.  It sort of clarified the type of
4 accounts I would work on.
5   Q.  Okay.  And do you know who made the
6 decision to change your role and increase your
7 salary?
8   A.  Kris Dunn.
9   Q.  And as a manager of key accounts, did you
10 report to Kris Dunn?
11   A.  Yes.
12   Q.  Did you report to Kris Dunn the entire
13 time you held the manager of key accounts
14 position?
15   A.  Yes.
16   Q.  Did you have any direct reports as a
17 manager of key accounts?
18   A.  I did not.
19   Q.  And this was still on the same group as
20 you've been in as a relationship manager with a
21 slightly different focus in terms of accounts?
22   A.  Oh.  Can you repeat the question?
23   Q.  Yeah.  The manager of key accounts
24 position --
25   A.  Uh-huh.

1   Q.  -- was still in the same group as the
2 relationship manager position?
3   A.  The -- the role is what you're saying?
4   Q.  Yes.
5   A.  Yes.
6   Q.  Do you know if anybody else held that
7 manager of key accounts position at the time you
8 did?
9   A.  There was no one in T3 who held that
10 title.
11   Q.  Was there anybody that held the
12 relationship manager position while you held that
13 title?
14   A.  Not to my knowledge.
15   Q.  Were there other people servicing
16 accounts or manage -- you know, with the
17 relationship --
18   A.  Not from a non-sales perspective in
19 telematics, no.
20   Q.  Okay.
21   A.  Yeah.
22   Q.  And looking at Exhibit 4 here, on the
23 second page there, that's your signature?
24   A.  Yes.
25   Q.  And it appears to be Kris Dunn's

1 signature above?
2   A.  Yes.
3   Q.  You can set that aside.
4   A.  Okay.
5        MR. JARROLD:  Let's mark this
6 Exhibit 5.
7        (Exhibit 5 marked for
8        identification.)
9        THE WITNESS:  Thank you.
10   Q.  (By Mr. Jarrold)  All right.  I've handed
11 you what's been marked Exhibit 5, Bates number
12 Equipmentshare/Anderson 54 and 55.  Have you seen
13 this document before?
14   A.  Yes.
15   Q.  And what is this?
16   A.  This is a position change from manager of
17 key accounts to manager of customer success and
18 professional services with a pay increase from
19 $70,000 to 75,950 and eligibility to receive
20 additional compensation.
21   Q.  Okay.  So we discussed that you held the
22 role of manager of key accounts starting sometime
23 around the beginning of July 2021 --
24   A.  Yes.
25   Q.  -- reporting to Kris Dunn, correct?

16 (Pages 58 - 61)

Veritext Legal Solutions
www.veritext.com                                    888-391-3376
Case 4:24-cv-00531-BCW   Document 30-2   Filed 05/16/25   Page 17 of 91

1    A.   Correct.
2    Q.   And then this reflects that you moved to
3  a position called manager of customer success as
4  of January 1, 2022; is that correct?
5    A.   The effective date on the position/pay
6  change form says 1/1, and the email says
7  January 10th.
8    Q.   So sometime in January 2022, that's when
9  you moved to the manager of customer success
10  position?
11    A.   That's correct.
12    Q.   Did you hold any other roles between
13  manager of key accounts and manager of customer
14  success?
15    A.   No, I did not.
16    Q.   Okay.  And this was a promotion to
17  manager of customer success?
18    A.   Correct.
19    Q.   And it came with an increase in
20  compensation from $70,000 annually to $75,950
21  annually?
22    A.   Yes.
23    Q.   And potentially some additional
24  compensation as well?
25    A.   Yes.

1    Q.   And if we're looking at
2  Equipmentshare/Anderson 55, is that your signature
3  there at the bottom?
4    A.   Yes.
5    Q.   And that's Kris Dunn's there?
6    A.   Correct.
7    Q.   And when you started in this role as
8  manager of customer success, did you report or
9  continue to report to Kris Dunn?
10    A.   Yes.
11    Q.   Did you interview for this position?
12    A.   No.
13    Q.   Did you express an interest in this
14  position --
15    A.   No.
16    Q.   -- or was -- okay.  That's fine.
17        Were you -- is it your understanding that
18  you were selected for this role?
19    A.   Yes.
20    Q.   Do you know who selected you for the
21  role?
22    A.   Kris Dunn.
23    Q.   Okay.  Were you ultimately pleased with
24  moving to this role?
25    A.   Yes.

1    Q.   Okay.  Tell me about the job
2  responsibilities of this new role, manager of
3  customer success.
4    A.   It was a brand new team created by Kris
5  Dunn under different management.  When I came in
6  my job was to hire additional personnel, train
7  them on the T3 platform, craft what their job
8  responsibilities were going to be, what the team
9  was going to accomplish, the goals, the metrics,
10  the standards, the processes, procedures,
11  policies, the systems that we would use to
12  implement the role.  How we'd integrate the
13  systems that we had to help the team complete the
14  role.  And then to strategically subdivide the
15  team based on strengths into trainers,
16  coordinators, success associates, train them up
17  and help them again be an internal liaison between
18  our product support operations teams and the
19  client that they were assigned to based on
20  territory.
21    Q.   Did you have subordinate employees in
22  this position?
23    A.   I did.
24    Q.   How many reports did you have as a --
25  approximately 'cause I understand that these

1  things can change over time certainly.
2    A.   I think I started with 7 and in the end
3  it was over -- it was around 30.
4    Q.   Okay.  And what were your reports doing?
5  What was -- what was -- what were their job
6  focuses?
7    A.   When I was strictly over customer
8  success, so just that arm 'cause sales success
9  came later.  But for customer success we had
10  customer success associates, customer
11  training associates, and customer success
12  coordinators.  Those three different positions did
13  different things.
14    Q.   Were all these roles -- or was the focus
15  of this customer success team, was it on
16  post-sales work with customers?
17    A.   That is correct, for the most part.
18    Q.   Some -- what -- what was there apart from
19  post-sales work --
20    A.   In the --
21    Q.   -- with customers?
22    A.   At some point success associates were
23  asked to start being involved in pre-sale calls
24  with the customers to kind of help them get over
25  the finish line by virtually joining a meeting and

1 being like I'm your -- you got all the support,
2 I'm -- I'll be your dedicated customer success
3 associate. And a lot of times that -- the
4 professional services arm of what I created and
5 managed was kind of what helped the sale. So I
6 would say that that's why they would -- that's why
7 I would say they were involved in some pre-sale
8 activity with the customer. And sometimes we'd --
9     Q. Understood.
10    A. -- give them concessions prior or demo
11 would be the correct terminology. And so we would
12 actually have success associates serving prior to
13 the sale as well. But for the most part
14 post-sale.
15    Q. Uh-huh. How was customer success
16 different from customer support or, you know, T3
17 support?
18    A. Yeah. Customer success is more about
19 onboarding the customer to the platform and then
20 managing the life cycle. Whereas, support is
21 there to help with technical needs, beyond working
22 with engineers and product support folks to
23 resolve technical -- mostly technological or --
24 issues that customers were having in the platform.
25    Q. Was there a customer success group prior

1 to your moving into this manager of customer
2 success position to your knowledge?
3     A. Yes. It was that group but it was
4 managed by -- it was created by Kris Dunn with the
5 direction of Trish Williams for a little bit
6 before I took it over.
7     Q. And so you were promoted to manager of
8 customer success as Trisha Williams moved to
9 manager of T3 support?
10    A. Correct.
11    Q. Okay. Did anyone else hold a manager of
12 customer success position while you were in that
13 role?
14    A. No.
15    Q. Did anybody else do the same work as you
16 as a manager of customer success?
17    A. Not to the full extent, no.
18    Q. Some people may have done some of it?
19    A. Sure.
20    Q. In what -- in what positions?
21    A. Well, we had leads who would help when
22 they got trained up to help offer the kind of
23 training and support that I would typically be the
24 only one offering. But if I was tied up in
25 meetings, they would be the go-tos. And then we

1 had Cynthia Butler as a -- her title escapes me,
2 but she sort of did -- I guess it's not -- but
3 she -- she really helped Trish with all the
4 training and getting folks, like, ready to be
5 success associates prior to me coming in. And so
6 I leaned on her to help me split the duties of
7 training all of these new team members and things
8 like that.
9         But as far as like the managerial
10 personnel management, supervisory type of roles,
11 you know, nobody else held that besides me.
12    Q. Okay. Do you know how many people --
13 well, let me ask you this: When you were -- when
14 you moved into the manager of key accounts role in
15 July -- approximately July of 2021, do you know
16 what Kris' title was?
17    A. I believe at that time he would have been
18 senior director of T3 sales.
19    Q. Okay. Do you know who Kris was reporting
20 to at that time?
21    A. When he promoted me into -- I'm sorry.
22    Q. When you -- when -- when he was
23 supervising you as manager of key accounts.
24    A. He reported to Willy Schlacks.
25    Q. And who is Willy Schlacks?

1     A. The co-owner. And I don't know if he
2 took president or CEO of the company.
3     Q. One of the two brothers who created the
4 company?
5     A. Yeah. Founder.
6     Q. Okay. And when you were manager of
7 customer success beginning sometime in January of
8 2022, throughout that time is it your
9 understanding Kris Dunn was senior director of T3?
10    A. Yes.
11    Q. Do you know if he held any other
12 positions?
13    A. I mean, he could have been director of
14 sales of T3 or senior director of -- director of
15 T3 sales or senior director of T3 sales.
16    Q. Okay. Did -- other than you, did he have
17 any other direct reports?
18    A. Yes.
19    Q. Okay. What roles also reported to him --
20    A. Yeah.
21    Q. -- in -- in as -- when he was in that
22 director or senior director of T3?
23    A. Jared Johnanning would become the
24 manager -- Jared Johnanning, sales engineer.
25        Do you want names or do you want the

1 roles?
2   Q. Just the roles.
3   A. Sales engineering manager and sales
4 engineers. Sales managers and sales
5 representatives. Customer success manager and
6 success associates, trainers, coordinators. Sales
7 support managers, billing specialists.
8   Q. And it -- and it sounds like you're
9 describing all the positions that flow up to
10 Kris --
11   A. Sorry, you asked for --
12   Q. -- to Kris Dunn. But just the people
13 that are directly underneath him and -- and not
14 specifically the people, but the roles --
15   A. Yeah.
16   Q. -- that were directly underneath Kris
17 Dunn.
18   A. A director of sales, a manager of sales
19 engineering, a manager of customer success, and
20 I'm not -- and there may have been one other.
21   Q. Okay. So three to four reports
22 potentially?
23   A. Yes.
24   Q. Of which you were one?
25   A. Wait. And customer support manager. So

1 four to five. Well, Penny was a direct -- six.
2 Office manager.
3   Q. Okay.
4   A. And you know what, operations manager,
5 Ben Wilson, might have reported to him, too. They
6 separated and -- at some point, I believe. He
7 could have been separate at that point, I -- I'm
8 not sure.
9   Q. Okay. So you believe that a director of
10 sales, manager of sales engineering, manager of
11 customer success, customer support manager, office
12 manager, and maybe operations manager reported to
13 Kris Dunn while he was director or senior director
14 of T3?
15   A. Yes.
16   Q. And all those positions did very
17 different work?
18   A. Yes.
19   Q. Now, the manager of customer success
20 position that you moved into in January of 2022,
21 you held that role till the end of your employment
22 with EquipmentShare, correct?
23   A. Yes.
24   Q. Okay. Now, at some point as manager of
25 customer success, did your supervisor change away

1 from Kris Dunn?
2   A. No.
3   Q. You reported to Kris Dunn throughout the
4 time that you were manager of customer success?
5   A. Yes.
6   Q. Okay.
7   A. Oh, I'm so sorry. Jerry Lasley became my
8 manager.
9   Q. And I wasn't trying to trick you.
10   A. No, I just like had a moment.
11   Q. Do you know when Jerry Lasley became your
12 manager?
13   A. It -- it was in -- I want to say it
14 was in Q -- it was in Q2 or Q3 of 2022.
15   Q. And what was Jerry Lasley's role at that
16 point?
17   A. He was the director of sales.
18   Q. Do you know who made the decision to
19 change your supervisor from Kris Dunn to Jerry
20 Lasley in Q2 or Q3 of 2022?
21   A. Yes.
22   Q. Who?
23   A. Kris Dunn.
24   Q. Okay. Do you know why Kris made that
25 change?

1   A. Yes.
2   Q. Why?
3   A. Because Jerry Lasley wasn't performing
4 and meeting metrics as a sales director. He --
5 and so he found a new role for him.
6   Q. So when Jerry Lasley became your
7 supervisor in 2022, was that part of a job change
8 for Jerry?
9   A. Yes.
10   Q. And Jerry had been in a director of sales
11 role?
12   A. Correct.
13   Q. What position did Jerry move into, if you
14 know?
15   A. A newly-created position of director of
16 sales success and customer success.
17   Q. And you think that that change occurred
18 sometime in Q2 or Q3 of 2022?
19   A. Yeah, I think it -- somewhere between
20 March -- through -- in March or July and I --
21 because we were doing a quarterly visit with all
22 of our teams across the country. I was holding a
23 quarterly visit when I found out. And that's kind
24 of like the marker and I would have it every
25 quarter. So that's why I think it was like March

1 or July sometime when -- during that period.
2  Q.  Did somebody move into the director of
3 sales position that Jerry was holding --
4  A.  Yes.
5  Q.  -- after Jerry?
6  A.  Yes.
7  Q.  And who was that?
8  A.  Jesse Johnsey.
9  Q.  Jesse is a male or female?
10  A.  Jesse is a male.
11  Q.  And you think -- did Jesse move into that
12 role also around Q2 or Q3 of 2022?
13  A.  He moved into that role as soon as Jerry
14 was transitioned out of it.
15  Q.  Okay.  Do you know what Jesse's position
16 was prior to director of sales?
17  A.  Like a T3 sales representative or
18 something comparable to that.
19  Q.  Okay.  Reporting to Jerry --
20  A.  Yes.
21  Q.  -- if you know?
22  A.  Maybe.  I don't know.
23  Q.  Okay.  And that director of customer
24 success and sales success role did not exist prior
25 to Jerry moving into it?

1  A.  It did not.
2  Q.  And Jerry Lasley, you're familiar he --
3 well, are you aware he started with the
4 organization November 2016?
5  A.  Yes.
6  Q.  Okay.  And he started as a director of
7 telematic sales?
8  A.  I do not know what his position or
9 start --
10  Q.  Okay.
11  A.  -- title was when he started.
12  Q.  Okay.  All right.  Looking at -- have I
13 given you that?
14  A.  No.  Position change.
15  Q.  No, I haven't.  We haven't marked this
16 yet.  Okay.
17  A.  It's 5?
18     MR. JARROLD:  Mark this as
19 Exhibit 6.
20     (Exhibit 6 marked for
21     identification.)
22     THE WITNESS:  Thank you.
23  Q.  (By Mr. Jarrold)  And I'm handing you
24 what's been marked as Exhibit 6 and that's
25 Equipmentshare/Anderson Bates number 53.  Go ahead

1 and take a look at that document.  Do you
2 recognize this document?
3  A.  Yes.
4  Q.  And what is it?
5  A.  This is a pay change form that increased
6 my salary based on meeting and exceeding
7 expectations during my annual review.
8  Q.  Where does it say meeting and exceeding
9 expectations in your annual review?
10  A.  It will be on the annual review document.
11  Q.  But this document doesn't say anything
12 about that.
13  A.  Okay.  This is a raise that came on my
14 annual review date of 11/5/2018.
15  Q.  That's your hire date, right?
16  A.  My hire date is 11/5/2018.  And my annual
17 review was completed on 11/4.  And this form, if I
18 recall, backdated the pay to change it based on an
19 annual review that I had completed with Jerry
20 Lasley.
21  Q.  Okay.
22  A.  Signature 11/4 and 11/5 respectively.
23  Q.  Okay.  And that's your signature there
24 next to "Employee Signature"?
25  A.  Yes.

1  Q.  Okay.  And where it says "Manager
2 Signature," is it your understanding that that's
3 Jerry Lasley's signature?
4  A.  Yes.
5  Q.  All right.  And effective as of
6 October 31st, 2022, your pay was increased from
7 $75,950 annually to $80,000 -- $80,200 annually,
8 correct?
9  A.  That's correct.
10  Q.  Okay.  And is it your understanding that
11 that was a decision by Jerry Lasley?
12  A.  Yes.
13  Q.  Okay.  Now, in all of these positions,
14 one thing that you didn't discuss is where are you
15 physically working.
16  A.  Uh-huh.
17  Q.  After you moved out of the rental
18 coordinator role and -- and switched over to Track
19 or T3 --
20  A.  Uh-huh.
21  Q.  -- telematics, whatever you want to call
22 it, were you always working in the same physical
23 location?
24  A.  No.
25  Q.  Okay.  What locations did you work in

1 after you switched out of the rental coordinator
2 role?
3    A.   After I switched out of the rental
4 coordinator role, I started at the downtown Track
5 office located in a shared co-working space off of
6 Main Street.  And then at some point we
7 transitioned out of that space into the 108 Abbie
8 warehouse space in Kansas City, Kansas.  And
9 during the pandemic and a little thereafter, I was
10 remote and remained as a hybrid model, so I worked
11 from home and at 108 Abbie.
12    Q.   In that hybrid model, did you maintain
13 that through the end of your employment?
14    A.   Yes.
15    Q.   How frequently were you in the office
16 generally in the hy -- as a -- in the hybrid
17 model?
18    A.   One to two days a week.
19    Q.   Okay.  And when did you go from fully
20 remote to that hybrid model?  Approximately.  I
21 know you're not going to have -- you're probably
22 going to have difficulty pinpointing the date.
23    A.   I remember being in the office when I was
24 a key account manager.  So it would have been
25 prior.  I -- I believe -- you know, I would have

1 been back at 108 Abbie during the summer of 2021.
2 But yeah, after -- after the pandemic there was
3 never a requirement to return in office full-time
4 five days a week, so...
5    Q.   When you were a -- when you were a sales
6 support manager, were your supervisors also in
7 that location with you?
8    A.   Yes.
9    Q.   Okay.
10    A.   At the downtown co-working space off of
11 Main Street.
12    Q.   And when you were a relationship manager,
13 were your supervisors in the same location as you?
14    A.   Yeah, at the 108 Abbie location.
15    Q.   And when you were manager of key
16 accounts, was Kris Dunn in that same location as
17 you?
18    A.   At 108, yes.
19    Q.   And when you were manager of customer
20 success, was Kris Dunn in the same location as
21 you?
22    A.   Yes.
23    Q.   Was Jerry Lasley in the same location as
24 you?
25    A.   Yes.

1    Q.   Now, at some point your supervisor
2 changed and Jerry -- you testified that initially
3 as manager of customer success, Kris Dunn was your
4 supervisor and then it switched to Jerry Lasley,
5 correct?
6    A.   Correct.
7    Q.   And then at some point it switched back
8 to Kris Dunn; is that correct?
9    A.   That's correct.
10    Q.   Did you have any other supervisors as
11 manager of customer success?
12    A.   No.
13    Q.   Okay.  Do you know when you switched back
14 to reporting to Kris Dunn as manager of customer
15 success?
16    A.   I do not have a date.
17    Q.   Was it before --
18    A.   It was around the time --
19    Q.   -- or after Jerry Lasley's employment
20 ended?
21    A.   It was after Jerry's employment ended.
22    Q.   Okay.  So your supervisory change back to
23 Kris Dunn was part of Jerry Lasley's employment
24 being ended?
25    A.   Yes.

1    Q.   Okay.  And if I told you that Jerry
2 Lasley's employment ended -- sorry, bear with me,
3 trying to find it.  If I told you Jerry Lasley's
4 employment ended in February of 2023, would that
5 sound correct?
6    A.   Yes.
7    Q.   And so sometime in February 2023, you
8 report -- you moved back to reporting to Kris
9 Dunn?
10    A.   Yes.
11    Q.   Okay.  All right.  So to round out our
12 review of your positions and --
13    A.   Uh-huh.
14    Q.   -- compensation, I'll show you Exhibit 7.
15        (Exhibit 7 marked for
16        identification.)
17    Q.   (By Mr. Jarrold)  You can set -- you can
18 set all those aside.
19    A.   Thank you.
20    Q.   All right.  I'm showing you what's been
21 marked as Exhibit 7.  And this is
22 Equipmentshare/Anderson Bates numbers 191 through
23 194.  Let's just start with that first page.
24        Just looking at the first page, does this
25 appear to be a Slack message from you to Kris Dunn

21 (Pages 78 - 81)

Case 4:24-cv-00531-BCW    Document 30-2    Filed 05/16/25    Page 22 of 91

1 dated April 20th, 2023?
2    A.   Yes.
3    Q.   Okay.  Feel free to take a look at this,
4 but you're requesting that -- well, you say in the
5 first line:  I also wanted to formally ask for
6 review of my current salary should my role not be
7 changing soon.
8         Right?
9    A.   Yes.
10    Q.   Okay.  And then if you go down to the
11 second paragraph, you state that -- under stats,
12 it says, "The median salary for CS manager is
13 $114,577."
14         Where did you get that information?
15    A.   I did research through the website
16 Glassdoor primarily.
17    Q.   And when you say "CS manager," what is --
18 what is the CS there?
19    A.   Customer success.
20    Q.   Okay.  And this median salary -- well,
21 this figure, $114,577, that's for customer success
22 managers throughout Kansas City, not specifically
23 EquipmentShare, correct?
24    A.   Correct.
25    Q.   Okay.  And -- and again, you were the

1 only customer success manager at EquipmentShare --
2    A.   Yeah.
3    Q.   -- right?
4    A.   Yes.
5    Q.   Okay.  And why were you making this
6 request?
7    A.   I was making this request because I was
8 approached on two different occasions by Kris Dunn
9 asking me if I would be interested in the director
10 position and -- as well as being offered benefits
11 and stock options.  And the offers never
12 materialized into fruition.  And at the time I was
13 managing 26 individuals, but I was more so
14 directing than I was managing.  And so I felt
15 like -- and then I learned that through -- I
16 learned that team members who were not in
17 management positions started off making more than
18 what I was making and I wanted to be compensated
19 based on the value that I thought that I brought
20 to the organization.  If no other changes that
21 were presented to me were going to take effect, I
22 wanted to at least be paid equitable of what I
23 deserved.  Like, what I felt like I deserved based
24 on my work ethic, my experience, my knowledge
25 base.

1    Q.   Okay.  Had you requested a pay increase
2 from Kris prior to this?
3    A.   I had not.
4    Q.   Okay.  And then if you look at the next
5 page, Bates number 192, those are additional Slack
6 messages between you and Kris Dunn, correct?
7    A.   Correct.
8    Q.   And does it sound right that your message
9 at the top was sent April 24th, 2023, just based
10 upon Kris' response as of April 25th, 2023?
11    A.   Yeah, it would have been between
12 April 20th and April 25th it appears.
13    Q.   Okay.  Did you have any further
14 conversations with Kris between April 20th, 2023,
15 and this message here on 192?
16    A.   I don't know.
17    Q.   Okay.  And in this message to Kris you
18 indicate your current salary is $80,200, right?
19    A.   Correct.
20    Q.   And proposed salary is $90,200?
21    A.   Then we did talk because he came up with
22 that number.
23    Q.   Okay.  Do you recall anything about that
24 conversation that you had with Kris?
25    A.   Yeah, and I apologize 'cause I couldn't

1 remember if that conversation took place before
2 the April 20th message, so I wanted to be
3 completely honest.
4    Q.   Sure.
5    A.   But yeah, in that conversation I had
6 mentioned to him, Hey, you know, you've -- you've
7 proposed this director level position, you
8 proposed additional benefits or stock options and
9 quarterly bonuses and those have not yet come to
10 fruition.  And I asked him, you know, What's the
11 holdup?  You know, is there anything that's
12 preventing this from happening?
13         And he's like, "No, I just got to do it.
14 I just got to do it.  I got -- I just got to get
15 it to Willy because he's got to approve it.  I
16 just haven't got it done."  And it just didn't
17 happen.
18         So in a call with him I'm, like, Look, if
19 you aren't comfortable making me a director yet,
20 even though you've offered it, and we're kind of
21 at a standstill on that effort, then can I at
22 least have supervisors to support me?  Because
23 managing a team of 26 is a lot.  And because I had
24 become a sales success manager along with a
25 customer success manager, I took on a second team

1 when Jerry left without a pay increase or title
2 change.
3          So I asked if I could be paid more to
4 represent the workload and the increased
5 responsibility without the title change. In
6 addition to that, I asked for supervisors without
7 a title change so that I could actually help what
8 needed to happen which was to technically direct
9 the team without a title. So the supervisors
10 would help with more of the day-to-day management
11 while I was able to get more into system
12 integration, a new ERP system that I was tasked to
13 be a part of and miscellaneous other, you know,
14 building blocks of -- of the team.
15    Q.   Uh-huh.
16    A.   Yeah.
17    Q.   What was the team that you ended up
18 taking on as a result of Jerry Lasley leaving?
19    A.   Sales success.
20    Q.   And how big was that team?
21    A.   That team was about, I want to say -- so
22 you had one, two, three...
23          I want to say about six or seven.
24    Q.   What kind of -- what roles were
25 encompassed within that team?

1    A.   Well, when I took it over, I changed the
2 strategy and the goals for the team to make it
3 more effective for our customers. But
4 effectively, their job was one part billing.
5 There was, like, a sub-billing team under sales
6 success and one part operations which was not --
7 working with the operations team on, like, returns
8 of devices, line cancellations, very
9 administrative back end sort of items.
10    Q.   Uh-huh.
11    A.   And then billing components. So billing
12 T3 was separate than EquipmentShare billing.
13    Q.   Did your -- did the structure -- so after
14 you inherited the reports under Jerry Lasley --
15    A.   And I did inherit them before Jerry
16 Lasley left. He asked me to take over the team
17 when Mary --
18    Q.   Okay.
19    A.   -- McClanahan transitioned. And at no
20 change -- no change in title or pay. Just asked
21 me to --
22    Q.   Did he have anyone else underneath him
23 other than this team of six or seven?
24    A.   So, yeah, before -- so he -- his direct
25 reports --

1    Q.   Uh-huh.
2    A.   -- prior to Mary McClanahan transitioning
3 to the rental side was Mary McClanahan and myself.
4 She was the manager of sales success, I was the
5 manager of customer success. She took on a new
6 job and he asked me to become a manager of both
7 teams, the customer success and sales success.
8    Q.   When was that?
9    A.   It would have been prior to February, his
10 departure. It could have been at the -- it might
11 have been December of the prior year. We'd have
12 to see when Mary transitioned in 2021. It would
13 have been -- and so we have a -- I have a text
14 exchange where he's asked -- where he's, like,
15 should we announce it that you're going to be the
16 interim sales success manager so we could...
17    Q.   So looking back at Exhibit 7 -- well,
18 and -- and we were discussing previously that you
19 had had a conversation with Kris Dunn about -- you
20 know, separate and apart from the Slack
21 conversations, you had had a conversation with
22 Kris Dunn about increasing your compensation --
23    A.   (Witness nods.)
24    Q.   -- because of the responsibilities that
25 you were handling and your view of your

1 performance?
2    A.   Yes.
3    Q.   Okay.
4    A.   Yes.
5    Q.   Do you know when that conversation with
6 Kris Dunn happened? Would it have been before or
7 after this April 20th, 2023 Slack message?
8    A.   I -- I was -- before. Kris had given me
9 a heads-up that things with Jerry's role might be
10 changing. And so he asked if I would -- if I'm
11 interested in the director level position. It was
12 at that time that he said it would start at a
13 hundred thousand dollars and it would come with
14 stock options and bonus potential. And said that
15 things might be changing, hold tight.
16          And then there was a second conversation
17 after Jerry's departure in February but before
18 this April date where, again, he's like "Let's go
19 to Con Expo. Let's let the dust settle from
20 Jerry's departure and then let's pick up the
21 conversation about the director level position."
22    Q.   Okay. So two conversations with Kris
23 Dunn about this -- Jerry's role or the director
24 role?
25    A.   Three -- can you be more specific?

23 (Pages 86 - 89)

1  Q.  Sure.  When did -- you indicated that
2  Kris gave you a heads-up that Jerry's role might
3  be changing.  Do you know when --
4  A.  (Witness nods.)
5  Q.  -- that conversation took place?
6  A.  I want to say that it was potentially
7  January sometime of 2022 Or 2023.
8  Q.  Did he give you any indication of what
9  that meant, his role might be changing?
10  A.  He didn't specifically state what that
11  meant.
12  Q.  Did he imply that Jerry's employment
13  might be ending?
14  A.  Yeah, he just said that, you know, "We've
15  noticed in leadership meetings you're presenting
16  everything."  He comes each week.  He's not --
17  he's not doing the job that I've asked him to do
18  effectively.  And when he found out that Jerry
19  made me sales success manager as well without
20  consulting him, he was frustrated and said he
21  actually intentionally told Jerry that it's
22  Jerry's job to manage the sales success team when
23  Mary McClanahan left.  So when he found out that
24  he made the decision to have me be interim, that
25  frustrated him.  And overall he was becoming

1  frustrated with Jerry's performance or lack
2  thereof.  So that part -- that was part of that
3  conversation.
4  Q.  Okay.  And you think that the first
5  indication by Kris to you that Jerry's role might
6  be changing was in January of 2023?
7  A.  Yes.
8  Q.  And I want to go back because, you know,
9  ultimately what -- what -- what I was asking was,
10  what conversations you had with Kris Dunn
11  about increasing your compensation and the times
12  in which you discussed that, right?
13  A.  Right.
14  Q.  Obviously, there's a Slack message from
15  April 20 of 2023.  How many -- outside of the --
16  how -- how many conversations do you recall having
17  with Kris about changing your compensation?
18  A.  Over the -- like in a -- in a Slack or --
19  we didn't use Zoom.  It was like a Zoom type.  It
20  wasn't Teams either.  But we had a virtual call.
21  Q.  Uh-huh.
22  A.  And that -- that's the call we discussed.
23  And I -- I apologize, but part of that
24  conversation that I forgot to mention was about
25  the discovery of pay inequity that came after

1  talking to HR.  So yeah, part of that conversation
2  included like, Hey, I -- I didn't get the director
3  position you asked for.  I also have noticed that
4  there's pay inequity.  And if you're not going to
5  do either one of those, could I be more -- paid
6  more equitably based on my position?  And can I
7  have supervisors, please?
8  And that was the crux of that
9  conversation.  If there was any other Slack
10  messages, there could have been, and that may not
11  be in the exhibit today, but that would be like
12  the one conversation like virtually that we had.
13  Q.  So there was one conversation with Kris
14  about changing your compensation?
15  A.  To my knowledge, yes, to my remembrance.
16  Q.  Do you recall when that was?
17  A.  It would have been before and I think --
18  I -- I think it's written down in Cindy's notes
19  potentially because she might have -- I think she
20  put the date because I called her.  I'm saying
21  that the dates might be more readily known if we
22  -- if we were to defer to her notes --
23  Q.  Sure.
24  A.  -- because she would have dated.  That
25  would have placed the timing for me.  But it would

1  have been before -- it would have been before
2  April 20th and it would have been after February.
3  So...
4  Q.  Okay.  Sometime after February but before
5  April 20th, you had one conversation with Kris
6  about compensation change?
7  A.  Yes.
8  Q.  Okay.  Was anybody else involved in that
9  conversation?
10  A.  No.
11  Q.  And what -- you referred to something
12  about pay equity.  What are you talking about
13  there?
14  A.  Well, there were two instances before
15  that --
16  Q.  Uh-huh.
17  A.  -- that I discovered that
18  similarly-situated males or men who had positions
19  without management were making more money than I
20  was.
21  Q.  Okay.  What positions?  Or who
22  specifically are we talking about?
23  A.  A sale -- a sales manager.  His name was
24  Jon, J-o-n, J-o -- yeah, J-o-n.  Last name is
25  escaping me.  He still works there today.  He left

1 his -- I always get W-9 and W-2 mixed up, but
2 the -- form that states what he made the prior
3 year, he left that on a printer at 108 Abbie. And
4 I had discovered it when I went to go print
5 something, and I immediately discarded it. And we
6 have a paper waste discardment box, so I discarded
7 it and I made Jesse Johnsey and Kris Dunn aware
8 that I had found it and that I had discarded it
9 safely so that no other employee could see this
10 private information.
11 Q. Uh-huh.
12 A. And that was the first instance. And
13 then the second -- and I -- and his salary on
14 that, I think, was 110. It was six figures. And
15 he was just newly hired that prior year.
16 And then -- and then I helped Jerry
17 Johnanning conduct a series of interviews for
18 potential sales engineers that would be reporting
19 to Jerry Johnanning. And on one of these
20 interviews at the end, the applicant, the
21 interviewee, asked information about salary and
22 benefits, and Jerry Johnanning told him that the
23 base salary starting pay was, I believe,
24 $90,000 --
25 Q. Uh-huh.

1 A. -- plus bonuses. Bonus potential.
2 Q. Okay.
3 A. And those two instances led me to
4 understand that there was pay inequity in -- in
5 the workplace.
6 Q. Okay. So the first instance of you
7 seeing someone making more money than you is this
8 individual Jon when you saw his W-2?
9 A. Jon, yes.
10 Q. What was Jon's last name?
11 A. It escapes me.
12 Q. Okay. And what position do you believe
13 Jon held?
14 A. Sales manager.
15 Q. Was he in a sales role or sales manager
16 role?
17 A. Was he on paper or day to day? His job
18 was to manage other sales reps --
19 Q. Okay.
20 A. -- in the same way that my job was to
21 manage customer success reps.
22 Q. Okay. Do you know who Jon reported to?
23 A. Jesse Johnsey.
24 Q. Well, who is Jesse Johnsey?
25 A. Director of T3 sales.

1 Q. Okay. Do you know if there were other
2 sales managers under Jesse Johnsey beyond just
3 Jon?
4 A. Yes. There was also -- there's one
5 other. At least one other. I don't -- Kris
6 Koenig may have reported also to Jesse Johnsey.
7 Kris Koenig was the -- in charge of more inside
8 sales or, like, the BDRs, business development
9 reps. I believe Kris reported to Jesse and
10 then -- yeah, what was his buddy's name? He's
11 still there at EquipmentShare -- Jim. Jim. Jim
12 and Jon.
13 Q. Okay. And this Kris that was also a
14 sales manager, is that a male or a female?
15 A. Kris Koenig is a male.
16 Q. Okay. And these are individuals that
17 were under the supervision of Jesse Johnsey?
18 A. Yes.
19 Q. Okay. And you didn't report to Jesse
20 Johnsey?
21 A. I did not.
22 Q. Okay. And their focus was on sales and
23 your focus was on customer success?
24 A. And sales.
25 Q. When was your focus on sales?

1 A. During Jerry's biannual review he
2 revealed that our job is also to help facilitate
3 sales.
4 Q. How was your job to facilitate sales?
5 Was that what we discussed when you might pop on
6 to calls at the end of a --
7 A. No, our phone --
8 Q. -- sales process?
9 A. Sorry. No, we would come to be
10 responsible for inputting add-on orders. The
11 customers would come -- if a customer asked a
12 customer success associate to add more lines, we
13 would be the ones responsible for that sales
14 function. And then we were also encouraged to
15 upsale. And that -- the function of our sales
16 success position, according to Jerry, was with the
17 efforts to gain additional sales. So --
18 Q. From existing customers?
19 A. Yes, from existing customers.
20 Q. Okay. So sales is bringing on new
21 customers and you-all might be trying to increase
22 the sales to existing customers --
23 A. Uh-huh.
24 Q. -- correct?
25 A. Correct.

25 (Pages 94 - 97)

1    Q.   Okay.  Do you know when you saw this
2  discarded W-2?
3    A.   I do not recall the date.
4    Q.   Would it have been in 2022, 2023?
5    A.   It would have been in 2023.
6    Q.   Okay.  Do you know what's entailed in a
7  sales manager role?
8    A.   Yes.
9    Q.   What's your -- have you ever held that
10  role?
11    A.   No.
12    Q.   Okay.  What's your understanding of what
13  a sales manager does?
14    A.   I think a sales manager is someone who
15  has been in a sales position before who can train
16  sales representatives on how to sell.
17    Q.   Okay.  Okay.
18    A.   And support them in -- in doing that.
19    Q.   Okay.  And the bulk of EquipmentShare's
20  revenue out of T3 comes from the sales group,
21  right?
22    A.   Yes.
23    Q.   Do you know what this Jon's background
24  was prior to EquipmentShare?
25    A.   I think he stayed -- I think he was --

1  not -- maybe not telematics directly, but maybe
2  telecommunications.  But sales nonetheless.
3    Q.   Came from a sales background?
4    A.   Yeah.  Yes.
5    Q.   Okay.  Do you know how long he worked in
6  sales?
7    A.   No.
8    Q.   Do you know how old he was?
9    A.   No.
10    Q.   Do you know what his educational
11  background was?
12    A.   No.
13    Q.   Okay.  Do you know who set his
14  compensation?
15    A.   No.  It would have been Jesse or Kris, I
16  suppose.
17    Q.   You don't know who would have set his
18  compensation?
19    A.   Yeah, it would have been Jesse or Kris.
20    Q.   But you don't know who would have --
21    A.   Correct.
22    Q.   -- set his compensation?
23         You suspect it may be someone specific,
24  but don't know exactly who it is?
25    A.   Just based on who the management is,

1  they're directly responsible for.
2    Q.   Okay.  You also mentioned -- so you said
3  there were two instances where you saw individuals
4  were making more money than you that were
5  concerning to you, right?
6    A.   Yes.
7    Q.   We talked about the instance or -- or
8  this individual Jon, we don't know his last name,
9  but you believe he held a sales manager role,
10  right?
11    A.   Yes.
12    Q.   And the other one you mentioned was while
13  interviewing sales -- well, go ahead and tell me.
14  This was an incident -- a situation with people
15  that Jerry Johanning was looking to hire?
16    A.   Jared Jo --
17    Q.   Oh, Jared Johnanning?
18    A.   Yeah.
19    Q.   Okay.
20    A.   He's the manager of sales engineering.
21    Q.   Do you know who Jerry -- what -- what
22  the -- who or what position the manager of sales
23  engineering would report to?
24    A.   Yeah, Kris Dunn.
25    Q.   Okay.

1    A.   Senior director of T3 sales.
2    Q.   Okay.  So the manager of sales
3  engineering would -- would report to the head of
4  T3?
5    A.   Yes.
6    Q.   Okay.  And I -- I'm sorry, you mentioned
7  it already, but go ahead and -- can you share
8  again how you came to see -- I think you said that
9  you came to learn that sales engineers started at
10  $90,000?
11    A.   Yeah.
12    Q.   Okay.
13    A.   I believe that's -- yeah.
14    Q.   Okay.  And how did you learn that?
15    A.   I was helping Jared interview a
16  candidate.
17    Q.   Okay.
18    A.   And the candidate had asked about salary
19  and Jared volunteered that information over the
20  call at the end of the interview.
21    Q.   Okay.  This was a telephonic interview
22  that you were conducting?
23    A.   Yeah, virtual.
24    Q.   Oh, okay.  Sure.  Do you know or recall
25  when you were conducting this interview?

1    A.   It would have been in 2020 -- Q1 of 2023.
2    Q.   Okay.
3    A.   Yeah.
4    Q.   Do you know what month in 2023?
5    A.   It could have been March, maybe early
6  April.  I think it was -- but it definitely was,
7  like, right before all of my concern.  You know, I
8  started -- had these conversations.
9    Q.   Sure.  Okay.  And so Jerry told the
10 applicant that the base was $90,000 as a sales
11 engineer?
12   A.   Jared did, yes.
13   Q.   Oh, I'm sorry.
14   A.   That's okay.
15   Q.   There's so many J names.
16   A.   There is, yes.  And K.
17   Q.   All right.  Now, did all the sales
18 engineers report to Jared?
19   A.   Yes.
20   Q.   Okay.  Do you know how many sales
21 engineers there were?
22   A.   There were three at the time.
23   Q.   Who were the sales engineers?
24   A.   RC Davis --
25   Q.   Okay.

1    A.   -- Kyle something, and the other
2  gentleman's name escapes me.
3    Q.   And what's your understanding of what
4  sales engineers do?
5    A.   It's just a fancy title for having
6  technical knowledge on the platform, so that when
7  you're -- their primary job and responsibility was
8  to join sales calls with the sale reps.  And when
9  customers would ask about things like integrations
10 and complex -- or just integrations.  It's
11 actually quite simple, but they'd have somebody
12 who was a sales engineer on the call to talk more
13 technically about what the platform could offer.
14   Q.   Sales engineers in your view are
15 different from sales reps?
16   A.   Yes.
17   Q.   Okay.  But a sales engineer's sole focus
18 is sales?  I mean, all they're doing is making
19 sales, right?
20   A.   They're not making sales, no.
21   Q.   Well, you said that they joined these
22 calls with sales reps --
23   A.   Yeah, like a support.
24   Q.   -- in an effort to make sales?
25   A.   I would say they're more sales support.

1    Q.   Okay.  I mean, do they have any objective
2  beyond trying to make sales?
3    A.   I don't know --
4    Q.   Okay.
5    A.   -- completely how to word it.
6    Q.   But they're not doing the customer
7  success work that you're doing?
8    A.   We're doing the customer -- we're doing
9  the sales engineering work they're doing, yes, I
10 would say, because we have to be familiar -- but
11 we're doing it post-sale.  So if the customer
12 doesn't bring it up until after, we're fielding
13 those questions, and we're responsible for having
14 knowledge about what those integrations are.
15 Instead of presenting it on the front end, we're
16 presenting on the back end --
17   Q.   Right.  Right.
18   A.   -- ramping up sale.
19   Q.   So we talked about how you-all will try
20 and maybe gain additional sales from existing
21 customers.
22   A.   Yeah.
23   Q.   And that's one aspect of your work,
24 that's not the -- the main focus, right?
25   A.   It -- it wasn't supposed to be to my

1  knowledge.  And then I got direction from Jerry at
2  some point that it needed to become the direction
3  of the team.  And after all, we were under T3
4  sales.
5    Q.   Uh-huh.
6    A.   So I sort of, like, kind of didn't
7  connect the dots, but it became more apparent even
8  with -- as discussions would go on, that we needed
9  to be more sales focused --
10   Q.   Okay.  Okay.
11   A.   -- than we were.
12   Q.   But that wasn't the primary focus of the
13 customer success group?
14   A.   Not at first.
15   Q.   Okay.
16   A.   It became.
17   Q.   It became the primary focus?
18   A.   It became, yeah.
19   Q.   And -- and when did that become the
20 primary focus?
21   A.   When -- well, at some point customer --
22   Q.   When Jerry told you, Hey, you need to --
23 this needs to be the focus?
24   A.   Yeah, I guess could you say that in --
25 that's in an official capacity, but just like

27 (Pages 102 - 105)

1 through meetings with Kris and Jesse. And --
2    Q. Did Kris backtrack on it after -- did
3 Kris dial that back after Jerry left?
4    A. No.
5    Q. Okay. Okay. Did you have any men on the
6 customer success team?
7    A. Yes, a few.
8    Q. Who were doing this post sale or, you
9 know, existing customer sales work?
10    A. Yes.
11    Q. Okay. Are you aware of any females that
12 held the sales engineer role?
13    A. No.
14    Q. Are you aware of any females that held
15 the sales manager role?
16    A. No.
17    Q. Okay. Before we break, I just -- so
18 looking at Exhibit 7, if you look at Bates number
19 192, so you say current salary $80,000, 200 -- or
20 $80,200. Proposed salary, $90,200 --
21    A. Uh-huh.
22    Q. -- in that message to Kris Dunn which was
23 presumably sent April 24, 2023, right?
24    A. Uh-huh.
25    Q. Yes?

1    A. I'm so sorry. Yes.
2    Q. And then the next day, April 25th, 2023,
3 Kris responds "Submitted your increase," right?
4    A. Yes.
5    Q. Okay. So you had pitched this pay
6 increase of $10,000 --
7    A. No.
8    Q. No?
9    A. That was his number on our call.
10    Q. That was his number?
11    A. Yes. I was just --
12    Q. And we talked --
13    A. -- summarizing our conversation.
14    Q. Okay. And we talked about how you had
15 this conversation with him about compensation.
16 Was -- was there more than one -- I'm just trying
17 to understand how many conversations you're having
18 with him.
19    A. Yeah.
20    Q. So was there a conversation with -- was
21 there a second conversation with Kris after
22 April 20th?
23    A. So no. I think that the conversation you
24 and I are talking about happened between
25 April 20th and April 24th presumably.

1    Q. Okay.
2    A. Yeah.
3    Q. There's one conversation with Kris --
4    A. Yeah.
5    Q. -- about compensation?
6    A. Yeah, 'cause this is like, "Hey, what do
7 you think?"
8    Q. Yeah.
9    A. And then let's talk about what we think,
10 and then let's come up with what we discussed.
11    Q. Okay.
12    A. 'Cause he -- he would say, put it
13 together -- there's a text even I have that says,
14 "Write it up." For the position description,
15 there's a -- so if you count text messaging -- I'm
16 sorry, there is text messages also where he -- I
17 asked him, "Hey, if you're not going to promote
18 me, I need support. Could I have supervisors?"
19     "Write it up," he said -- and his
20 response is "Write it up."
21    Q. Uh-huh.
22    A. So that's kind of a subconversation, but
23 then we did meet virtually to talk about all this.
24    Q. Okay.
25    A. And then at the end he said, "Get -- send

1 everything to me so I can see it."
2    Q. So we think there was one conversation,
3 the conversation we've been talking about with
4 Kris Dunn about compensation --
5    A. Yes.
6    Q. -- that occurred, we believe, sometime
7 between April 20th and April 24th, 2023?
8    A. Yes.
9    Q. After you sent that initial Slack message
10 where you indicate -- you talk about median
11 salary?
12    A. Yes.
13    Q. Okay. And Kris was the one who said --
14 who -- who threw out the $90,000 -- $90,200
15 figure?
16    A. He said, "I can't do six figures, but we
17 could do that."
18    Q. Okay. Did he say why he couldn't do six
19 figures?
20    A. Because directors start at a hundred
21 thousand.
22    Q. Okay.
23    A. And I was a manager.
24    Q. Okay. Have we discussed everything that
25 transpired in that conversation with Kris Dunn?

28 (Pages 106 - 109)

1   A.   Yes, to my remembrance.
2   Q.   Okay. And ultimately, Kris pushed for
3 and got you a approximately 10,000 raise?
4   A.   Yes.
5   Q.   Okay. We've been going over an hour. Do
6 you want to take a break?
7   A.   No, I don't need one.
8   Q.   I'm going to take one.
9   A.   Okay.
10      MR. KLINKENBORG: Yeah, no
11 objections.
12      THE VIDEOGRAPHER: Okay. We're
13 off the record at 11:55.
14      (After a brief lunch recess the
15      following proceedings were had with the
16      same persons present with the exception
17      of Lauren Perkins Allen:)
18      THE VIDEOGRAPHER: Back on record
19 at 12:19.
20   Q.   (By Mr. Jarrold) Okay. Ms. Anderson, we
21 took kind of an extended break. You understand
22 you're still under oath, yes?
23   A.   Yes.
24   Q.   Anything about your testimony so far that
25 you feel needs to be changed or is inaccurate?

1   A.   No.
2   Q.   Okay. We were last looking at Exhibit 7.
3 Do you have that in front of you?
4   A.   I do.
5   Q.   Okay. And is it your understanding that
6 in April 2023, Kris Dunn requested an increase of
7 your salary from 80,200 to $90,200?
8   A.   Yes.
9   Q.   And that was eventually approved,
10 correct?
11   A.   Yes.
12   Q.   Do you know who approved it?
13   A.   I do not.
14   Q.   Okay.
15   A.   It was in June, though.
16   Q.   Okay. But it was a request from Kris, we
17 just don't know who approved it?
18   A.   Correct.
19   Q.   Okay. We'll be talking about some of
20 that further, but for now...
21      So in this lawsuit you've asserted causes
22 of action for sex discrimination and
23 retaliation --
24   A.   Yes.
25   Q.   -- does that sound right to you?

1   A.   It does.
2   Q.   Okay. Are you aware of any other sort of
3 claims being asserted? I'm not trying to trick
4 you up.
5   A.   No, what do you mean by that?
6   Q.   You're asserting sex discrimination and
7 retaliation, yes?
8   A.   Yes.
9   Q.   Are you asserting anything else? Any
10 other sorts of claims? And we'll drill into
11 specifically --
12   A.   Okay.
13   Q.   -- what we're talking about.
14   A.   Yeah, just I think --
15   Q.   But --
16   A.   -- they're under those two umbrellas.
17   Q.   Okay. Okay. All right. Well, I first
18 want to talk about some of the complaints that you
19 claim to have made during -- during your
20 employment.
21   A.   Okay.
22      (Exhibit 8 marked for
23      identification.)
24   Q.   (By Mr. Jarrold) And I'm going to hand
25 you what we'll mark as Exhibit 8. Okay. Take a

1 look at Exhibit 8. Do you recognize this
2 document?
3   A.   Yeah, I filled it out.
4   Q.   Okay. And these are your responses to
5 EquipmentShare's interrogatories, correct?
6   A.   Yes.
7   Q.   So various questions that are to be
8 answered by you, correct?
9   A.   Yes.
10   Q.   Okay. And then if you look at the last
11 page of Exhibit 8 where it says at the top
12 Verification of Answers to Interrogatories. Is
13 that -- that's your signature there?
14   A.   I'm sorry, what page did you say?
15      MR. KLINKENBORG: You've got two
16 8s.
17      MR. JARROLD: Oh, sorry.
18      MR. KLINKENBORG: We may have done
19 that. I'm not throwing accusations as to who
20 caused the typo but there's two 8s.
21   Q.   (By Mr. Jarrold) If you look at the very
22 last page --
23   A.   I do see the last page.
24   Q.   -- where it says, "Verification of
25 Answers to Interrogatories"?

1    A.   I do see my name.
2    Q.   And is this your signature here?
3    A.   It is.
4    Q.   Okay.  And above that it says, "The below
5   named person, having been duly sworn upon her,
6   states that she has read the contents of the
7   foregoing Answers to Interrogatories and knows the
8   contents thereof and that the facts set forth
9   therein are true and correct to the best of her
10  knowledge and belief."
11       Is that correct?
12   A.   Correct.
13   Q.   Okay.  And so did you review -- you
14  reviewed these answers previously?
15   A.   I don't -- I don't think I ever went back
16  and reread my answers if that's what you're
17  asking.
18   Q.   Okay.  But when -- when the answers were
19  put together, you tried to make sure that
20  everything in there was accurate and complete?
21   A.   Absolutely.
22   Q.   Okay.  All right.  I want to look at the
23  5th interrogatory and that's on page 2 --
24   A.   Uh-huh.
25   Q.   -- do you see that?

1        And it says, "Have you ever (1) filed a
2   charge of discrimination; (2) complained (orally
3   or in writing) to anyone regarding harassment,
4   discrimination, or retaliation; or (3) threatened
5   to sue anyone (for anything, including, but not
6   limited to, discrimination, harassment,
7   retaliation, or personal injury)?  If so, please
8   state the nature of each charge, complaint or
9   threat; the date and year each charge was filed
10  complaint or threat was made; the place the charge
11  was filed or to whom the complaint; the name of
12  the company in which you were employed when the
13  charge, complaint or threat was made; the style
14  and docket number of the charge; the name in which
15  it was brought; and how the matter was resolved."
16       Okay.  And so there's an answer
17  underneath there.  And as we discussed, you --
18  you -- you tried to make sure that everything in
19  here was complete and accurate in these
20  interrogatory responses, correct?
21   A.   Yes.
22   Q.   Okay.  Go ahead and read your response.
23  You don't have to read it out loud --
24   A.   Okay.
25   Q.   -- but go ahead and review your response

1   there and then I'll ask you some questions.
2    A.   (Witness reviews document.)
3    Q.   Just let me know when you're ready to
4   talk about it.
5    A.   I'm ready.
6    Q.   Okay.  All right.  So first of all, is
7   this still an accurate response?
8    A.   Yeah, I think this is probably more true
9   of the timeline of a conversation with Kris.
10   Q.   Okay.
11   A.   I'd originally reported that it happened,
12  but --
13   Q.   And -- and -- and we'll get into the
14  details.
15   A.   I want --
16   Q.   All I wanted to know right now,
17  Ms. Anderson, is whether this --
18   A.   This all happened.
19   Q.   -- is an accurate --
20   A.   Yes.
21   Q.   And is this a complete summary of the
22  complaints that you made?
23   A.   Yes.
24   Q.   Okay.  And sorry to cut you off.  I'm not
25  trying to be rude, I just -- just -- just wanted

1   the answer to one specific question.  And we'll
2   get into what you were -- what you were talking
3   about there in a sec.  Okay.
4        So to start, it says, "I orally
5   complained to Cindy Hudson, EquipmentShare's Human
6   Resources, about Jerry Lasley's retaliatory
7   performance improvement plan resulting from my
8   reporting of preferential treatment of his son on
9   our team."
10       And then there's a break there.  I think
11  it's a comma.  Okay.  So let's just -- I just want
12  to kind of break these all down --
13   A.   Uh-huh.
14   Q.   -- right?  And we'll get -- get into some
15  details.
16       So first of all, who is Cindy Hudson?
17   A.   Employee relations in the human resources
18  department.
19   Q.   She's -- she's employed within human
20  resources at EquipmentShare?
21   A.   Correct.
22   Q.   Okay.  And Cindy is a woman?
23   A.   She is.
24   Q.   Okay.  And -- well, let's kind of
25  summarize them all first and then we'll go into

1 detail on them.
2 So you -- you talk about this performance
3 improvement plan. Then you say, his handling of
4 asking me to allow him to talk to a male co-worker
5 instead of -- instead due to nature of hygiene
6 concerns.
7 Right?
8 A. Uh-huh.
9 Q. "And his attempt to undermine my
10 leadership by proactively seeking out negative
11 responses from team members to use on said PIP."
12 Okay. So it sounds like you're talking
13 about three things that -- in that -- in that
14 sentence --
15 A. Yes.
16 Q. -- right?
17 A. In no --
18 Q. A PIP -- just hold on.
19 A. -- particular order.
20 Q. Yeah, yeah. A PIP, having -- allowing --
21 or him asking to talk to a male co-worker about
22 some hygiene concerns, and his seeking out
23 negative responses to -- to use on the PIP?
24 A. Yes.
25 Q. Okay. And you say you -- you complained

1 about those things to Cindy Hudson?
2 A. Yes.
3 Q. Okay. Was that all part of one
4 conversation with Cindy or were there multiple
5 conversations with respect to those three things
6 that we've discussed so far?
7 A. Multiple conversations.
8 Q. Multiple. Do you know how many
9 conversations?
10 A. I would say two to three.
11 Q. Okay. Okay. And then in the next
12 sentence you say: I also reported to Cindy pay
13 discrimination based on gender prior to my
14 termination in 2023. I expressed my interest in
15 speaking directly with Kris Dunn about pay to see
16 if he would consider my current wages. After the
17 discussion, Kris asked me to send him salary comps
18 which resulted in/around approximately $110,000
19 but he only agreed to increase my pay from $80,000
20 to $90,000 which was still less than the starting
21 salary of a Sales Engineer.
22 Okay. Did I read that correctly?
23 A. Yes.
24 Q. Okay. So tell me if I'm misstating this,
25 but it sounds like you're claiming there -- you --

1 you essentially made -- complained about four
2 things. You talked to Cindy Hudson about this
3 PIP. You talked to Cindy Hudson about Jerry
4 Lasley wanting to handle a hygiene issue with an
5 employee. You talked to Cindy Hudson about Jerry
6 Lasley soliciting responses from team members for
7 the PIP. And then you talked to Cindy Hudson
8 about compensation issues. Is that accurate?
9 A. It is, but I guess one thing I didn't
10 mention here was we had conversations about tone.
11 Q. Tone?
12 A. Yeah.
13 Q. You had conversations with who about
14 tone?
15 A. Well, I guess that's covered under the
16 PIP. Cindy. Cindy. I talked to Cindy about
17 discrimination based on gender, but I just want to
18 clarify, not just about pay inequity but also
19 about differential treatment based on being a
20 female manager because of feedback about tone. So
21 it's kind of all covered under what was in that
22 PIP.
23 Q. Well, it doesn't say anything in this
24 response about discrimination other than pay
25 discrimination, correct?

1 MR. KLINKENBORG: Objection. The
2 answer speaks for itself in the exhibit.
3 Q. (By Mr. Jarrold) Okay. Is there
4 anywhere in here where it mentions discrimination
5 other than pay discrimination?
6 MR. KLINKENBORG: Same objection.
7 Q. (By Mr. Jarrold) Go ahead and answer.
8 A. Can you ask the question again?
9 Q. Sure. The only reference to -- well,
10 first of all, it doesn't say anything about tone
11 anywhere in this response, correct?
12 MR. KLINKENBORG: Same objection.
13 I'll just let me standing --
14 MR. JARROLD: Sure.
15 MR. KLINKENBORG: -- if that's
16 good.
17 MR. JARROLD: Sure.
18 A. It says that I orally complained to Cindy
19 Hudson about Jerry Lasley's retaliatory
20 performance improvement plan.
21 Q. (By Mr. Jarrold) Okay.
22 A. So in that conversation that encompasses
23 us talking about tone.
24 Q. Okay. Is that the -- but -- but -- but
25 nowhere else is there anything about tone?

31 (Pages 118 - 121)

Veritext Legal Solutions
www.veritext.com                                    888-391-3376
Case 4:24-cv-00531-BCW    Document 30-2    Filed 05/16/25    Page 32 of 91

1    A.   On this specific document, in this
2 answer --
3    Q.   Okay.
4    A.   -- it does not say the word "tone."
5    Q.   Okay.  Okay.  But your testimony is that
6 when talking to Cindy about this performance
7 improvement plan, there was discussion about tone?
8    A.   Yes.
9    Q.   Okay.  Were there any other -- are you
10 claiming that you had any other discussions about
11 tone?
12    A.   It did come up with Tallese Alvarez
13 situation.
14    Q.   Okay.  Now, this question was asking
15 about all complaints of discrimination, harassment
16 or retaliation that you made in your employment.
17 I understand that you're saying that in
18 conversation about the PIP there was some
19 discussion about tone.  You mention nothing in
20 this response about Tallese Alvarez, correct?
21    A.   I did not in this -- in this --
22    Q.   Okay.
23    A.   -- summary, yeah, I did not.
24    Q.   Okay.  So are you claiming that there was
25 some sort of complaint of discrimination or

1 mistreatment that you made in connection with the
2 Tallese Alvarez situation but you failed to
3 include it in this response?
4    A.   Yes.
5    Q.   Okay.  So it must not have stuck out to
6 you?
7    A.   It did.
8    Q.   Okay.  But you --
9    A.   I thought it was covered under -- like so
10 when I was answering these questions as far as
11 like -- I was answering as though it was like a
12 summary.  So about Jerry Lasley's retaliatory
13 performance improvement plan, I did not expand on
14 what all was included in that performance
15 improvement plan.
16    Q.   Well, when was this issue with Tallese
17 Alvarez?
18    A.   This issue with Tallese Alvarez was after
19 Jerry Lasley was let go.
20    Q.   Okay.  So that would not be -- there's no
21 logical reading by which --
22    A.   Not in this document, but in other
23 documents that we have set forth in this case it
24 does make mention.
25    Q.   Okay.

1    A.   But in this one I -- I do not mention
2 tone in this specific document, you are correct.
3    Q.   Okay.  Okay.  So we talked about -- so
4 you said you complained to Cindy Hudson about this
5 PIP from Jerry Lasley.  Jerry asked me to talk
6 about -- talked to another individual about
7 hygiene concerns rather than you.  His seeking out
8 responses from team members to use on the PIP, and
9 pay concerns.  And you're also saying that you
10 talked to Cindy about tone.
11    A.   Yeah.  Which --
12    Q.   Does that encompass all the complaints
13 that you --
14    A.   Yes.
15    Q.   -- allege to have made?
16    A.   Yes.
17    Q.   Okay.  Let's break these down then.
18    A.   Okay.
19    Q.   All right.  So let's start with the --
20 with the PIP.  You say:  I orally complained to
21 Cindy Hudson about Jerry Lasley's retaliatory
22 performance improvement plan resulting from my
23 reporting of preferential treatment of his son on
24 our team.
25        Okay.  So were you ever issued a

1 performance improvement plan?
2    A.   Can you define "issued" --
3    Q.   Yes.  Were you ever placed on a
4 performance improvement plan?
5    A.   No.
6    Q.   Okay.  What are you referring to here
7 when you talk about a performance improvement
8 plan?
9    A.   One day Jerry Lasley came into my office
10 unexpectedly without setting a meeting and asked
11 if he could have a couple minutes.
12        And I was just, like, "I don't have a
13 couple minutes.  I'm getting ready to run to a
14 meeting," but he sat down anyway.  And he started
15 asking me questions about, like, a specific
16 situation and about a conversation or some
17 direction that I had with an employee who was not
18 on my team.  And started kind of digging and asked
19 questions like almost discovery questions.  So I
20 didn't know what the purpose of the meeting was
21 and so I answered him.  And I said, "I'm not sure
22 what's -- I really have to get to this meeting."
23        And he said, "Well" -- and then he's
24 like, "I have this" and he just showed it to me
25 like this (indicating) and says -- it goes on to

32 (Pages 122 - 125)

1 explain that he -- he has, like, some -- a
2 performance improvement plan for I don't know what
3 exactly. I remember I got a chance to review it
4 afterwards.
5 Q. Uh-huh.
6 A. But I -- it really was about
7 relationships or tone. You know, this theme about
8 tone or certain reports of being, like,
9 condescending and things of that nature. And so,
10 like, it covered -- he didn't have specific
11 examples for me and he did not present any names
12 or anything like that. He just said, "Hey,
13 there's been some -- I know you've been under a
14 lot of stress, but there's been some complaints,
15 here are -- here are some of the things."
16 And I -- when I realized what it was, I
17 was like, "Oh, my goodness" -- I just remember
18 saying, "Oh, my, is this -- that's what we're --
19 that's what's -- what's happening?"
20 And so I started to question him on it.
21 And then I started to say, "Now, look" -- you
22 know, because I -- I had just reported him to HR
23 after three or four different complaints from the
24 team about perceived favoritism of his son, Gabe
25 Lasley.

1 And it came off the heels of we also
2 reported Jerry, our team members -- in that
3 conversation with Kris and Cindy, I also had
4 reported that he had done -- had an inappropriate
5 meeting with myself and two other leads in which
6 he -- gosh, I don't know how much -- it's like --
7 it's just so much. I just don't know how much you
8 really want me to go into.
9 But basically I thought the PIP was
10 retaliatory. I called Jerry on the fact that I
11 thought it was retaliatory and the reasons in
12 which I thought it was retaliatory.
13 And he says, "You know what," and he rips
14 it up in front of me. And -- and then he just
15 leaves.
16 Q. Okay. Okay. Do you know when that was?
17 A. I have text messages that would date --
18 date it.
19 Q. Have you provided the text messages to
20 your attorneys?
21 A. Yes.
22 Q. Okay.
23 A. It's all on my Google drive.
24 Q. Okay. When do you believe that he
25 attempt -- or, you know, talked to you about

1 potentially issuing a PIP?
2 A. Okay, let's think. So -- well, okay, so
3 he was terminated within 48 hours of that PIP and
4 that would -- his last -- we talked about
5 February. So I would say, like, it would have
6 been late January or been in February before -- I
7 would say it was two days before the date of his
8 termination in February.
9 Q. Okay. So January or February is when he
10 came and attempted to issue this PIP to you?
11 A. Yes.
12 Q. Okay. And you told him you believed it
13 was retaliation for what, complaints -- you say in
14 your interrogatory response that you complained to
15 Cindy about the retal -- "this retaliatory
16 performance improvement plan resulting from my
17 reporting of preferential treatment of his son on
18 our team."
19 A. So that conversation happened after
20 the -- so the PIP was issued --
21 Q. Uh-huh.
22 A. -- or not issued, but it was presented,
23 torn up, he walked out. And I immediately called
24 Kris Dunn. "Kris Dunn, this is what happened."
25 And Kris Dunn's exact words were to me,

1 "Do you feel like this was retaliatory?"
2 Q. Uh-huh.
3 A. And I said, "Yes."
4 He said, "Okay." And he hung up the
5 phone.
6 Q. Okay.
7 A. I'm assuming him and Kris -- him and
8 Cindy had a conversation, but then all three of us
9 had a post whatever conversation. And that -- on
10 that call is when I re-explained that I felt like
11 it was retaliatory.
12 Q. Retaliatory for reporting Jerry's --
13 A. Having previously reported Jerry's --
14 Q. -- preferential treatment of his son?
15 A. -- preferential treatment of his son.
16 Q. Okay. Anything else? I think --
17 A. There was a meeting -- this is kind of
18 what I was going to, like -- I didn't know if you
19 wanted me to go into.
20 Q. Go ahead and tell me.
21 A. Okay. There was a customer success -- so
22 -- okay, I had two leads on the team. They were
23 going to try something new because we talked it
24 over, we present -- I was not all on the call for
25 the whole call, I hopped off at one point. The

33 (Pages 126 - 129)

1 leads went over the customer success metrics'
2 public data that's available in HubSpot.
3    Q.  Uh-huh.
4    A.  On that call the leads asked some of the
5 team members who had not completed their specific
6 tasks yet, "Hey, when do you plan to get this
7 done? Hey, do you have a timeline on when you
8 think that you can get -- have this done?"
9       After that meeting it is assumed that
10 Gabe Lasley went to Jerry Lasley and said, "Did
11 you know that they had this meeting where we were
12 publicly asked about our tasks?"  And there was a
13 feeling and there was another -- there was -- and
14 this is further confirmed by another CSA who
15 called me directly and said, "Hey, Yulia and Haley
16 kind of called people out on this call and said,
17 Where are we with this, that and the other.  We --
18 I didn't like it."
19       And I was like, "Okay, tell me more about
20 that."  We talked through it.  And we said, okay,
21 we tried this out.  This didn't work as far as
22 just asking people in front of others, "Hey, where
23 are you on this?"
24       So we already had created a plan.  Okay,
25 that method didn't work, we're going to -- let's

1 not try that again.  Well, I -- based on Gabe's
2 report to Jerry, Jerry started doing what he
3 called skip sessions which is you skip your
4 manager to go to your next manager.  And he did
5 not interview everybody on the team, he only
6 interviewed select CSAs who happened to be part of
7 that call on that day.  Remember, there are CSAs,
8 then there's trainers and there's coordinators.
9 So he did not make an attempt to schedule this
10 with everyone, only a select group.
11       And then he showed up to this meeting --
12 or he held a meeting, did not -- as -- as a
13 manager did not tell me what it was going to be
14 about.  And then we got on the call and he
15 basically got on to the leads for how they handled
16 that call.  And said, This was inappropriate that
17 you did this.  And here's what everybody thinks
18 after that, that they don't -- they feel this way
19 or that way.
20       And we -- we left the call feeling so
21 uncomfortable and so, like, what just happened?
22 Like, we didn't get a chance to say, "Hey, Jerry,
23 like, we've actually already course corrected."
24 You know, it was more of just like a ridicule than
25 it was an opportunity for an open dialogue

1 about --
2    Q.  Uh-huh.
3    A.  -- what occurred.
4       And so that was part of, like, what I had
5 talked to Kris and -- 'cause I talked to Kris
6 about it and he was like, "You know, that's really
7 odd.  Like, he shouldn't have done that.  The way
8 that he -- the way that he spoke to you-all, like,
9 that wasn't appropriate.  I don't know.  I'm going
10 to talk to Cindy about it."  And so that did end
11 up getting brought up as well.  Like, at some
12 point I talked to Cindy about that.
13    Q.  Okay.  So it sounds like before the
14 issuance of this performance improvement plan, you
15 had conversations with Cindy and/or Kris about
16 Jerry's preferential treatment of his son?
17    A.  Yes.
18    Q.  And --
19    A.  And Jerry about it.  I told Jerry I would
20 be reporting it.
21    Q.  Okay.  And --
22    A.  I don't...
23    Q.  Are you saying that you also had
24 conversations with Cindy and/or Kris about the way
25 Jerry acted in this meeting?

1    A.  Yes.
2    Q.  Okay.  So I -- I -- I need to
3 understand --
4    A.  Okay.
5    Q.  -- each of the time you had one of these
6 conversations.
7       So when did you report Jerry's
8 preferential treatment of his son or your view of
9 him having preferential treatment of his son and
10 to whom?
11    A.  I reported it to Kris Dunn --
12    Q.  Okay.
13    A.  -- and Cindy.
14    Q.  Okay.
15    A.  I reported it first to -- I reported it
16 first to Jerry.  "Hey, Jerry, I know we've talked
17 about this in the past, I've had one too many
18 complaints now.  If I don't -- if I do not make a
19 report about this on behalf of the team, then I
20 would be showing you favoritism and Gabe, and at
21 this point I need to be fair."
22       So I just gave him a heads-up.  I said,
23 "I know we've talked about that."  This was part
24 of -- one of the concerns I had about -- of many
25 that I had about Jerry coming and being a

1 director, is that his son was already on the team.
2 And so he would be manage -- directing and in
3 charge of a team that his son was on. So that
4 already -- we already had --
5 Q. Okay. So you told Jerry --
6 A. Sorry.
7 Q. -- that you were -- you told Jerry that
8 you were going to be reporting --
9 A. Yes.
10 Q. -- this -- this issue. And what was his
11 -- his son's name was?
12 A. Gabriel Lasley.
13 Q. Okay. And what was Gabriel's position?
14 A. Customer success associate.
15 Q. Okay. So he -- Gabriel reported to you?
16 A. Yes.
17 Q. And you're saying you had -- there were
18 concerns brought to you from other team members?
19 A. Yes.
20 Q. About preferential treatment --
21 A. Yes.
22 Q. -- by Jerry towards Gabe?
23 A. Yes. (Witness nods.)
24 Q. And what were those concerns?
25 A. Well, Gabe would have, like, certain

1 And he said, "You're right. Sometimes I
2 get caught up in being dad versus boss and we do
3 have side conversations and we will stop."
4 And so I was like, "Okay, great."
5 But then after that there were additional
6 reports of just the overall frustration about the
7 dynamic of Jerry Lasley seemingly being a manager
8 who -- or a director who wasn't directing, who was
9 not involved, who was very hands off, that wasn't
10 accessible. And yet -- and because of all of
11 that, he wasn't able to kind of see who were, I
12 guess, low performers, which could include his
13 son.
14 And so they kind of felt like no matter
15 what happened, Gabe would not be at risk of any
16 sort of constructive feedback for his low
17 performance because he was a son of Jerry Lasley.
18 Q. Okay. So how many conversations did you
19 have or -- or how many conversations did you have
20 with Jerry in which you told him that you were
21 going to report him or -- or concerns about
22 nepotism?
23 A. One conversation over the phone.
24 Q. Okay. And when was that?
25 A. I do not recall.

1 information that he would know -- he would not
2 otherwise have from Jerry, heads-up, some things
3 like that if Jerry wasn't his father. Like, they
4 were having -- and then, you know, Gabe would talk
5 openly about their conversations.
6 Q. Uh-huh.
7 A. Also, the fact that Gabe was
8 underperforming. But that was another concern was
9 that there was the perception of nothing's ever
10 going to happen to Gabe because Jerry is the big
11 boss. That was a resounding feeling from multiple
12 team members.
13 Q. Okay.
14 A. And then I had my own concerns with Jerry
15 because I had said -- there was an instance, and I
16 cannot recall what it was, but it was a
17 conversation I had with Gabe that, again, he
18 had -- he had information that he should not have
19 otherwise had. And I went to Jerry and said,
20 "Jerry, it's not appropriate that Gabe has this
21 information. I just want to make sure 'cause we
22 said we were going to create space. I am between
23 you and him for a reason, to prevent the
24 appearance of favoritism. And so in order to do
25 that we really got to work together."

1 Q. And you'll recall that --
2 A. It would have been --
3 Q. -- you've testified that Jerry Lasley
4 became your supervisor in Q2 or Q3 of 2022?
5 A. Yeah. So this would have probably
6 happened sometime in 2023, like quarter one.
7 Q. Well, he was -- his employment ended in
8 February of 2023.
9 A. So it would have happened probably
10 January before he was fired.
11 Q. Okay. So in January --
12 A. And could have been --
13 Q. Hold on. So in January of 2023, that's
14 you believe when you told Jerry you were going
15 talk to human resources about nepotism issues?
16 A. It could have been, like, November,
17 December, and January.
18 Q. Okay. Okay.
19 A. 'Cause it all -- it had -- it had to be
20 very close together because everything happened so
21 fast as far as, like, the reporting and then the
22 PIP and then he's gone two days later. That's why
23 I think -- it could have even been -- so it could
24 have been in February 'cause everything felt so
25 close.

1  Q.  Okay.
2  A.  And I --
3  Q.  So sometime --
4  A.  Forgive me because it's been --
5  Q.  Sure.
6  A.  -- three -- two years.
7  Q.  So sometime between November 2022 and
8  Jerry's separation in February of 2023 --
9  A.  Yeah.
10  Q.  -- you notified him that you were going
11  to talk to human resources about concerns with
12  nepotism?
13  A.  Yes.
14  Q.  Okay.  Did you tell him that you were
15  going to be complaining about anything else?
16  A.  I don't recall.  Probably not.
17  Q.  Okay.  And then other than Jerry Lasley,
18  who did you talk to about -- if anyone, or who did
19  you complain to, if anyone, about concerns with
20  nepotism of Jerry toward his son?
21  A.  Cynthia Butler, Haley Casillas, Yulia
22  Soto, and Kris Dunn.  And I believe there was --
23  there was one more report.  I think the --
24  Q.  Okay.
25  A.  -- one --

1  Q.  Of the individuals you mentioned, all of
2  them are -- other than Kris Dunn, are your
3  subordinate employees, correct?
4  A.  Yes.  And Haley and --
5  Q.  Okay.
6  A.  -- Yulia were on the call with Jerry
7  that -- yeah.
8  Q.  Okay.
9  A.  And they -- they're the ones who --
10  Q.  I'm talking about who you complained to
11  about -- who you raised con -- who you raised --
12  A.  Oh.
13  Q.  -- concerns to about nepotism of Jerry
14  toward Gabe.
15  A.  No, no, nobody.
16  Q.  Who --
17  A.  They reported it to me.
18  Q.  But who did you --
19  A.  Cindy Hudson and Kris Dunn.
20  Q.  Okay.  And was that part of one
21  conversation with Cindy Hudson and Kris Dunn in
22  which you reported concerns with nepotism by Jerry
23  Lasley or was that multiple conversations?
24  A.  Multiple conversations.
25  Q.  Okay.  How many conversations did you

1  have?
2  A.  Well, okay, so Jerry, it happened and
3  then -- or I called Jerry to tell him I was going
4  to report.  Then I called Kris and said, "Kris, I
5  talked to Jerry, I'm going to report."
6  Kris says, "That's a good idea," so
7  that's two.
8  And then I called Cindy and had the
9  conversation with her, so that's three.  Three
10  conversations.
11  Q.  Okay.
12  A.  They would have been within 24 to 48
13  hours of each other and they would have been
14  between November of 2022 and February 2023.
15  Q.  Okay.  Perfect.  Yeah, I just got to
16  pinpoint --
17  A.  No, I understand.
18  Q.  -- timelines and that sort of thing.
19  A.  I just have to, like, stay --
20  Q.  Okay.
21  A.  -- really focused to be able to --
22  Q.  Sure, sure, sure.
23  A.  -- answer really.
24  Q.  Okay.  So you believe then that you
25  had -- you notified Jerry that you're going to

1  have some conversations or -- or talk to HR about
2  nepotism.  You had one conversation with Kris Dunn
3  indicating that you were going to talk to Cindy
4  Hudson about Jerry's alleged nepotism.  And then
5  you had a conversation with Cindy Hudson about
6  Jerry's alleged nepotism?
7  A.  Yes.
8  Q.  Is that all of the complaints that --
9  that -- that you made related to concerns around
10  Jerry's nepotism?
11  A.  Yes.
12  Q.  Okay.  And you don't know exactly when
13  any of those complaints were other than they
14  occurred sequentially sometime between
15  November 2022 and Jerry's termination?
16  A.  Yes.
17  Q.  Okay.  Okay.  And then I think you said
18  you also reported a complaint about the way Jerry
19  had spoken to some team members in a meeting.
20  A.  Uh-huh, yes.
21  Q.  Yes?  And was that something that you
22  reported to Cindy Hudson?
23  A.  I -- Kris did it.  Kris spoke to Cindy
24  Hudson from my understanding.
25  Q.  Okay.

1    A.   Yeah.  I only reported it to Kris.
2    Q.   So you reported to Kris at some point
3  that the way Jerry had talked to some team members
4  in a meeting, and your understanding is that Kris
5  relayed that to Cindy?
6    A.   It is my understanding --
7    Q.   Okay.
8    A.   -- that that occurred.
9    Q.   Do you know when that meeting was,
10  that -- hold on.  Sorry.  Do you know when that
11  meeting was that Jerry had with the team members?
12    A.   No, but if you gave me access to Slack I
13  could tell you all of this 'cause it's all
14  documented.
15    Q.   Okay.
16    A.   But no, I don't have it, but it is
17  documented and it can be found.
18    Q.   Okay.  And who was involved in that
19  meeting that Jerry had where you had concerns
20  about the way he was speaking?
21    A.   It was Haley -- Haley Casillas and Yulia
22  Soto.
23    Q.   Anyone else in there?
24    A.   No, not to my knowledge.
25    Q.   Were you involved?

1    A.   I was on that call, sorry, yes.
2    Q.   So the three of you plus Jerry?
3    A.   Yes.
4    Q.   And who was Haley?
5    A.   Haley at the time was a lead, a customer
6  success lead.  And so was Yulia.
7    Q.   And they're both females?
8    A.   Yes.
9    Q.   And you don't know when that conversation
10  occurred between Jerry and -- and you and the
11  leads about --
12    A.   Yeah.  It would be between November
13  2022 --
14    Q.   Okay.
15    A.   -- and February 2023.
16    Q.   And why do you think it would be
17  November 2022?
18    A.   I don't know.  I just kind of use that
19  as, like, to cover myself 'cause I don't want
20  to --
21    Q.   Okay.
22    A.   I know it couldn't -- so I think -- the
23  reason why I -- okay, here's -- here's the reason
24  why I know.  September is when I received my first
25  ever kind of, like, indication from a biannual

1  review, but it wasn't about biannual 'cause my
2  annual was November.
3    Q.   Uh-huh.
4    A.   Was my first indication that something --
5  there was something starting to brew with Jerry
6  and Kris about tone and con -- being
7  condescending.  On my biannual, that's when, like,
8  the first ever something kind of came up that --
9  so I know that it happened after that.  That's
10  like my --
11    Q.   And who issued the biannual?
12    A.   Jerry Lasley.
13    Q.   Okay.  And do you know who prepared it?
14    A.   Jerry Lasley.
15    Q.   Okay.  And what was the issue -- in this
16  meeting with Jerry, Yulia, I think you said
17  Haley --
18    A.   Yeah.
19    Q.   -- and you, what was the issue with
20  Jerry's behavior in your view?
21    A.   I'm trying to -- it's actually -- like,
22  it's in -- I'm trying to recall it.  I think it
23  was just the way he ambushed us.  Like, more
24  of an accusatory -- like, there wasn't, like, due
25  process.  It was, like, "I know you did this, I

1  went and talked to these people who said this is
2  what happened, it's unacceptable, and I don't want
3  to hear it ever happening again."  It was kind of,
4  like, that was the end of it.
5    Q.   And he was frustrated with in his view
6  team members being called out for their progress
7  on tasks?
8        MR. KLINKENBORG:  Calls for
9  speculation.
10    Q.   (By Mr. Jarrold)  What did he relay that
11  he didn't want to --
12    A.   I think the --
13    Q.   What did he relay --
14    A.   I mean --
15    Q.   What did he relay --
16    A.   I think he was upset --
17    Q.   Hold on just a second.  What did he relay
18  that he didn't want to see again?
19    A.   Team members called out for not doing
20  their jobs on a public -- in a public forum.
21    Q.   Okay.  And is it your belief that that's
22  what he was concerned with?
23    A.   No.
24    Q.   Okay.  What do you believe he was
25  concerned with?

37 (Pages 142 - 145)

Veritext Legal Solutions
www.veritext.com                                                          888-391-3376
Case 4:24-cv-00531-BCW    Document 30-2    Filed 05/16/25    Page 38 of 91

1    A.  I feel like he was mounting a case
2 because he was going to get reported for
3 retaliation.  I think he -- I think Jerry started
4 to become aware of the fact that he was
5 underperforming.
6    Q.  Uh-huh.
7    A.  And was becoming more clear that I was --
8 'cause, I mean, at that point, you know, we talked
9 about Kris had -- had had -- I'm assuming -- I
10 hope he had a conversation with Jerry about you
11 weren't supposed to make Kasey the manager of
12 sales success, it was supposed to be all you.  So
13 now you have Jerry who's been underperforming,
14 he's consistently worried about what Jesse Johnsey
15 in doing in sales and padding his pockets and
16 reporting that back to Kris.  Now he's got someone
17 who's bringing attention to the fact that there
18 might be some nepotism.  And I think that there
19 was just concerns and fears of losing his job, so
20 he started to mount, number one, like a case
21 against me starting with that and then seeking out
22 feedback to include in this PIP is my theory.
23 'Cause it's not -- yeah, we didn't start having
24 concerns until it started becoming clearer to
25 Jerry that others were picking up on the fact that

1 he was underperforming.
2       And Jerry and I had lots of private
3 conversations about Kris Dunn and Jesse Johnsey's
4 relationship and Jesse's inflating numbers and --
5 and Jerry being dismissed by Kris for those
6 reasons.  And we talked about how I think Jerry
7 felt like he maybe pushed Kris a little too far on
8 that topic.  And that, you know, he had been told
9 a few times you need to stay out of sales business
10 and do what we've asked you to do.  You're not the
11 sales director anymore, you are customer success
12 and sales success, so you need to stay in your
13 lane.
14    Q.  Okay.  Okay.  So when did you talk to
15 Cindy -- well, actually, let's back up.  Tell me
16 about the complaints you made related to Jerry's
17 behavior in this meeting with you and the two
18 leads.
19    A.  I felt that he --
20    Q.  Who did you complain to?
21    A.  Kris Dunn.
22    Q.  Okay.  Did you complain to anyone else?
23    A.  No.
24    Q.  Okay.  And when -- and when was that
25 complaint to Kris Dunn?

1    A.  After -- after the -- he -- after Jerry
2 called the meeting --
3    Q.  Okay.
4    A.  -- with us three.
5    Q.  Okay.  And -- and tell me everything you
6 said to Kris Dunn.
7    A.  I said that I felt -- I thought the
8 meeting was inappropriate because it was, like,
9 Jerry was verbally accosting us and not giving us
10 a chance -- number one, I thought it was
11 inappropriate that he called the meeting just in
12 like an or -- as far as like an orderly fashion of
13 management.  So you have the director, a manager,
14 and then the manager's two leads.
15       So he invites the manager and the two
16 leads to a call to accost the leads without giving
17 me as a manager a heads-up.  So I'm walking into a
18 meeting not knowing the purpose of the meeting --
19    Q.  Okay.
20    A.  -- or what is about to happen.  So that
21 would be number one that I told Kris that I --
22 that didn't --
23    Q.  Okay.
24    A.  -- that didn't feel good.
25    Q.  Okay.

1    A.  Yeah, that didn't feel good.  It felt
2 like an ambush.
3       The second thing is that Jerry revealed
4 that he had a talk with everyone but it would --
5 it would be found out that he did not actually
6 have a talk with everyone.  So I felt like it was
7 targeted.
8       And my third problem with it was that he
9 didn't give us a chance to explain our position,
10 the tactic that was used, the fact that we
11 actually had a call to plan out.  This wasn't on a
12 whim.  This was very well intentional and planned
13 out as a strategy to get answers on tasks that
14 need to get done.
15       And that afterwards when we found out
16 from -- actually, it was when Mary Tittlemier who
17 told me, "Hey, I didn't like that."
18       "Okay, great.  Thank you for that
19 feedback.  We'll never do that again."
20    Q.  Okay.
21    A.  So if he had given us a chance to say,
22 Hey, we -- we worked through this, we problem
23 solved, maybe -- you know, as opposed to just a
24 ridicule of you did this, you should not have done
25 this, why did you do this.  And not even why, but

1 don't ever do it again. And it just -- and that's
2 it and the conversation ended.
3    Q. Okay. Any other -- anything else that
4 was said with you and Kris?
5    A. I think those are the three main points.
6    Q. Okay. And it's your understanding that
7 he then -- that Kris then talked to Cindy about
8 this?
9    A. It is my understanding because he said he
10 would.
11    Q. Okay. Okay. Do you know what action, if
12 any, was -- was taken after that?
13    A. I -- Kris told me that he talked to Cindy
14 about it. I don't know that any specific -- if
15 there was any specific action that happened in
16 regards to Jerry, I do not know what that action
17 would have been.
18    Q. And it probably wouldn't be shared with
19 you?
20    A. It probably would not be shared with me.
21    Q. Okay. And I want to back up to on this
22 PIP. So that was never -- it was ultimately torn
23 up and not delivered to you, right?
24    A. Yes.
25    Q. Okay. And you think it was shortly

1 before Jerry's employment ended?
2    A. Yes, two days before.
3    Q. Okay. So you were never ultimately on a
4 PIP during your employment?
5    A. No.
6    Q. Okay. All right. And so we got on to
7 this topic because you had complained to Cindy --
8 you said you complained to Cindy about a
9 retaliatory performance improvement plan resulting
10 from "my reporting of preferential treatment of
11 Jerry's son"?
12    A. Yeah.
13    Q. And I think you added to that that you
14 had also complained about the way he conducted
15 this meeting --
16    A. Yeah.
17    Q. -- with your team?
18    A. Yeah.
19    Q. Okay. When did you complain to Cindy
20 about this performance improvement plan?
21    A. So after it was torn up and -- it had to
22 be within a couple days of it.
23    Q. Uh-huh.
24    A. Because the reason it was -- so -- so
25 afterwards, after that happened and Kris said -- I

1 -- if you recall, I said that Kris and I had the
2 conversation. He said, "Do you feel like it was
3 retaliatory?"
4    I said, "Absolutely."
5    He's like, "Okay, bye." He gets off the
6 phone, I presume he called Cindy. Him and I had a
7 conversation at some point before. And then
8 Cindy, him and I did. And he said, "I want you to
9 know that I knew Jerry was going to present this
10 PIP."
11    Q. Who said that?
12    A. Kris Dunn.
13    Q. Okay.
14    A. He said, "I want you to know that I had
15 knowledge that it was going to happen." And he --
16 he said, "I just wanted to see how it played out."
17    Q. Okay. So I want to understand each
18 conversation that you had. So after the PIP, who
19 do you complain to first?
20    A. I called Kris Dunn first.
21    Q. Okay. And tell me everything -- and when
22 was that that you called Kris Dunn after the PIP?
23    A. Within five minutes of Jerry leaving my
24 office.
25    Q. Okay. And tell me everything that was

1 discussed with Kris.
2    A. "Kris, you'll never guess what
3 happened" --
4    Q. Uh-huh.
5    A. -- except I guess he could guess.
6 "You'll never guess what happened. I -- Jerry
7 came into my office unannounced and with an
8 unscheduled meeting to present what he says is a
9 PIP. And then as we're going back and forth about
10 it, at some point he tears it" -- I mean, there's
11 more to the con -- I mean, I'm explaining here's
12 what we talked about during the PIP. Like, here's
13 what Jerry says was part of it. And then -- and
14 then we get to me questioning Jerry on why are
15 you -- what are the intentions behind why you are
16 presenting this.
17    And then there was -- I -- I -- like, I
18 don't know if you want to know, but I talked to
19 Kris about basically the conversation of what went
20 back and forth between Jerry and I. And then I --
21 I said -- and then I told Kris after our
22 conversation of going back and forth about it,
23 Jerry was, like, "Let's just take a break." He --
24 he ripped up the PIP. I told Kris Jerry ripped up
25 the PIP and then was like -- 'cause I said, "Can I

1 see it?"  At the point I told him, that I told
2 Jerry, let me -- "I would like to see it.  Let me
3 see the PIP."
4        And he says, "No."  He ripped it up.  I
5 told Kris he rips it up and then he says, "Let's
6 take break," and then he just walks out.  So I --
7 that's where I told him that's what just happened.
8        And he said, "Okay."
9        And then I --
10        And he says, "Do you think it was
11 retaliatory?"
12        And I said, "Absolutely."
13        And he says, Okay.  I'm going to go," and
14 we hang up the phone.
15    Q.   Anything else said to Kris in that
16 conversation?
17    A.   Maybe.  Yeah, I mean, maybe like there --
18 maybe we did talk about other things, but it's
19 been years, but that was the crux --
20    Q.   Nothing else stands out to you about the
21 conversation with Kris?
22    A.   Nothing else stands out, no.
23    Q.   Okay.  Okay.  And you never actually saw
24 the PIP?
25    A.   I did not see it during that day, but the

1 -- I saw it later.
2    Q.   When did you see it later?
3    A.   I asked Kris if he had a copy 'cause he
4 said, "I knew about it, I just wanted to see how
5 this played out."
6        And I said, "Okay.  Can you send it to me
7 because I never actually got to see it?"
8        And he's like, "Yes."  But it was always
9 communicated that it was not going to be filed, it
10 was not formal.
11        And so we -- I did look at it at that
12 point.  And then when Kris, Cindy and I got on to
13 this very first point of where I'm making
14 complaint about it being retaliatory --
15    Q.   Uh-huh.
16    A.   -- that is where she -- or maybe it was a
17 second call.  There could have been two calls
18 after Jerry's.  It could have been -- gosh, I
19 talked to her so much.  I worked with Cindy Hudson
20 for two years so we talked all the time.
21    Q.   Okay.
22    A.   She was like my dedicated employee
23 relations person, if that matters.  So we are in
24 constant communication.  We are Slacking, we are
25 phone calling, we are texting.  And so I don't

1 know if it was one meeting or two meetings, but at
2 some point I'm talking to her about that.
3    Q.   Uh-huh.
4    A.   But I can't tell -- I can't tell you for
5 sure, like, was it a Slack message.
6    Q.   Okay.  And are you telling Cindy that
7 this is -- that you believe -- did -- are you
8 telling Cindy that you believe that the PIP was
9 retaliatory?
10    A.   Yes.
11    Q.   Okay.  And retaliatory for what?
12    A.   For reporting him.
13    Q.   Reporting who?
14    A.   Jerry for favoritism of his son on the
15 team and for reporting to Kris about the meeting
16 that Jerry had with --
17    Q.   Okay.  Okay.  So you share with Cindy
18 that you believe the PIP is retaliation for
19 reporting Jerry for nepotism and the meeting that
20 was held with you and your two leads?
21    A.   Yeah.
22    Q.   Okay.  Did you suggest that it was based
23 on anything else?
24    A.   No.
25    Q.   Okay.  Did you tell Kris Dunn -- outside

1 of that conversation that -- that you said you had
2 immediately after the PIP discussion with Jerry,
3 did you tell Kris Dunn, other than in that
4 conversation, that you believe the PIP was
5 retaliatory?
6    A.   He was a party on that call with Cindy,
7 so therefore --
8    Q.   Okay.
9    A.   -- he would have heard that same.
10    Q.   Okay.
11    A.   -- information again.
12    Q.   So when you told Cindy that it was
13 retaliation for nepotism in the way Jerry behaved
14 on that call with you and the two leads, Kris was
15 part of that call as well?
16    A.   Yeah.
17    Q.   Okay.  Did you tell Cindy -- did you ever
18 tell Kris that the PIP was based on anything other
19 than retaliation for those two issues that we
20 discussed?
21    A.   Huh-uh.  No.
22    Q.   Did you complain about the PIP to anyone
23 else other than Cindy and Kris?
24    A.   Yes.
25    Q.   Who?

Veritext Legal Solutions
www.veritext.com                                               888-391-3376

1    A.   Who didn't I?  I was really upset.  I
2  told my family.  I told my friends.
3    Q.   Okay.  Anybody within the organization?
4    A.   I told -- I did tell several people in
5  the organization.  I did, yes.
6    Q.   Okay.  Who in the organization did you
7  tell besides Cindy and Kris?
8    A.   Cynthia Butler.
9    Q.   Who's Cynthia Butler?
10    A.   She's on the customer success team.
11    Q.   She's one of your subordinate employees?
12    A.   Yes.
13    Q.   Or was one of your subordinate employees?
14    A.   Yes.
15    Q.   Okay.  Who else?
16    A.   Haley Casillas.
17    Q.   So --
18    A.   My leads.  I told my leads.
19    Q.   Okay.
20    A.   I think I told Yulia.  I may not have
21  told Yulia.  We'll say -- we'll just say I did.
22    Q.   Okay.  Anyone other than Cynthia, Haley
23  and Yulia?
24    A.   Oh, man, I think I told Jared.  I told
25  Jesse.

1    Q.   When would you have told these folks,
2  would that have been around the time that he
3  attempted to issue it?
4    A.   Yeah, it would have been within the first
5  -- it would have been within the next 48 hours --
6    Q.   Okay.
7    A.   -- that he issued it that I would have --
8    Q.   And that would have been sometime before
9  February 2023 or -- I think you suggested that it
10  was sometime within days of his --
11    A.   Well, it would have had to have been
12  in -- it would have had to have been in February
13  of 2023 that I shared that with them.
14    Q.   Okay.  Other than the one conversation
15  you had with Cindy and Kris where you say that you
16  believe that this was -- this PIP was issued
17  because of your complaints about nepotism and
18  the -- the meeting, did you have any other
19  conversations with Cindy or Kris in which you were
20  complaining about the -- PIP?
21    A.   I mean, it wouldn't put it past me and
22  Kris Slacking about it, being like -- or talking
23  about it on our check-ins.  To be like, can you
24  believe that happened or --
25    Q.   Okay.

1    A.   -- like, you know, something to that
2  nature.
3    Q.   Okay.
4    A.   Just maybe, like, going over it again.
5    Q.   And -- and -- and when did Kris tell
6  you -- you think you said that Kris told you he
7  knew about the PIP?
8    A.   Uh-huh.
9    Q.   Yes?
10    A.   Yes, he did.
11    Q.   When did Kris tell you that, was that
12  part of this conversation with Cindy?
13    A.   It was before the conversation with Cindy
14  when I had just called him directly.  I believe.
15    Q.   Okay.
16    A.   I believe it was during that call.  They
17  was like, yeah, I -- I knew it was going to
18  happen, I just wanted to see how it played out.
19    Q.   And do you have a copy of this?
20    A.   I don't.
21    Q.   Okay.  Do you recall what the PIP said?
22    A.   There were like -- there was a specific
23  scenario that happened.  Like, no names were put
24  on this.  But it was basically about -- it kind of
25  touched on the same themes during Jerry's biannual

1  review of, like, condescending tone --
2  condescending, tone issues, abrasive, not easy to
3  work with.  And I think it laid out maybe some
4  specific examples of working with a team member
5  who wasn't on my team, but it didn't have any
6  names or anything.  If I recall, that's kind of
7  the crux of what it was.
8    Q.   Okay.  Anything else?
9    A.   It was, like, an interpersonal
10  improvement plan.
11    Q.   Okay.
12    A.   And that is when I -- that conversation
13  with Cindy is --
14    Q.   Yeah.
15    A.   -- and Kris was -- you know, the question
16  of, is there a policy against tone and could I be
17  asked about my tone if I were a man?  And so
18  that --
19    Q.   When did you said -- you said you -- when
20  did you have this conversation?
21    A.   When we -- when we had -- when -- when I
22  orally complained to Cindy Hudson and --
23    Q.   Uh-huh.
24    A.   -- Kris Dunn on the call about Jerry's
25  retaliatory performance improvement plan resulting

Case 4:24-cv-00531-BCW    Document 30-2    Filed 05/16/25    Page 42 of 91

1 from my reporting, during that phone call, I made
2 that statement.
3 Q. What statement?
4 A. Of the -- the -- is there a tone -- is
5 there a policy on tone as well as -- and this is
6 not the only time I mentioned it to Kris, but
7 would I be asked to improve my tone if I were a
8 male? Or would the -- something to the effect of,
9 would we even be talking about tone if I were a
10 male.
11 Q. Okay. And was there any response to
12 that?
13 A. They were just, like, you need to -- just
14 doubled down. You just need to watch your tone.
15 Just make sure you're pleasant. I know -- I know
16 Kris used that term, just -- just always try to be
17 pleasant.
18 Q. Anything else discussed in that
19 conversation?
20 A. No, just to -- just that the PIP wasn't
21 going to be -- the PIP wasn't going to be honored.
22 It wasn't going to be filed. It wasn't going to
23 be -- it was kind of a double-edged deal 'cause it
24 wasn't going to be filed and it wasn't going to be
25 recognized, and yet, there still was, like, but

1 you know we talked about tones, just try to --
2 just try to be pleasant. You're a -- you're a
3 manager, try to be pleasant.
4 Q. Was --
5 A. You know, make sure you're doing
6 everything you can to --
7 Q. When -- when you had this conversation
8 with Cindy and Kris about the PIP, had Jerry's
9 employment been ended?
10 A. I don't recall.
11 Q. So it may have been --
12 A. It could have been -- it could have been
13 before he was actually let go.
14 Q. Okay.
15 A. I do not recall, but it should be on the
16 record.
17 Q. And did they tell you -- did they -- did
18 Kris and Cindy tell you the PIP was not going to
19 be reported?
20 A. Yes.
21 Q. Did they say why?
22 A. No.
23 Q. Okay. Have we talked about -- have we
24 covered everything that was discussed in
25 connection with your complaint about the PIP as

1 identified in your interrogatory response?
2 A. I believe that we have.
3 Q. All right. In that conversation with
4 Cindy and Kris, again, was within a matter of days
5 of the PIP which would have been issued sometime
6 near -- I mean, sometime in or just before
7 February 2023?
8 A. Yes.
9 Q. Okay. Now, you also mention Jerry's
10 handling of asking you to allow him to talk to a
11 male co-worker instead of you, I think --
12 A. Uh-huh.
13 Q. -- due to nature of hygiene concerns.
14 Are you saying in this -- are you suggesting that
15 he was issuing the PIP --
16 A. No, these are --
17 Q. -- because of that or is this separate?
18 A. Maybe they should be like semi colons --
19 Q. Okay.
20 A. -- instead of commas maybe.
21 Q. Okay.
22 A. Yeah.
23 Q. That's -- I just --
24 A. Yeah, yeah.
25 Q. I figured but wanted to clarify.

1 A. Yeah.
2 Q. So -- so it sounds like you're saying you
3 also complained, so we -- we covered the first
4 complaint that you made --
5 A. Right.
6 Q. -- right, about the PIP? And then all
7 the details within that, correct?
8 A. Correct.
9 Q. Okay. That's covered. What about -- so
10 there's another complaint that you made about
11 Jerry asking you to allow him to talk to a male
12 co-worker about some hygiene concerns?
13 A. Yeah, that happened prior.
14 Q. Okay. When -- when was that?
15 A. I mean, it had to be Q4 of 2024 or
16 potentially January of 2023.
17 And I just -- again, I -- my marker is
18 just as Jerry's performance started to decline,
19 that's kind of what my mental marker is. But
20 again, all of this is documented in Slack, so the
21 dates can be referenced if we need them.
22 Q. Okay. So what was the hygiene concern?
23 A. Yeah. There was a gentleman on our team
24 named Brian, and Brian would come to work a lot of
25 times with dan -- what appeared to be dandruff on

42 (Pages 162 - 165)

1  his, like, dark shirts --
2  Q.  Uh-huh.
3  A.  -- as well as reported odor, foul
4  smelling odor.
5  Q.  Uh-huh.
6  A.  And so there would be reports of that
7  made.  And --
8  Q.  What's Brian's last name?
9  A.  Hold on one second.  I -- it's not
10 Morris.  It's Brian -- I don't recall his last
11 name.
12 Q.  That's okay.  What position did Brian
13 hold?
14 A.  He was a customer success -- not
15 associate.  Not trainer.  Gosh, I had all this
16 memory -- memorized at one point if you could
17 think of it, but it's just been too many years.
18 But what did I -- so customer success associate,
19 customer success trainer and customer success -- I
20 mentioned it earlier.  There were three.  He
21 wasn't an associate, he wasn't a trainer, he was a
22 different --
23 Q.  Okay.
24 A.  -- last title.
25 Q.  One of your subordinate employees?

1  A.  Yes.
2  Q.  Okay.  And you said there were concerns
3  about -- concerns were raised about dandruff and
4  odor --
5  A.  Correct.
6  Q.  -- related to this Brian?  Who raised
7  those concerns and to whom?
8  A.  I think Ben Wilson, if I recall.  The
9  operations manager at the Abbie warehouse, I
10 believe is the one.  I could be wrong.  I'm just
11 -- I'm trying to picture it 'cause there were two
12 different occasions it was reported.  And so I
13 believe Ben was involved in one and he had spoken
14 to Jerry and I in it as a team.  Or maybe he had
15 just spoken to Jerry about it, then Jerry brought
16 it to my attention.  I want to say it was Ben
17 Wilson the first time.  And then I don't recall
18 the second time.  Could have been Ben again --
19 Q.  Okay.
20 A.  -- for all I know.
21 Q.  Do you recall when the concerns were
22 raised?
23 A.  No.
24 Q.  Okay.  But they were either raised first
25 to Jerry or to you and Jerry?

1  A.  Yes.
2  Q.  And they were first raised by Ben Wilson
3  you believe?
4  A.  I believe, if I -- if my memory serves
5  me.
6  Q.  And there may have been a second one, but
7  you don't recall who -- who raised the concern?
8  A.  Correct.
9  Q.  Okay.  Now, at some point you're claiming
10 that you complained to Cindy Hudson about what
11 related to this hygiene issue?
12 A.  I think I just brought it up of, like,
13 did you -- you know, there was an incident where
14 it came to our attention that there was a hygiene
15 issue, and Jerry said, "I'm going to take this one
16 because I think Brian's going to receive it better
17 coming from a male, man to man."
18 Q.  Okay.
19 A.  Even, like, went as far as to say like a
20 fatherly figure.  And I didn't argue back, I was
21 just like, "Okay."
22 Q.  Okay.
23 A.  And then when it happened a second time
24 where he insisted that he was going to have that
25 conversation, there was a Slack message from me to

1  Jerry that I -- this is part of what I was telling
2  Cindy at whatever point I mentioned it to her of
3  like -- I just kind of stood my ground and said,
4  "I will be having -- I would like to have the
5  opportunity to have the conversation with Brian.
6  I don't think it's appropriate that it has to come
7  from a male, you know, manager, it can come from
8  me as his manager."
9  And so -- and I, also as a manager, I
10 need to, like, have practice of having those hard
11 conversations, you know.
12 Q.  Uh-huh.
13 A.  And so I'd like the opportunity.  And he
14 was -- and Jerry said, "Okay."
15 Q.  So is it your understanding then that
16 Jerry had a conversation with Brian and there
17 continued to be an issue?
18 A.  Yeah, I think that it got better for a
19 minute.  Like Brian cut his hair --
20 Q.  Okay.
21 A.  -- and things like that and seemed to,
22 like, be doing better, and then it kind of
23 regressed again.
24 Q.  Okay.  And tell me again exactly what
25 Jerry said to you the first time he said he

1 thought it would --
2   A.  It would just be -- come -- it would be
3 better coming from a man.  A man to man about
4 hygiene as opposed to coming from a woman.  It --
5 he was concerned that it might not come across
6 very well.
7   Q.  And Brian is a male?
8   A.  Yes.
9   Q.  Okay.  And do you understand that that
10 might be true at all, that it might be better
11 received from a -- from a man?
12   A.  I understand that that -- there's a
13 potential for that, but in the workplace --
14   Q.  Uh-huh.
15   A.  -- as far as maintaining professionalism
16 and good hygiene, that's a handbook.  And so when
17 you're communicating that, it really isn't about
18 feelings, it's about pol -- like policy so it
19 shouldn't matter who it's coming from.
20   Q.  And do you think the same would be true
21 if, say, Brian was a woman?
22   A.  I don't think it should matter.  It
23 should come from your direct --
24   Q.  Okay.
25   A.  -- manager in my opinion.

1   Q.  Okay, okay.
2   A.  The person who is your supervisor and is
3 directly responsible --
4   Q.  Okay.
5   A.  -- for your performance.
6   Q.  How do you -- and did you -- when Jerry
7 first told you that, you know, he was going to
8 handle it, did you push back at that point?
9   A.  I did not.
10   Q.  Okay.  And have you told me everything
11 that was discussed with Jerry the first time he
12 said he was going to handle it?
13   A.  I believe I have.
14   Q.  Okay.  Did you complain to Cindy after
15 that or was it only after the -- the second time?
16   A.  I don't recall at what point I had
17 reported it to her.
18   Q.  Do you --
19   A.  I had -- but I had mentioned it --
20   Q.  How many conversations did you --
21   A.  I did mention it to some --
22   Q.  How many conversations did you have with
23 Cindy about this hygiene issue?
24   A.  If I had -- it had probably only been
25 once, but I did bring it up to another co-worker,

1 our chief experience officer, and our product
2 manager because it --
3   Q.  Okay.  And you don't mention that at all
4 anywhere in the interrogatory response?
5   A.  No.  And -- and actually, I was reading
6 back through it.  I didn't realize that I could
7 put in here the complaints I made to somebody who
8 wasn't human resources and that's my fault.  That
9 is my mistake.  Because I actually -- now that I'm
10 looking back at it, it says anyone.  And yeah, it
11 says -- it says here you can report it to anyone,
12 and I didn't include --
13   Q.  And I don't want to know about
14 subordinate employees.
15   A.  And it's not.  It's a chief experience
16 officer.
17   Q.  Okay.  And what complaints did you report
18 to a chief experience officer?
19   A.  I complained to her after Jerry presented
20 the biannual review which was the first time I had
21 ever heard tone.  That's the first time I ever
22 heard like, "Hey, you need to improve your tone."
23   Q.  Uh-huh.
24   A.  And it was the first time I ever heard
25 feedback about coming off condescending,

1 unpleasant to work with, those kind of things.
2   Q.  Okay.
3   A.  And so I had -- she was in town one day.
4 She doesn't work at the Abbie office.
5   Q.  Is this Karin Giefer?
6   A.  Yeah.  And Maroua Jawadi, a product
7 manager.
8   Q.  Okay.
9   A.  They happened to be there.
10       And I knew Maroua had gone through a
11 really tough moment with a customer who said -- or
12 with a territory account manager who called her
13 sweetie once.  And so I was, like, okay, let me go
14 talk to these women in management roles about what
15 my experience was with Jerry and let me get their
16 advice.
17       And Karin's advice was, the next time you
18 have your review, you should have a female present
19 to kind of help stop Jerry at moments of saying,
20 "Hey, this might be a micro aggression" or "Hey,
21 this might be a little biased.  This might be a
22 little gendered in the feedback that you're giving
23 as far as like the example about tone."
24       So I said, "Okay, thank you -- thank you
25 so much for that advice."

Veritext Legal Solutions
www.veritext.com                                        888-391-3376

1 Q. That's what Karin said?
2 A. Uh-huh.
3 Q. When was -- yes?
4 A. That is what Karin -- Karin --
5 Q. You said "uh-huh," that's why I was --
6 A. I am so sorry. Yes, Karin -- sorry,
7 you're asking me what Karin said?
8 Q. Yes.
9 A. Karin said that I should have somebody in
10 my next review --
11 Q. Okay.
12 A. -- to help account for if there's micro
13 aggressions or there's gendered feedback, that
14 they could kind of stop him and say, hey.
15 Q. Okay. Did you have any other -- or did
16 you make any other complaints to the chief
17 experience officer?
18 A. I mentioned -- and what made me think of
19 this 'cause I mentioned the -- I was like and also
20 the -- the hygiene. The word escaped me, the
21 hygiene.
22 Q. This is all part of one -- in one
23 conversation about --
24 A. Yeah, yeah. There was like just a series
25 -- and then I -- and there was just something that

1 happened with Ben Wilson. I like -- I just -- it
2 was a day where I was like I feel like I'm
3 experiencing multiple experiences of micro
4 aggressions happening. I feel like this is what
5 happened during the biannual. This is what
6 happened with the hygiene issue with Brian, and
7 then Ben did this whatever. And I was like, "And
8 what do you -- what would you do -- what do you
9 think about it?"
10       And then her response really just
11 addressed, "Okay, in the future when you -- if you
12 only have one male, one female in the room, you
13 should have another female in the room when you're
14 given your review to try to kind of account for
15 those micro aggressions or those gendered feedback
16 items to help manage that."
17 Q. Okay.
18 A. And that was the end of that
19 conversation, never brought up again.
20 Q. Okay. No further conversations with the
21 chief experience officer?
22 A. No.
23 Q. Okay. Any -- so other than that
24 conversation with the chief experience officer --
25 A. And Maroua was in the room. Sorry.

1 Q. Okay. Other than that conversation with
2 the chief experience officer, is what's outlined
3 in the what -- interrogatory response and what
4 we've discussed, does that cover all the
5 complaints that you made to any sort of
6 supervisory or human resources person?
7 A. Yes, including what we discussed about
8 tone, that is not --
9 Q. Yes, yes.
10 A. -- directly in this document. Yes,
11 that -- that is it.
12 Q. Okay. Just have to be clear that I have
13 the full kind of scope.
14 A. Yes.
15 Q. Okay. And do you know when this
16 conversation was with Karin Giefer?
17 A. I don't recall, but it would have been
18 after September of 2022.
19 Q. Okay.
20 A. And before February of 2023 because
21 September was when I got my biannual, so I --
22 Q. Got it.
23 A. -- I would have given --
24 Q. Okay.
25 A. The next time she would have been in town

1 I would have, like -- it would have been really
2 close --
3 Q. All right.
4 A. -- for me to have brought it up and been
5 feeling pretty strongly about it, seeking advice.
6 Q. Okay. Let's go back to this hygiene
7 question.
8 A. Okay.
9 Q. You say that you complained to Cindy
10 Hudson about Jerry wanting to handle the
11 conversation with Brian --
12 A. Okay.
13 Q. -- right?
14 A. Yes. Brian.
15 Q. You may have answered this already, but
16 do you recall when that -- was this multiple
17 conversations with Cindy or a single conversation
18 with Cindy?
19 A. I think it would have only been brought
20 up a single time.
21 Q. After the second incident or second time
22 that -- that you and Jerry discussed?
23 A. No, I don't think -- I just think I
24 brought -- like, I didn't bring it up as a
25 complaint in the moment. I brought it up as a --

45 (Pages 174 - 177)

Veritext Legal Solutions
www.veritext.com                                    888-391-3376
Case 4:24-cv-00531-BCW    Document 30-2    Filed 05/16/25    Page 46 of 91

1 kind of like a factor after the fact, you know.
2    Q.  Okay.
3    A.  And, "Hey, I didn't appreciate that he
4 did this that one time."
5    Q.  Okay.
6    A.  Yes.
7    Q.  Do you know --
8    A.  Didn't love it.
9    Q.  -- when that conversation happened?
10    A.  I am fairly confident that it happened
11 when we were talking about the performance
12 improvement plan.
13    Q.  Okay.
14    A.  'Cause it could have happened in Slack,
15 though.  It could have been a different
16 conversation.
17    Q.  Okay.
18    A.  So I -- I'm going to say that I don't
19 completely know.
20    Q.  You don't know when you had this conver
21 -- or mentioned this -- this issue with the
22 hygiene but...
23    A.  Yeah, I think it's fair to say that I --
24 I do not remember when I had the conversation.
25    Q.  But it may have been in the conversation

1 about the PIP --
2    A.  Yes, it may have been.
3    Q.  -- when you were talking with Cindy and
4 Kris?
5    A.  Correct, it may have been.
6    Q.  Okay.  And do you recall any separate
7 conversations with Kris about this hygiene
8 conversation with Jerry?
9    A.  I -- I probably would have mentioned it
10 to Kris either in a Slack message or by --
11    Q.  Do you recall any?  Not --
12    A.  Yes.
13    Q.  I don't care if you would have or --
14    A.  Yes, I did.  I would have mentioned it to
15 Kris Dunn, yes.
16    Q.  You recall specifically having a
17 conversation with Kris?
18    A.  Yes.
19    Q.  Okay.  And do you --
20    A.  As again I know --
21    Q.  Do you recall when that happened?
22    A.  I do not.
23    Q.  Any general time frame that you can give
24 me?
25    A.  Sure.  It would have been Q4 of 2022 into

1 Q1 of 2023.
2    Q.  Okay.  Tell me everything that you recall
3 sharing with Cindy about the hygiene conversation.
4    A.  Just the same exact thing I would have
5 said to Karin.  Like, I didn't love it when Jerry
6 presented the idea that it would be better if a
7 male presented this information to Brian instead
8 of me because he would receive it better.
9    Q.  Okay.
10    A.  I felt like that was an example of
11 sexism.  And I just -- I didn't like it or
12 appreciate it.
13    Q.  Did you tell Cindy that you believed that
14 was sexism?
15    A.  I don't recall if I used those words.
16    Q.  Okay.  What was Cindy's response to your
17 call?
18    A.  I mean, she felt like I should have --
19 her response was that I was just as capable of
20 having that kind of conversation with Brian as
21 Jerry was.
22    Q.  Anything else?
23    A.  Not that I can recall.
24    Q.  And was any action taken as a result of
25 that conversation with Cindy about the hygiene

1 stuff?
2    A.  No.
3    Q.  Do you know that for sure?
4    A.  No.
5    Q.  At that point the hygiene issues had been
6 addressed?
7    A.  I wouldn't say they were addressed.
8 Again, I think because I reported it after the
9 fact, I don't think it -- I don't think it was
10 really necessarily addressed.
11    Q.  But it didn't come up again with Jerry?
12    A.  No.  Because I kind of like -- the second
13 time I was like, "I -- I feel like I should have
14 the opportunity to do it."
15        And he said "Okay."
16        So I was like okay.
17    Q.  Okay.  So when you said -- the second
18 time you said you were going to do it --
19    A.  Yes.
20    Q.  -- and you did do it?
21    A.  Yes.
22    Q.  Was Jerry a part of it?
23    A.  No.
24    Q.  So it was just you having this
25 conversation with Brian?

46 (Pages 178 - 181)

Veritext Legal Solutions
www.veritext.com                                                                      888-391-3376
Case 4:24-cv-00531-BCW    Document 30-2    Filed 05/16/25    Page 47 of 91

1    A.  Yes.
2    Q.  And how did Brian receive it?
3    A.  He said that he understood and that he
4 would make changes.
5    Q.  Do you remember when that was?
6    A.  I do not, but it is in Slack.
7    Q.  Was the conversation with Brian in
8 person?
9    A.  It was virtually.
10   Q.  Okay.
11   A.  To my -- to my recollection it was
12 virtually.
13   Q.  And your complaint to Cindy or when you
14 were mentioning this to Cindy, this conversation
15 about hygiene, was that a virtual call?
16   A.  Yes.  Yes, all of our -- yes.
17   Q.  Okay.  And tell me -- I think you said
18 you believe you would have shared this
19 conversation with Jerry about hygiene with Kris,
20 right?
21   A.  Yes.
22   Q.  Would that have been part of that
23 conversation with Cindy or would it have been a
24 separate conversation?
25   A.  It could have been one or the other.

1    Q.  Okay.
2    A.  Or both.
3    Q.  Do you recall what you would have shared
4 with Kris?
5    A.  Yeah.  It would have been the same kind
6 of messaging, this -- this happened, I didn't
7 really like it or appreciate it.
8    Q.  Okay.  And what did Kris say, if
9 anything?
10   A.  Yeah, I mean, he agreed that I should be
11 able to handle that.
12   Q.  Okay.  Did he say anything else?
13   A.  Not to my recollection.
14   Q.  Do you know what, if anything, happened
15 as a result of that conversation?
16   A.  I do not.
17   Q.  Do you know when the conversation with
18 Kris was?
19   A.  I do not.
20   Q.  Okay.  In or before February 2023 the
21 conversation --
22   A.  "In or before" you said?
23   Q.  Would it be in --
24   A.  Yeah.
25   Q.  -- or before the conversation of February

1 2023 --
2    A.  Yes.
3    Q.  -- when you talked to Kris about --
4    A.  Yes, yes, because I wouldn't have -- you
5 know, when Jerry -- when Jerry was let go, that
6 was it.  I mean, we just didn't --
7    Q.  Yeah.
8    A.  We didn't think or go backwards, we just
9 really focused on pushing ahead.
10   Q.  Okay.
11   A.  Yeah.
12   Q.  And is the same true of when you had the
13 conversation with Cindy, it would have been in or
14 before February of 2023?
15   A.  Yes.
16        MR. JARROLD:  We've been going for
17 a while.  I think we can take a break if you guys
18 need one.
19        THE REPORTER:  Yes.
20        MR. KLINKENBORG:  An hour and 15
21 or so.
22        MR. JARROLD:  Okay, let's go ahead
23 and take a break.
24        THE VIDEOGRAPHER:  Off the record
25 at 1:34.

1        (Recess.)
2        THE VIDEOGRAPHER:  We're back on
3 the record at 1:43.
4    Q.  (By Mr. Jarrold)  Okay.  Ms. Anderson,
5 we're back on the record.  You understand you're
6 still under oath, yes?
7    A.  Yes.
8    Q.  And anything about your testimony thus
9 far that you feel needs to be corrected or is
10 mis -- or is incorrect?
11   A.  No, I just wanted to clarify that a lot
12 of this can be found in Slack.
13   Q.  Okay.
14   A.  A lot of dates.
15   Q.  Do you have any of those documents?
16   A.  I wish but...
17   Q.  Okay.  All right.  So we talked about
18 complaints related to the PIP, complaints related
19 to this conversation about hygiene.  The next
20 complaint identified in -- in your interrogatory
21 relates to -- you refer to Jerry's "attempt to
22 undermine my leadership by proactively seeking out
23 negative responses from team members to use on
24 said PIP."
25        Who did you complain to about that?

47 (Pages 182 - 185)

Veritext Legal Solutions
www.veritext.com                                  888-391-3376
Case 4:24-cv-00531-BCW    Document 30-2    Filed 05/16/25    Page 48 of 91

1     A.  I would have complained -- I would have
2  complained about that I guess -- I shouldn't say I
3  guess.  I know that I communicated it.  I know
4  that I put that into words whether it was a
5  written or verbal response.  So I'm going to say
6  that I do not recall.
7     Q.  You don't know who you raised that to?
8     A.  I mean, it would have been -- I know who
9  I would have raised it to, Kris Dunn and Cindy
10  Hudson.
11     Q.  Okay.  Do you know when you would have
12  raised it?
13     A.  I don't recall.
14     Q.  And would it have been while Jerry was
15  still employed or closely after?
16     A.  It wouldn't have been after.
17     Q.  Okay.  So in or before February 2023?
18     A.  Yes.
19     Q.  And you don't recall what -- whether that
20  was by phone, virtually, in person?
21     A.  Yeah.  So like it could have been during
22  the call right after with Kris when it was
23  presented.  It could have been included when him
24  and I and Cindy were in a group call together
25  or -- and/or it could have been written in Slack.

1     Q.  And what would you have relayed?
2     A.  I -- that I felt like Jerry -- I knew --
3  sorry, let me correct it.  I knew Jerry was
4  seeking out negative responses from team members
5  to use on said PIP.
6     Q.  How did you know that?
7     A.  Because afterwards I had a call with Mary
8  McClanahan because the example that he gave -- one
9  of the examples that he gave in the PIP was
10  related to her subordinate.  And so I had a phone
11  call with Mary McClanahan to say basically like,
12  "Hey, I'm so sorry."  Like, "I'm so sorry if I
13  messed up when I was asking Kat if she did the
14  thing she said that she did.  I should have, you
15  know, handled that better."
16        And she -- that's when she revealed to
17  me, "Yeah, Jerry was asking me."  "I had" -- she
18  said, "I had mentioned it but Jerry wanted to know
19  more about it.  How did I feel about it."
20        And that's what he used on the PIP, was
21  that situation.
22        And then there were a couple of other
23  situations.  And I think that -- if I recall from
24  the PIP, he would have included some of the
25  feedback that he had gotten.  Remember when I said

1  that he did those skip meetings but he didn't
2  interview everyone?  He proactively sought those
3  meetings out.  They were not requested by the team
4  members.  And those team members did confirm,
5  like, that he reached out.  I mean, he -- it's on
6  his -- it was also on his calendar.  Like, if you
7  went and looked at his calendar, it was a meeting
8  from Jerry to those.  It was public.
9     Q.  Okay.  So who mentioned Mary McClanahan
10  told you that Jerry reached out to her about a
11  situation with one of her subordinates, Kat, that
12  was referenced in the PIP that was torn up,
13  correct?
14     A.  Well, on that one, I don't know if, like,
15  he reached.
16     Q.  You mentioned that Mary McClanahan had --
17     A.  Yeah, they had a conversation.
18     Q.  -- told you that there was a
19  conversation?
20     A.  Yeah.
21     Q.  Okay.  Just wait to speak until I finish
22  and I'll try to do the same for you.  I know it's
23  hard for her to type it all out, so...
24        So Mary McClanahan told you that he had a
25  conversation with her about some situation that

1  was referenced in the PIP?
2     A.  Yes.
3     Q.  Who else, if anyone, made you aware that
4  Jerry was inquiring about negative or seeking
5  negative responses?
6     A.  Some of the CSAs at the time who -- like,
7  Haley -- so Haley and Yulia, I'm trying to recall
8  which one of them, but they had had conversations
9  with some of the CSAs.  I'm like, "How did your
10  meeting with Jerry go?  Like, what kind of
11  questions did he ask?"
12        And I did the same thing when I would do
13  my quarterly check-in.  I would have a check-in
14  with every team member, and I'd be like, "So did
15  you meet with Jerry?  Like, how did that go?
16  Like, was it great?"
17        And then that's when I found out, like,
18  some people had meetings, some people didn't have
19  meetings.  And I'd be, like, "What -- what kind of
20  questions did he ask?"  And so they would tell me.
21  And that's how I found out.
22     Q.  Sure.  How -- how big was your team at
23  that point in time?
24     A.  I think at that time it was 26 --
25     Q.  Okay.  And --

48 (Pages 186 - 189)

1    A.  -- that I was reading here.
2    Q.  And -- and it -- would it be reasonable
3  for Jerry to have a meeting with every single one
4  of those people?
5    A.  He had mentioned to me that he was going
6  to be doing skip meetings with every single
7  customer success team.
8    Q.  Okay.  But he ultimately did?
9    A.  He ultimately did not.
10    Q.  Okay.  But you think it was problematic
11  that he only had meetings with certain people?
12    A.  Yes.  And that it came off the heels of
13  that call that I referenced earlier where people
14  were asked to talk about their tasks.  And then
15  he --
16    Q.  Okay.  And what did you share with Cindy
17  when you -- I -- I understand you said that you
18  didn't know exactly when or how this was discussed
19  other than while -- it would have been while Jerry
20  was employed.  But what would you have shared with
21  Cindy about him seeking out responses?
22    A.  I would have -- I would have said what I
23  said to you, which is, I learned that he was
24  reaching out to some people, but not all people.
25  Some of the examples that were provided on the PIP

1  would have seemed like they aligned with some of
2  the things that he had already mentioned about how
3  that meeting went.  I would have just said that.
4    Q.  Would you have said that that was
5  retaliatory?
6    A.  I would have said -- yeah, 'cause I did.
7  I did say that --
8    Q.  Okay.
9    A.  -- in that meeting with Cindy.  We -- I'm
10  sorry, I thought we --
11    Q.  Okay.  So you think that this was
12  potentially part of that whole PIP conversation?
13    A.  (Witness nods.)
14    Q.  Okay.  And so there may not have been
15  separate conversations with Cindy or Kris about
16  Jerry soliciting responses for the PIP, it may
17  have been part of those conversations about the
18  PIP generally?
19    A.  Yes.
20    Q.  Okay.  And you would have suggested that
21  all of this would have been potentially
22  retaliatory for reporting him for nepotism or
23  reporting him --
24    A.  For nepotism primarily, yes.
25    Q.  And -- but also potentially being

1  inappropriate -- the way he handled that meeting
2  with you and the two leads?
3    A.  Yes.
4    Q.  Okay.  And so do you know if Jerry was
5  aware of any of your complaints to Kris or human
6  resources?
7    A.  He was aware of the nepotism complaint
8  because I made him aware before.
9    Q.  Okay.  Was he aware -- do you know if he
10  was aware of any other complaints?
11    A.  I don't think -- know if he was aware of
12  any other complaints.
13    Q.  Okay.  And what do you -- and -- and his
14  awareness of the nepotism complaint would have
15  been limited to the fact that -- that's a bad
16  question.
17        You only believe that he was aware of the
18  nepotism complaint because you told him you were
19  going to be notifying human resources of concerns
20  around nepotism?
21    A.  Yeah.  I don't have any other evidence to
22  suggest that any other things that I had made
23  mention of were brought --
24    Q.  Okay.
25    A.  -- to his attention or that there was any

1  action taken.
2    Q.  Did you tell him you were going to be
3  reporting anything other than concerns with
4  nepotism?
5    A.  No.  Did I tell him that I -- say -- can
6  you ask the question again?
7    Q.  Yes.  Did you tell Jerry Lasley that you
8  were going to be reporting complaints to human
9  resources related to him regarding anything other
10  than nepotism?
11    A.  No.
12    Q.  Okay.  All right.  Have we now covered
13  everything -- all conversations or all --
14  everything that was discussed in connection with
15  your complaints around Jerry seeking out negative
16  responses?
17    A.  I sure hope so.  I -- I --
18    Q.  I do, too.
19    A.  To my recollection, I believe we have
20  covered everything.
21    Q.  Okay.  Now, you also indicate that you
22  reported to Cindy concerns with pay in 2023.
23    A.  Yes.
24    Q.  All right.  And you can set that -- that
25  whole thing aside.

49 (Pages 190 - 193)

Veritext Legal Solutions
Case 4:24-cv-00531-BCW    Document 30-2    Filed 05/16/25    Page 50 of 91
www.veritext.com                                                    888-391-3376

1    A.   Oh, I was going refer to it when you ask
2 me about timeline.
3    Q.   Go ahead and just set all of those aside.
4    A.   Oh, okay.
5    Q.   Thanks.
6         MR. JARROLD:  All right.  What are
7 we on here, 9?
8         THE WITNESS:  8.  9.
9         MR. KLINKENBORG:  Yeah, 9.
10    Q.   (By Mr. Jarrold)  All right, I'm going to
11 hand you what we'll mark as Exhibit 9.
12         (Exhibit 9 marked for
13         identification.)
14    Q.   (By Mr. Jarrold)  All right.  You have in
15 front of you Exhibit 9.  It's Bates labeled
16 EquipmentShare/Anderson 211.  Have you ever seen
17 this document before?
18    A.   Last night.
19    Q.   Okay.  So you hadn't seen it prior to
20 preparation for this deposition?
21    A.   No.
22    Q.   Are you familiar with what it is?
23         MR. KLINKENBORG:  Objection, calls
24 for speculation.
25    Q.   (By Mr. Jarrold)  Okay.  And I'll just --

1 I'll represent to you that these are notes from
2 Cindy.
3    A.   Okay.
4    Q.   And if you look at the top, it says,
5 April 21st.
6    A.   Uh-huh.
7    Q.   And if you go down, about halfway down, a
8 little more than halfway down, it says:  Requests
9 more pay in the median salary she feels she
10 exceeds expectations.
11         Do you see that?
12    A.   I do see that.
13    Q.   Okay.  Would this have been -- would you
14 have had a conversation with Cindy about concerns
15 with pay April 21st, 2023?
16    A.   It's like a hard question to answer
17 because it's like I don't -- I can't -- I have to
18 depend on Cindy having really good recordkeeping,
19 right?  She's in HR and you hope that somebody,
20 like, put the right date.  So...
21    Q.   Do you recall having more than one
22 conversation with Cindy about your compensation?
23    A.   Yeah, it would have been over Slack.
24 There would have been Slack messages as well as
25 a -- it could have been phone or virtual.  So

1 these notes could be in reference to a Slack
2 conversation or verbal.
3    Q.   Okay.
4    A.   I don't know.
5    Q.   Do you recall having more than one
6 conversation with Cindy about your compensation?
7    A.   If you count Slack, yes.  As a separate
8 instance from phone conversation, yes.
9    Q.   Okay.  So you had Slack communications
10 with Cindy about compensation, and then a phone
11 conversation with Cindy about compensation?
12    A.   Uh-huh.
13    Q.   Did you?  Yes?
14    A.   Yes.
15    Q.   Did you have any other conversations with
16 her about compensation?
17    A.   Potentially.
18    Q.   Do you recall any conversations other
19 than Slack communications and one telephone
20 conference?
21    A.   I don't recall.
22    Q.   Okay.
23    A.   I want to recall.
24    Q.   I understand.  What did you tell --
25 and -- and feel free to look this over, but -- but

1 what do you recall sharing with -- well, let's
2 back up.
3         Do you recall when you were having those
4 Slack conversations with Cindy about your
5 compensation?
6    A.   I mean, it definitely would have been
7 April that I -- because it was after I interviewed
8 the -- the engine -- for the sales engineer role,
9 that would have been the secondary thing that
10 happened to finding the document.  So that was
11 like, okay, now I got two things, now I'm starting
12 to get a little frustrated, you know.
13         And so I had talked to her more of --
14 like, the first approach was like "How would you
15 handle this?"  Like, here's the scenario --
16    Q.   Sure.  Hang on.  I just want to -- I just
17 want to figure out when you had the conversation.
18    A.   Oh, sorry.  April 2023.
19    Q.   April of 2023 you would have had Slack
20 conversations?
21    A.   March or April.
22    Q.   Okay.
23    A.   Q1 --
24    Q.   And when would you have had --
25    A.   -- of 2023.

1    Q.   When would you have had your phone
2 conversation with her?
3    A.   I'm going to say Q1 of 2023.
4    Q.   Okay.  And April is Q2 --
5    A.   I'm just nervous because it's like what
6 if it was March 31st.  That's true.  That's true.
7    Q.   Sure.
8    A.   You're right, April --
9    Q.   So March or April of 2023 is when you had
10 Slack communications and the phone conversation
11 with Cindy about compensation?
12    A.   I believe so, but I would refer to our --
13 to Slack and phone call logs to confirm.
14    Q.   Okay.
15    A.   I'm sorry, I like to be exact.
16    Q.   I understand.
17    A.   I like to be completely honest and it
18 makes -- I'm getting nervous because it's, like, I
19 can't tell you that it was at 2:34 p.m. on --
20    Q.   That's okay.
21    A.   And I want to be able to give you --
22    Q.   That's okay.
23    A.   -- what you're looking for.
24    Q.   Don't worry about it.  I just want the
25 best that you can recall.

1    A.   Okay.
2    Q.   Now, what would you have shared with
3 Cindy via Slack or phone conversation?  And what
4 would you have shared with Cindy in your
5 conversation about compensation?
6    A.   I would have shared that I recently
7 discovered that similarly-situated males in my --
8    Q.   Hold on.  Did you use the phrase --
9    A.   No.
10    Q.   -- "similarly-situated males"?
11    A.   I would have said that males -- I would
12 have said -- I would -- no, I would not have said
13 that.
14    Q.   Okay.  What would you have said to Cindy?
15    A.   I would have said to Cindy that I -- I
16 would have said something along the lines of
17 "Recently I've discovered that I may be paid
18 inequitably," and I would have used and did use
19 several times the word "inequitable."
20    Q.   Okay.
21    A.   And that I felt that I was doing as much
22 or more than my male counterparts who were getting
23 paid more than I was.
24    Q.   Anything else?
25    A.   That I desired to talk to Kris Dunn about

1 his -- that I brought up that he had offered up
2 the director level positions, but they hadn't come
3 to fruition yet.  And I was seeking her advice on
4 how -- what can I do to help kind of, like, pick
5 that conversation back up again.
6    Q.   Uh-huh.
7    A.   And figure out how to, like, move forward
8 with that.  And she gave me advice.
9    Q.   What was -- what did -- tell me
10 everything that Cindy shared with you.
11    A.   Well, Cindy's first response was that I
12 -- it -- I shouldn't be -- I -- it's not fair for
13 me to say what I think I should make because those
14 other jobs are not the same as my job --
15    Q.   Uh-huh.
16    A.   -- and so how can I say?  How can I truly
17 compare?  That was her first.  There wasn't...
18        And then I said back to her, "Well, I
19 know exactly what a sales engineer does.  I've
20 done the role as a sales engineer.  And not in a
21 formal capacity, but it's a fancy term.  And my
22 male counterpart, who is the manager of that team,
23 has a bachelor's degree like I do with no former
24 experience in engineering."  'Cause I -- I felt
25 like I had to explain to her, like, I get that you

1 may not understand, like, what -- it sounds like a
2 sales engineer may have qual -- 'cause she
3 mentioned, like, you don't know the qualifications
4 that they have.  You may not know the education.
5 You may not know the training.  You may not...
6        And my argument was I do because we,
7 Jerry and I had to act as that when we were in our
8 previous positions until we started growing the
9 teams.  And it was like when me, Jesse, Kris and
10 Jerry had to grow the teams, we were growing
11 extensions of ourselves essentially.  We were
12 duplicating our efforts because we were expanding,
13 we were growing.  So I do understand because when
14 it was just the four of us, we had to do it all.
15    Q.   Okay.  What did she -- what else did she
16 say?
17    A.   She -- I mean -- I mean, she held her
18 position of "You just -- you can't really -- you
19 really can't say because you" --
20    Q.   She told you they were distinct
21 positions?
22    A.   Yeah, yeah.
23    Q.   Okay.  What else did she say, if
24 anything?
25    A.   Well, because -- I had asked her for

51 (Pages 198 - 201)

Veritext Legal Solutions
www.veritext.com                                                888-391-3376
Case 4:24-cv-00531-BCW    Document 30-2    Filed 05/16/25    Page 52 of 91

1 advice about, "Hey, you know, Kris has told me a
2 few times you're going to have a director level
3 position, you're going to have stock options,
4 you're going to have bonus potential." And I'm,
5 like, And it hasn't happened yet. And I don't
6 really know how I should -- like, I don't want to
7 keep bothering him about it, but, like, I want
8 this growth, like what should I do?"
9 And she's like, "Well, you should -- the
10 way that you should approach Kris is, you should
11 say, is there anything that I can do to support
12 you."
13 Q. Okay. Anything else discussed in your
14 conversations with her?
15 A. Yeah, I mean, I just -- I mean, I think
16 I -- I talked stream of consciousness, so I'm sure
17 that I was just like I just don't feel like I've
18 gotten the recognition that I deserve. I feel
19 like I've been passed over time and time again for
20 the director level position. I didn't feel like
21 it was fair that Jerry got that position to begin
22 with. And I've seen other -- I don't know.
23 I would have -- I think I would have spoken like
24 that. I would have stayed on the theme of, like,
25 what I was feeling in the moment of just feeling,

1 like, there was inequity. And I would have
2 touched on any aspect or facet of that feeling of
3 inequity.
4 Q. Okay.
5 A. And that could have been very broad
6 reaching of everything that I felt --
7 Q. Okay.
8 A. -- in that moment.
9 Q. Would you have referenced gender in that
10 conversation or sex?
11 A. Yes. Yes.
12 Q. How?
13 A. I would have said that I didn't feel like
14 as a woman I was being paid equitably to do this
15 job.
16 Q. Okay. Now, we talked earlier about the
17 fact that nobody else that -- held the same role
18 as you did as manager of --
19 A. Uh-huh.
20 Q. -- customer success, correct?
21 A. Correct. Yes.
22 Q. Okay. And you mentioned something about
23 male counterparts. What's a male counterpart?
24 Are you just talking about other people that
25 reported to Kris Dunn?

1 A. I -- when I say it, I mean other
2 managers. Other --
3 Q. Okay.
4 A. They might be -- specifically, a manager
5 of a team. Somebody who is responsible for
6 personnel management regardless of what that
7 person -- the personnel did as a job function.
8 Q. Okay.
9 A. And it also -- and I also was like --
10 Q. Okay.
11 A. -- that's crazy that an engineer that
12 doesn't have direct reports or responsibility
13 would make more money because of that position.
14 Q. You recognize that people in sales often
15 make more than managers, correct?
16 A. I do.
17 Q. Okay.
18 A. Well, I -- I guess I do now. I did not
19 know that.
20 Q. Not because of sex?
21 A. No, in that -- in that --
22 Q. Hold on. You recognize that people in
23 sales, regardless of sex, can make more than
24 managers?
25 A. I don't know that for -- I didn't know

1 that for sure.
2 Q. Okay. When -- and -- okay. So when
3 you -- you said that -- when you were talking
4 about male counterparts, you just mean anybody
5 else that's in a management position, is that
6 what -- is that what you were testifying?
7 A. And if I said -- when I said the male
8 counterpart, it means anybody who's in a manager
9 position, yes.
10 Q. Okay. Regardless of whether the ultimate
11 functions of their team are different from yours?
12 A. Right.
13 Q. Because you were the only person handling
14 customer success and -- and all --
15 A. Yeah, I just meant like people who are
16 managing other humans.
17 Q. Okay. Now, did you mention to Cindy any
18 specific people that you thought were being paid
19 more than you?
20 A. I don't know if I used specific names
21 'cause one of them would have been -- that was a
22 candidate --
23 Q. Yeah.
24 A. -- right? So I wouldn't have known his
25 name.

52 (Pages 202 - 205)

1       (Ms. Lauren Perkins Allen enters
2    the room.)
3   A.  I would have referred to that candidate
4 situation --
5   Q.  (By Mr. Jarrold)  Okay.
6   A.  -- like as a situation of hey.
7   Q.  Okay.
8   A.  And -- and it would be an assumption on
9 my part at the time to have been like, hey, if a
10 -- if -- if this is what sales engineers make --
11   Q.  Yeah.
12   A.  -- what does this mean for what other
13 people make, you know.
14   Q.  Okay.  So you may have brought up the --
15 the sales -- what sales engineers make --
16   A.  Yes, I definitely did bring that up.
17   Q.  -- to Cindy?
18   A.  Yes.
19   Q.  Would you have brought that up to anybody
20 else?  I mean, would you have brought up any other
21 positions to Cindy?
22   A.  I would have -- I would have brought up
23 the printer document -- the document I found on
24 the printer from John.
25   Q.  Okay.  And we discussed that.  Would you

1 have brought up any other positions to Cindy?
2   A.  Just I would have covered it like
3 holistically under my male counterparts.
4   Q.  Okay.
5   A.  That I was -- and it was more of just
6 like -- not even like specific accusations, just
7 curiosity and concern.  Like --
8   Q.  Okay.
9   A.  -- "I think this might be happening.
10 Like, is this happening?"
11   Q.  And she denied that that was happening?
12   A.  And she -- no, she didn't deny it was
13 happening.  She diverted to you can't say because
14 you don't have the same job title.
15   Q.  Okay.  So she didn't deny that some
16 people might be making more --
17   A.  No.
18   Q.  -- she suggested -- and just hold on till
19 I finish my question.
20      She didn't deny that some people were
21 making more money, right?
22   A.  Correct.
23   Q.  She suggested that it was perhaps because
24 of different roles or backgrounds or experiences?
25   A.  Yes.

1   Q.  Okay.  And you think you had these
2 conversations and call with Cindy in -- did you
3 say March or April 2023?
4   A.  Yeah.
5   Q.  Okay.  And have we talked about
6 everything that was discussed with -- with Cindy
7 in these conversations?
8   A.  I mean, there's -- there's more here on
9 this document that we haven't yet covered.
10   Q.  Okay.  Did you -- so I understand
11 you said you told Cindy that you felt some of the
12 pay was inequitable?
13   A.  Uh-huh.
14   Q.  Yes?
15   A.  Yes.
16   Q.  Now, we discussed your -- your
17 conversations with Kris about compensation --
18   A.  Uh-huh.
19   Q.  -- right?
20   A.  Yes.
21   Q.  Would you have said anything to Kris
22 about inequity?
23   A.  Yes.
24   Q.  When?
25   A.  I would have -- after I had a

1 conversation with her, I remember having a
2 conversation with him.  Kind of gave me the
3 like -- it's what gave me the like confidence to
4 have that kind of conversation with him 'cause it
5 was kind of -- it was nerve racking.  I was really
6 worried about making an accusation that my senior
7 sales director was not paying me equitably, but we
8 did have the conversation.
9   Q.  Okay.
10   A.  And that was before April 20th.
11   Q.  When was that conversation with Kris?
12   A.  It -- it could have been a day before, it
13 could have been a few days before, but I think it
14 was in around.
15   Q.  Close in time to that conversation -- to
16 that Slack message from April 20th --
17   A.  Yeah.
18   Q.  -- of 2023?
19   A.  Yes.
20   Q.  Okay.  And what exactly would -- and how
21 was -- did you just have the one conversation with
22 Kris prior to April 20th, 2023?
23   A.  I believe so, yes.
24   Q.  Okay.  Was that a virtual or in-person
25 conversation?

53 (Pages 206 - 209)

1    A.  We -- so we had a conversation virtually,
2  yeah, about -- we -- it -- it was virtual.  We had
3  our cameras on.
4    Q.  Okay.  And -- and what was discussed in
5  that conversation?
6    A.  It was just a recap of the conversation
7  that I had with Cindy and that I just -- I
8  reminded him about how I found -- he already knew
9  I had found that document on the printer,
10 remember, 'cause I had told him right away to let
11 him know.  At the time that I found it, it was
12 just like, "Hey, I'm just letting you guys know I
13 found this document but I -- I got it.  I put it
14 away safely."  So he knew I already had that.
15       But I brought that up and said, "Hey,
16 okay, so you know, remember I found that document
17 that one time.  And then I was on a call with
18 Jared, I found out about what a starting sales
19 engineer makes.  And, you know, I just started to
20 become concerned that I'm not getting paid
21 fairly."
22       And I did say based on gender, I'm the
23 only female leader on this team.  I'm the only
24 female manager on this team, and I am -- I am
25 concerned now knowing what a sales engineer makes.

1  What could that mean for that person's manager and
2  other managers?  Not that I was, like, accu --
3  that I had proof other than Jon's, you know, in
4  that interview.  But just that, hey, there's this
5  appearance that maybe, like, I'm not being paid
6  equitably and it just doesn't sit right with me.
7       And, you know, Kris was very -- at least
8  he came off as though he was very understanding.
9  Like it surprised me.  I thought he was going to
10 be, like, more frustrated or upset just even
11 thinking through, I mean.  And all I can assume
12 now is just like he -- he just knows how to play
13 the game, but he -- I think he presented well and
14 presented like he -- whether it was authentic or
15 not.
16    Q.  What did Kris tell you?
17    A.  He was, like, "Yeah, I -- I understand
18 how that might feel.  And just -- I want you to
19 put together something for me and send -- send
20 over what you think -- you know, you think that
21 you're -- you should have."
22    Q.  Okay.
23    A.  I -- also, you know, I -- I mentioned to
24 you that, like, I kind of recapped my
25 conversation, so there's more points here that I

1  would have recapped with him about.  You know, I
2  know a couple of times we talked about the
3  director level position and that hasn't happened
4  yet.
5       And I would have said I am doing more
6  with less.  And my concern that I was, like, being
7  taken advantage of being in this position but not
8  being promoted to the level in which that I was
9  actively operating the team -- actually directing
10 the team, you know.  And just that how much I have
11 accomplished in such a short amount of time that I
12 felt like.  And that I didn't understand why it
13 wasn't coming.
14       And, you know, you just really stayed
15 focused on shooting him over the numbers, you
16 know, kind of giving him an idea of what I'm
17 thinking because -- you know, we talked about it a
18 little bit verbally because, remember, he said
19 directors start at a hundred thousand.
20    Q.  Right.
21    A.  "So I can't give you" -- 'cause he
22 wasn't -- for whatever reason this care of, like,
23 you're going to be a director.  And then it's,
24 like, well, I can't give you more than a hundred
25 thousand dollars 'cause that's what directors

1  make.  So he was, like, just shoot me over what
2  you found and let's, like, work it out from there.
3    Q.  Right.
4    A.  And then that's when that --
5    Q.  And that's what you put in Exhibit 7?
6    A.  Yeah.
7    Q.  Okay.
8    A.  Yeah.
9    Q.  Have you -- have you told me everything
10 that Kris and you discussed in that conversation?
11    A.  I -- I -- I am sure that there were more
12 details about me advocating for myself and talking
13 about how hard I've been working and that I
14 need more support.  And that, you know, I'm sure I
15 mentioned there, but I definitely mentioned
16 there's a text message that I have where I say,
17 "You know, if you're not going to give me the
18 director level position, fine, but can you give me
19 supervisors" --
20    Q.  Sure.
21    A.  -- "to help support me?"  And so I
22 imagine on that call I would have reiterated that
23 text message.
24    Q.  Okay.
25    A.  I would have said something about, like,

54 (Pages 210 - 213)

1 if I'm -- if I can't have X, can I have the next
2 best thing which is support and a raise.
3    Q.   Okay.  Who was reporting to Kris Dunn at
4 that point in time, do you recall?
5    A.   Who was?
6    Q.   Who -- who else was reporting to Kris
7 Dunn directly --
8    A.   Okay.
9    Q.   -- not -- not the full board --
10    A.   Uh-huh, yeah.
11    Q.   -- just who was reporting directly to
12 Kris Dunn at that point in time?
13    A.   You just want their names?
14    Q.   Why don't we do -- if you recall their
15 position, go ahead and tell me.
16    A.   Okay.  Jesse Johnsey, director of T3
17 sales.
18    Q.   Okay.
19    A.   Jared Johnanning, manager of sales
20 engineering.
21    Q.   Okay.
22    A.   Jerry Lasley, director of customer
23 success and sales success.
24    Q.   He was let go in February of 2023, so I'm
25 talking about the April --

1    A.   Oh, okay.
2    Q.   -- 2023 time frame --
3    A.   Okay.
4    Q.   -- when this was happening.
5    A.   Okay.  And I do believe Adam -- don't
6 recall his last name -- reported directly to Kris
7 Dunn.  And I don't -- he was in our leadership
8 meetings.
9    Q.   Okay.  So three other people?  Just
10 three?
11    A.   Yes.
12    Q.   And where was Mary McClanahan?
13    A.   She had already transitioned before
14 Jerry's departure to manage a different team on
15 the rental side of the company.
16    Q.   Okay.  But she had previously been under
17 Kris?
18    A.   She had previously been under Jerry, and
19 Jerry reported to Kris.
20    Q.   Okay.  So she transitioned after Jerry
21 left?
22    A.   Before Jerry left.  And I -- he asked me
23 to be the interim manager.
24    Q.   Oh, okay.  Okay.
25       Now, if we go back to that Exhibit 7 --

1 Ms. Anderson --
2    A.   Yes, sir.
3    Q.   -- if you look at Exhibit 7 and that
4 communication with -- with Kris Dunn on April 20
5 of 2023, there's no reference in there to other
6 jobs at Equipment -- well, I won't -- I won't say
7 that.
8       In that -- in that third paragraph, you
9 mention, "As I know you were saying that Directors
10 here start at 100K."
11    A.   Yes, I do see that.
12    Q.   Okay.  But other than that, there's no
13 reference to other roles and what they make at
14 EquipmentShare, right?
15    A.   Correct.
16    Q.   Okay.  And there's no reference to your
17 gender or sex, right?
18    A.   Correct.
19    Q.   But you're saying you raised that in a
20 separate verbal conversation with Kris prior to
21 this --
22    A.   Yes, after talking --
23    Q.   -- Slack?
24    A.   -- to -- there probably -- there wasn't
25 anything in writing to Kris about gender or sex.

1 I was -- I was in fear of my job, but I did -- I'm
2 pretty confident those terms were used to Cindy to
3 describe like, hey, I don't want -- I am nervous
4 about -- like, I don't -- here's how I'm feeling.
5 I'm pretty sure that that was in a Slack writing
6 to her of -- of saying that written out, yes.  She
7 should have that.  But I was ner -- I had reported
8 to her I'm just nervous to, like, talk to him
9 about this.  Like, I don't want to lose my job.
10 Like --
11    Q.   But you --
12    A.   -- I was scared.
13    Q.   -- ultimately did talk to him about it
14 and --
15    A.   I did after her advice.
16    Q.   Hold on.  You've got to wait for me to
17 finish my question.
18       You ultimately did -- you claim that you
19 did talk to him about it in April of 2023 prior to
20 this Slack message on the 20th?
21    A.   Correct.
22    Q.   Okay.  Okay.  So why don't you go back to
23 Exhibit 8 for me.
24    A.   Okay.  I'm here.
25    Q.   And go to page 3, the question we've been

1 talking about.
2   A.  Okay.
3   Q.  All right.  So have we -- have we now
4 talked about all the complaints you allege to have
5 made related to discrimination, harassment,
6 retaliation, during your employment?
7   A.  Other than reporting Jesse Johnsey, but
8 that's not really gendering.  I mean, that was --
9 no.  Like we haven't talked about Jesse Johnsey
10 yet.
11   Q.  Okay.  Tell me what's this complaint
12 about Jesse Johnsey.
13   A.  In or -- in or around the time that I was
14 having the conversations about pay and equity and
15 promotions and all of that, I was also in the
16 middle of auditing customer accounts because --
17 for the purpose of a new billing system.  And
18 attempting to reconcile every single account so
19 that when the data goes into the new billing
20 system, we're not having to correct a bunch of
21 stuff after.
22       Okay.  So, like, do they have five
23 Trackers or do they have 10, you know?  Do they
24 have 5 but are they paying for 12?
25       And in my audits every, you know, 9 out

1 of 10 audits are going to be we're overcharging
2 the customer.  The customer is getting charged
3 more per month than what units they have on hand.
4 The type of plans were different.  And it's kind
5 of hard to explain, but they shouldn't have been
6 different.  There was a lot of discrepancies in
7 the way -- because the way you write up a plan can
8 make all the difference in your MRR, ARR --
9   Q.  Okay.
10   A.  -- and what you get paid out.
11       So I made the suggestion to Kris that I
12 felt like based on that data and previous
13 conversations and data that we had seen in -- in
14 Slack from Jesse that the numbers were not correct
15 and that he was doing -- mismanaging financials in
16 a way that would benefit his compensation.
17   Q.  Okay.  So you complained to Kris that you
18 believed Jesse Johnsey was mismanaging financials
19 in a way that was benefiting his compensation?
20   A.  Or misrep -- misrepresenting in the way
21 that he was classifying these deals and maybe even
22 quantities.  There was even a time that he double
23 paid himself on a shipment, and I brought that to
24 his attention.
25   Q.  Okay.

1   A.  I said I think there's something weird
2 going on here that might need to be looked into.
3   Q.  Okay.  And you said that you -- this was
4 around the same time period?
5   A.  Yes.
6   Q.  You think it was around April 2023?
7   A.  I -- I will say March, April.  Yeah, all
8 this happened --
9   Q.  Okay.
10   A.  -- in such a small amount of time.  I --
11   Q.  Okay.
12   A.  -- bit off more than I could chew.
13   Q.  And did you -- you reported that to Kris?
14   A.  (Witness nods.)
15   Q.  Did you report it to anybody else?
16   A.  Report it?  So you're talking about to HR
17 or anyone who's in a position above --
18   Q.  Yeah, did you notify supervisors --
19   A.  Jerry and I talked --
20   Q.  -- or human resources --
21   A.  Yeah.
22   Q.  -- personnel?
23   A.  Jerry and I talked about it a lot.  We
24 talked about it a lot.
25   Q.  And so this would have been --

1   A.  Jerry and I would have discussed the --
2 this would have been an ongoing -- this was an ongoing
3 discussion amongst lots of people in the
4 department both fired for knowing this information
5 presumably.  And yes, my supervisor, Jerry Lasley,
6 and I had several conversations about it.  It was
7 kind of exhausting because he was more focused on
8 everything Jesse was doing incorrectly instead of
9 focusing on being the director of...
10   Q.  Okay.  So -- but if -- if you were having
11 a conversation with Jerry about it, that would
12 have been in February of 2023 or earlier?
13   A.  It would have been.
14   Q.  Okay.  Is that when you would have talked
15 to Kris about it?
16   A.  I would have talked to Kris about it
17 in -- it would have been after Jerry.  I started
18 doing audits -- gosh, I started doing audits,
19 really hitting that heavy.  It could have been at
20 the start -- it could have been when Jerry was
21 still there --
22   Q.  Okay.
23   A.  -- but I don't think I talked to Kris
24 about it until Jerry was gone.
25   Q.  So you think --

1    A.   When I was --
2    Q.   So you think you talked to Kris about
3 these financial issues with -- under Jerry --
4 Jesse Johnsey sometime in February 2023 to
5 April 2023?
6    A.   (Witness nods.)
7    Q.   Okay.  Yes?
8    A.   Yes, I think so.
9    Q.   Any other -- and you had a conversation
10 with Jerry about it or conversations with Jerry
11 and you had a con -- a conversation with Kris as
12 we discussed between sometime February and
13 April 2023?  Yes?
14    A.   Yes.
15    Q.   Did you have a conversation about this
16 with any other supervisory or HR personnel?
17    A.   Ben Wilson and I talked about it a few
18 times.
19    Q.   Okay.  When did you talk to -- did you
20 talk about it with anybody else?
21    A.   (Witness nods.)
22    Q.   In a supervisory or human resources role?
23    A.   I may have talked to Kris Koenig about
24 it.  He's technically a supervisor over folks.
25    Q.   Okay.  And who is Kris Koenig?

1    A.   He is in charge of the business
2 development reps, the BDRs.  I don't -- I think he
3 was a BDR manager --
4    Q.   Okay.
5    A.   -- but he still reported to Jesse.  I
6 think.
7    Q.   But what -- you're -- you're suggesting
8 this was not included on that interrogatory
9 response because --
10    A.   It was included in my --
11    Q.   -- it doesn't have anything -- hold on,
12 just let me finish my question.
13    A.   Okay.
14    Q.   It wasn't included in that interrogatory
15 response because I think you suggested it doesn't
16 have anything to do with gender or sex, right?
17    A.   I don't think that's why it's not on
18 there.  I just don't think that I --
19    Q.   Okay.  But the --
20    A.   -- remember -- I don't think I remember
21 to put it -- I put it all here.  I think it's just a
22 simple, like, I forgot to put it all here.
23    Q.   Sure.  But this was a -- this was a
24 complaint about financials and not about sex or --
25    A.   Yes.

1    Q.   -- gender or retaliation?
2    A.   Correct.
3    Q.   Okay.
4    A.   Sorry.
5    Q.   Okay.  I just want to know if we can push
6 this one aside.
7    A.   I don't think we can.
8    Q.   Have we now -- well, for purposes of
9 this, have -- have we now covered all the
10 complaints that -- that you allege you have made
11 in your employment?  And I'll go through them for
12 you, okay?
13    A.   Okay.
14    Q.   You testified that you complained about
15 this PIP, right?  You complained about this --
16 number two, you complained about this -- these
17 hygiene conversations?
18    A.   Am I answering yes after each prong or at
19 the end?
20    Q.   Let's -- we'll go -- we'll do each prong
21 and then I'll do a wrap-up, how about that?
22    A.   Because you're looking, but I wasn't
23 sure.
24    Q.   I know.  I know.
25    A.   Okay.

1    Q.   All right.  You complained about this
2 PIP, yes?
3    A.   Yes.
4    Q.   Okay.  You complained about this -- these
5 conversations related to, you know, you and/or
6 Jerry talking to an employee about hygiene, yes?
7    A.   Yes.
8    Q.   We talked about you complained about
9 Jerry seeking out responses from team members for
10 the PIP, right?
11    A.   Yes.
12    Q.   And we talked about your complaints to
13 Cindy and Kris about compensation, right?
14    A.   Yes.
15    Q.   And we talked about your complaints
16 related to Jesse Johnsey's financials, right?
17    A.   Yes.
18    Q.   Any other complaints --
19    A.   Well, we --
20    Q.   -- that we have not discussed?
21    A.   No, but we -- I mean, one that you didn't
22 mention that we discussed was just, like, not
23 being promoted or being passed over for --
24    Q.   Okay.
25    A.   -- verse -- in comparison to my male

1 counterpart.  I mean, I guess I should say in
2 comparison to Jerry.  Just being passed over for
3 roles, not given roles.  We kind of -- we touched
4 on that.  Like, that was my conversation --
5    Q.  Okay.
6    A.  -- right like --
7    Q.  Why did you not include that in your
8 interrogatory response?
9    A.  If I'm going to be completely honest,
10 I -- I think you guys gave this to me on an
11 evening and asked me --
12    Q.  Don't talk about any sort of
13 communications with them but --
14       MS. PERKINS ALLEN:  Yeah.
15    A.  I thought it was covered under my EEOC
16 file.
17    Q.  (By Mr. Jarrold)  Okay.
18    A.  I thought it was covered --
19    Q.  Okay.
20    A.  -- under all the documentation that I
21 also had in addition to this one document.  And I
22 honestly thought I was giving, like, a quick
23 summary that we could expand upon.  I -- this --
24 I'm not -- I guess I'm naive and I didn't realize
25 that -- and I think we should have looked it up

1 that I should have, like, really dove in deep.
2 Because I'm a very detail-oriented person and I --
3 looking back I should -- if I had known, I would
4 have --
5    Q.  Okay.
6    A.  -- I would have put -- I would have put
7 the 14-page timeline that I wrote into that
8 answer.
9    Q.  Okay.
10    A.  And so I apologize for that.
11    Q.  Okay.  So let's just -- let's just make
12 sure I have everything now, all right?  You
13 complained about the PIP; you complained about
14 the -- talking about the hygiene concerns; you
15 complained about Jerry seeking out responses for
16 the PIP; and you complained about compensation;
17 you complained about Jesse Johnsey and the
18 financials; and you complained about not getting
19 certain positions?
20    A.  Yes.
21    Q.  Is that the full scope of complaints --
22    A.  Yes.
23    Q.  -- that you have made during your
24 employment with EquipmentShare?  Are those all the
25 complaints that you made?

1    A.  No.  This is just during my time --
2    Q.  Okay.  I've asked many times now about
3 each complaint and we keep adding more and more.
4 So I really need you to tell me all the complaints
5 that you made.
6    A.  You said --
7    Q.  Are there others than -- all right.  We
8 talked about -- you added the director thing most
9 recently.  What else am I missing?
10    A.  You're missing something from 2019.  So
11 when you -- I was asking -- I was just answering
12 you honestly.  Like, it's not here, so we don't
13 need to cover it.  But I -- your question was,
14 does this cover everything at EquipmentShare, so I
15 wanted to answer honestly.  The honest word --
16 honest is no, but it is not in here.  And we -- I
17 don't think we really need to cover it unless
18 you're just --
19    Q.  Well, what is the complaint that --
20 that's not included here?  Are there more -- is
21 there more than one -- and not included here that
22 I just summarized?  Are there -- is there more
23 than one complaint that I did not include?  Is
24 there more -- is there -- how many more complaints
25 have not been included here in what I just

1 summarized?
2    A.  I just want to, like, answer very
3 honestly.  And I don't know if you are asking me
4 if you -- like, to go beyond the scope of
5 ultimately what led up to my firing.  Like, I --
6 this is very specific to my firing, and I -- do
7 you want me to take your question literally of my
8 entirety at EquipmentShare from 2018 to 2023 or
9 should I focus on just the complaints made in the
10 months leading up to my firing?
11    Q.  How many other complaints throughout your
12 employment did you make?
13    A.  One.
14    Q.  Okay.  And what was that?
15    A.  It was to David, the director.  He's
16 retired now, but David in HR.  I emailed that I
17 felt like I wasn't getting opportunities to grow
18 when I got transitioned to a customer support,
19 whatever my title was, specialist or something.
20 That I just wanted more opportunities that I felt
21 like I wasn't getting under Eric's leadership.
22    Q.  That was in 2019?
23    A.  Yes.
24    Q.  And who was that?  That was an email you
25 sent to somebody named David?

58 (Pages 226 - 229)

Veritext Legal Solutions
www.veritext.com                                                                888-391-3376
Case 4:24-cv-00531-BCW    Document 30-2    Filed 05/16/25    Page 59 of 91

1    A.  I asked -- I asked David if we could
2  meet.  You know, David was actually the head of HR
3  until he retired within the last few days.  I'm
4  trying to remember his name.  But I sent him an
5  email asking if we could talk about it.  He came
6  into town, into Kansas City, we went and got
7  coffee.  He just said, "Hey, keep working hard,
8  keep talk -- keep saying what you want and that
9  should take you places," and that was the end of
10 that.
11    Q.  Did you suggest to David that your
12 opportunities or lack of opportunities had
13 anything to do with sex, gender or was
14 retaliatory?
15    A.  No.
16    Q.  Okay.  All right.  So let's move forward
17 to the director.
18    A.  Okay.
19    Q.  When did you complain about not
20 receiving -- I don't know what your words were,
21 but not receiving a director or other roles or
22 being passed over roles, when did you complain
23 about that?
24    A.  The first time I ever said something
25 about that was to Kris Dunn during our meeting

1  about Jerry's announcement of becoming a director.
2    Q.  And that was, what, Q2, Q3 of 2022?
3    A.  Yes.  Whenever Jerry was announced as
4  director, we would have had that conversation.  We
5  did it by phone conference.
6    Q.  Okay.  And what did you tell Kris?
7    A.  I have a whole write-up, but -- of my
8  notes from that call.  But I brought up my --
9    Q.  Have you provided your notes to your
10 counsel?
11    A.  Yes.
12    Q.  And what did you -- what did you tell
13 Kris?
14    A.  We -- gosh, I wish I had that document in
15 front of me.  But we talked about a lot.  We
16 covered -- I had a list of questions that I wanted
17 to ask him, I prepared before the call.  And then
18 I have notes of, like, what his responses were.
19 But we -- we covered a lot of things.
20       But I had concerns about -- generally
21 speaking, you know, what was the decision that led
22 to moving Jerry into that role when it was
23 well-known that he wasn't performing well and
24 disguising it as a promotion.  And -- and, you
25 know, his -- well, I also said, "What's it going

1  to look like for Jerry to be in a position over a
2  team that his son is on?"
3       I asked, "How will the reporting
4  structure change?  Do I report to Jerry, do I
5  report to Kris?  Just kind of, like, the logistics
6  of --
7    Q.  Okay.
8    A.  Oh, any kind of question you could think
9  related --
10    Q.  Okay.
11    A.  -- to, like, how is this going to work
12 now?  Who am I calling for what?  Those kind of
13 questions.
14       We talked about -- we -- I remember,
15 'cause I wrote the notes down, about -- something
16 about some sort of benefits that could happen.
17 'Cause there was, like, a note about divesting --
18 or something -- something stock related on there.
19       And I voiced my concerns about how I felt
20 passed over because -- in -- in accepting this
21 manager position, I really thought there was going
22 to be an upward trajectory of growth.  And that
23 now with Jerry coming over and managing -- or
24 directing a team he's not had -- I -- I
25 communicated my frustrations about how he had --

1  didn't have the experience to be in a director
2  level position, and that I felt like because he
3  now got this role he -- now he's blocking my
4  ability to be able to grow within the company and
5  have an upward career trajectory that I was --
6  previously expressed to Kris that I had the
7  interest in pursuing.  Like, I -- I mentioned my
8  goals to him of, like, you know, we talked before
9  that, like, the goal for me is nowhere but up.
10 And so I felt like that decision blocked my
11 ability for growth.
12    Q.  Okay.  Anything else you shared with Kris
13 in that conversation?
14    A.  I would refer to that document.  There --
15 there could have been other names.
16    Q.  I don't have that document.
17    A.  I understand but...
18    Q.  Anything else you shared with Kris?
19    A.  Yes, but that's all I can recall at this
20 time.
21    Q.  Okay.
22       MR. JARROLD:  And if you-all have
23 that document.
24       MR. KLINKENBORG:  We'll look for
25 it.

Case 4:24-cv-00531-BCW    Document 30-2    Filed 05/16/25    Page 60 of 91

1          MR. JARROLD:  Okay.
2     Q.  (By Mr. Jarrold)  So you had this
3  conversation with Kris around the time that
4  Jerry's -- it was announced that Jerry was moving
5  into this director of customer success role?
6     A.  Uh-huh, yeah.
7     Q.  Any other conversations with Kris Dunn
8  about -- or complaints about not receiving a
9  position or being passed over?
10    A.  I mean, yeah, it -- I mean, we would have
11 talked about it when I'm -- I mean, we -- I mean,
12 technically -- I guess, like, remember when I
13 said -- I don't know if you want me to repeat
14 this, but like when I said, Hey, you mentioned,
15 like, that I was going to become a director, when
16 is that going to happen?  Just asking about it.
17 Like, checking in, like, is this going to happen
18 now?  Is that what you mean, like --
19    Q.  Any sort of complaints, like --
20    A.  Oh, complaints, okay.
21    Q.  -- that you --
22    A.  If I did, I can't recall right now.
23    Q.  Okay.  Okay.  And did you ever say --
24 when you were talking to Kris about these director
25 roles, did you ever say, you know, "I'm not

1  getting it because it's retaliatory or because I'm
2  a woman" or anything like that?
3     A.  I did not say that to Kris.
4     Q.  Okay.  Did you complain to someone other
5  than Kris?
6     A.  Yeah.  I -- I --
7     Q.  About --
8     A.  Yes.
9     Q.  -- being passed over?
10    A.  Yes.  Yes, and --
11    Q.  And super -- hold on one second.  Did you
12 complain to anyone other than Kris in a
13 supervisory or HR role about not receiving
14 director role or being passed over for positions?
15    A.  Yes.
16    Q.  Who?
17    A.  Cindy.
18    Q.  When did you complain to Cindy about
19 that?
20    A.  4/21.
21    Q.  Okay.  And -- and you're gesturing to the
22 exhibit that I put in front of you which is marked
23 as -- what's that number?
24    A.  9.
25    Q.  9.

1          MR. JARROLD:  Thank you, Erik.
2          MR. KLINKENBORG:  You're welcome.
3     Q.  (By Mr. Jarrold)  And so do you think
4  that conversation with Cindy happened on
5  April 21st, 2023?
6     A.  Again, if she took really great notes, if
7  that was -- it's been -- it could have been.  It
8  could have been the next day or a few days later
9  that she wrote her notes down.  Or -- I don't know
10 why I'm hanging my hat on it.
11    Q.  Sure.
12    A.  It's just you're depending on me to speak
13 to her date.
14    Q.  Yeah.  But you recall one conversation
15 with Cindy about that?
16    A.  Yeah, at -- yes.
17    Q.  And according to this document,
18 Exhibit 9, it says, presumably you, Kasey, she
19 wants director role, talk to Kris, was going to
20 respond to Slack.
21         What did you share with Cindy about
22 either this director role or being passed over for
23 roles?
24    A.  I just explained that I -- in this
25 conversation we just -- anything that was relevant

1  to that we would have talked about how I got
2  passed over because Jerry was assigned to the
3  director role, not having any -- have had any
4  prior experience.
5     Q.  Well, hold on.  You understand that Jerry
6  came into the organization in 2016 as a director
7  and at all times held a director position, right?
8     A.  Of sales, correct.
9     Q.  Okay.  So you understand that he had
10 background as -- in director level positions?
11    A.  Yes.
12    Q.  Okay.  And you understand, too, that he
13 had about 20 more years working experience than
14 you?
15    A.  I do.
16    Q.  Okay.
17    A.  In sales.
18    Q.  Okay.  All right.  Did you express to
19 Cindy that you thought that Jerry receiving this
20 director role or you not receiving this director
21 role or otherwise being passed over for roles, was
22 somehow related to gender, sex or retaliation?
23    A.  Yes.
24    Q.  What did you tell her?
25    A.  I told her it was based on -- I said it

1 was based on gender, and I told her that --
2    Q.  What exactly did you tell --
3    A.  I told --
4    Q.  -- her was based on gender?
5    A.  I told Cindy that I felt Jerry
6 unfairly -- I think it's more about -- it was
7 probably more about, like, Jerry got selected
8 because he's a man and less about because I'm --
9 because I'm a woman.  Like, I am the only
10 female -- like, it just felt like a prevention.  I
11 was the -- I was just -- I don't know, I just felt
12 passed over because --
13    Q.  Okay.
14    A.  -- because I'm a female.
15      And the examples I used is how can a man,
16 who is poorly performing and everyone knows it,
17 get promoted to a director level position and in
18 the same way RC Davis, who was in a director level
19 position, get demoted to a sales engineer with the
20 explanation that he is doing a work life balance.
21 It felt like these men were just being favored
22 even for -- favored and rewarded for poor
23 performance while I'm over here working my butt
24 off and not being given the same.  That is what we
25 talked about.

1    Q.  As of April 2023, you were what, manager
2 of customer success?
3    A.  Yes.
4    Q.  Okay.  And you had had a pay increase six
5 months earlier, right?
6    A.  For my annual review?
7    Q.  Uh-huh.  Yes.
8    A.  Yes.
9    Q.  Okay.  And between January 2022 and
10 April '23, your comp had been increased $15,000,
11 right?
12    A.  On the -- 10,000 of that was directly
13 after I complained about pay inequity and it comes
14 off the heels of having HR conversation where
15 Cindy told me I have to stop talking about pay
16 equity because I'm a manager and managers don't
17 talk about that with --
18    Q.  Okay.  We -- previously I had -- I had
19 talked to you about your conversations with Cindy
20 about compensation, right?  And -- and we
21 discussed that you had shared everything about
22 your conversations with her, but now you're
23 telling me that Cindy told you not to talk about
24 pay equity?
25    A.  This came later.  This is -- yeah, you

1 didn't ask me about -- we -- we had call -- this
2 was a feedback call.  This was not a call that
3 pertained to -- Cindy learned later that I was
4 talking to people about pay equity.  So this was a
5 feedback call.  This wasn't a, hey, I'm coming to
6 you, Cindy --
7    Q.  Okay.
8    A.  -- and --
9    Q.  When was this?
10    A.  It would have been around the time --
11 there's some documentation where a situation
12 happened with Tallese Alvarez.  I would have to
13 refer to that document for, like, the exact
14 timeline, but it was around that time.  It's going
15 to be -- all of this happened, I would say, Q1 of
16 2023.
17    Q.  Okay.
18    A.  So it would have been after -- okay, so
19 it would have been around April because I reported
20 it to Cindy, but I was also talking about it to
21 other people and it got back to Cindy that I was
22 having conversations about pay equity.  So it had
23 to be after April 21st.
24    Q.  Okay.  So let's -- let's go back 'cause
25 we -- originally we were talking about your

1 concerns raised to Cindy about not being put into
2 a director role and you -- or -- or being passed
3 over, right?
4    A.  Right.
5    Q.  Okay.  And you said that you referenced
6 sex, gender or retaliation, right?
7    A.  I said gender.
8    Q.  And you said that -- what specifically
9 you said to Cindy was, you thought that Jerry
10 Lasley was placed into that director of customer
11 success role because he was a man?
12    A.  I said that I felt like men were being
13 treated -- what I said was that I felt like men
14 were being treated with better favor despite
15 having had poor performance.  Being put in
16 positions -- instead of being let go, they're
17 promoted or they're demoted into positions instead
18 of disciplined.  And I think that that is --
19    Q.  Okay.
20    A.  -- discrimination based on sex because --
21    Q.  Okay.  And this was a conversation you
22 had with her in April of 2023 --
23    A.  Yeah.
24    Q.  -- as part of that --
25    A.  Yeah.

61 (Pages 238 - 241)

1    Q.  -- compensation discussion you're saying?
2    A.  Yes.
3    Q.  Okay.  And did you give her specific
4  examples?
5    A.  Yes.
6    Q.  What examples did you give?
7    A.  The example of Jerry Lasley being moved
8  from the director of sales into the director of
9  customer success and sales success.  And I gave
10  her the example of RC Davis being demoted from
11  director of customer support to a sales engineer
12  in the name of work life balance when it was
13  reported from Kris that it was performance and
14  conduct related.
15    Q.  Yeah, how -- how do you know --
16    A.  We had private --
17    Q.  -- what Jerry Lasley's performance was or
18  that it was not up to par?
19    A.  Not only was it reflected in HubSpot
20  because it's public data --
21    Q.  What's HubSpot?
22    A.  HubSpot is the CRM that T3 uses to track
23  sales metrics and performance of sales
24  representatives that the team prides itself on
25  being public so that it can hold people

1  accountable to their metrics.  Not only was the
2  data there in HubSpot, but Kris actually had
3  personal conversations with me telling me that
4  Jerry was not performing.  And Jesse Johnsey had
5  personal conversations telling me he was not
6  performing.
7    Q.  Okay.  Any other reason that you believe
8  that Jerry Lasley was not performing?
9    A.  Yeah, other than -- yeah, other than he
10  wasn't performing.  There are no other reasons.  I
11  mean, I saw --
12    Q.  Other than what you saw in --
13    A.  Yeah.  Other than what I saw --
14    Q.  -- the sales -- hold on -- hold on.
15      Other than what you saw in the sales
16  metrics, and you said that Kris and Jesse shared
17  that he was not performing?
18    A.  Correct.
19    Q.  Okay.  And that's what you base your
20  belief on?
21    A.  Yes.
22    Q.  Okay.  What about RC Davis, you believe
23  that he was not performing?
24    A.  (Witness nods.)  Yes.
25    Q.  Why?

1    A.  Be -- well, one reason I felt like he
2  wasn't -- like I -- he was my manager at one
3  point, so I -- I lived under him.  There was also
4  a nepotism issue.  Katherine, his wife's sister,
5  worked for his team, and we all had concerns that
6  she got longer breaks than us, she -- there's just
7  a lot of nepotism with that.  So that was the
8  climate.
9      He, as a manager, didn't manage.  He --
10  there was no accountability in his leadership.
11  And there -- you did not get training from RC
12  unless it was, like, the first week on the job and
13  then thereafter if you wanted to seek him out, you
14  had to go to him.  So...
15    Q.  Okay.  Did anybody tell you that RC Davis
16  was not performing?
17    A.  Yes.
18    Q.  Who?
19    A.  Kris Dunn.
20    Q.  And when was that?
21    A.  I don't recall.
22    Q.  Okay.
23    A.  It --
24    Q.  Have we covered everything that you
25  discussed with -- well, what did -- what did --

1  excuse me, what did Cindy share with you or what
2  was Cindy's response to your, you know, saying
3  that these men had been moved despite poor
4  performance?
5    A.  Okay.  So we're going back.  'Cause we
6  talked about the feedback call, but we're going --
7  we're back to April '21?
8    Q.  Yeah, the conversation with Cindy.  I
9  think this all started because we were talking
10  about you sharing with her, you know, not
11  receiving a director role.
12    A.  She really encouraged me to talk to Kris.
13  I mentioned before that she encouraged me to seek
14  him out to see, like -- to ask him "What can I be
15  doing in my role to better support you?"  That was
16  the main crux of her advice.  And to just ask him,
17  like, about -- about a pay increase.
18    Q.  So that was her advice, not just for
19  the -- your concern with compensation, but not
20  receiving the director role?
21    A.  Yeah.  I don't recall what she would have
22  said about that.
23    Q.  Okay.
24    A.  She -- I --
25    Q.  Anything --

1    A.  I can't recall what she said.
2    Q.  Okay.  Anything else about those
3  conversations that we -- that was said that we
4  haven't discussed?
5    A.  I don't think so.
6    Q.  Okay.  Have we now covered all of your
7  complaints during your employment?
8    A.  We have covered -- yeah, every -- under
9  this answer in general?
10    Q.  All of your complaints during your
11  employment.
12    A.  Yeah.  I'll just -- yes.
13    Q.  Okay.
14        MR. JARROLD:  All right.  Why
15  don't we take a break, five-minute break and then
16  come back.
17        MR. KLINKENBORG:  All right.
18        THE VIDEOGRAPHER:  Off the record,
19  2:50.
20        (Recess.)
21        THE VIDEOGRAPHER:  We're back on
22  the record at 3:03.
23    Q.  (By Mr. Jarrold)  Okay, Ms. Anderson,
24  we're back on the record.  Do you understand
25  you're still under oath?

1    A.  Yes.
2    Q.  Anything about your prior testimony that
3  needs to be corrected or was mis -- or was
4  incorrect?
5    A.  No.
6    Q.  Okay.  All right.  At any point during
7  your employment were you issued any sort of
8  written discipline?  And I understand that Jerry
9  Lasley talked about giving you a PIP, but
10  ultimately he did not issue it --
11    A.  Correct.
12    Q.  -- right?
13        So other than that, were you ever issued
14  any sort of written discipline during your
15  employment at EquipmentShare?
16    A.  No.
17    Q.  Okay.  Now, you received some coaching
18  during your employment, correct?
19    A.  No.
20    Q.  No coaching whatsoever?
21    A.  Yes, there was -- yes, there was
22  coaching.  So I'm trying to -- I shouldn't guess
23  what you mean by that.
24    Q.  Sure.
25    A.  I -- yes.

1    Q.  What do you mean by "coaching"?
2    A.  Like, hey, how do I handle this really
3  difficult situation with a personnel problem and
4  then --
5    Q.  Okay.
6    A.  -- this is how you handle it.
7    Q.  Did any -- did anyone ever raise any sort
8  of concerns to you about your performance?
9    A.  Yes.
10    Q.  Who?
11    A.  Or -- performance, conduct.  I got to get
12  -- stop being in the weeds.  The first time I ever
13  had anything come up was in September of 2022 when
14  I was presented my biannual review from Jerry
15  Lasley.
16    Q.  Okay.  Any other times that your
17  performance or leadership or professionalism were
18  brought to your attention?
19    A.  After the PIP they said the conversation
20  of, like, just watch your tone, be professional,
21  be pleasant.
22        And then the call with Cindy of be --
23  don't talk about pay 'cause you're a manager.
24  Managers don't talk about things like that.
25        And then the fourth would be with Tallese

1  Alvarez.  There was -- there was just another
2  discussion about tone and pleasantness with...
3    Q.  Okay.  So you mentioned that there was
4  feedback on -- or, well, there was -- concerns
5  with your performance were brought to your
6  attention by Jerry in September of 2022 related
7  to --
8    A.  Interpersonal.
9    Q.  Okay.
10    A.  Tone, tone.
11    Q.  Okay.  And then there was discussion of
12  being pleasant with --
13    A.  Like you asked about coaching.
14    Q.  -- Cindy and Kris; is that right?
15    A.  Yeah, you asked about, like, coaching.
16  They were saying, like, their coaching was be
17  pleasant, be -- watch your tone, be pleasant.
18    Q.  And when -- when was that?
19    A.  That was during our meeting about the
20  PIP.  After the PIP -- after Jerry was let go --
21    Q.  Okay.
22    A.  -- they were like "Here's the PIP, we're
23  not filing it.  It's not formal, but it was
24  written.  So all we're going to say to you is just
25  make sure you're being pleasant, being -- watching

63 (Pages 246 - 249)

1  your tone" --
2    Q.  Okay.
3    A.  -- "being professional."
4    Q.  Okay.  Okay.  And then you said Cindy
5  told you not to discuss compensation at some
6  point?
7    A.  Yeah, there was a separate phone call on
8  that.
9    Q.  Okay.
10   A.  Yeah.
11   Q.  Do you recall when that was?
12   A.  It would have been after, like, the
13 April 21st conversation, but after -- probably
14 after April 24th.  Maybe like -- I would say maybe
15 the late April, early May --
16   Q.  Tell me what was that conversation about.
17   A.  -- I think.
18      It was just reported to her that I would
19 -- at some point during one of the conversations
20 that we were having she just brought up that she
21 knew somehow that I had been having conversations
22 about inequitable pay in the workplace with people
23 who were not -- people who were my subordinates,
24 not just, like, manager to manager.
25   Q.  Okay.

1    A.  And she advised me that I do not need to
2  be having those type of conversations because it's
3  not appropriate.
4    Q.  And -- and what conver -- were you having
5  conversations --
6    A.  I was.
7    Q.  -- with subordinates?
8    A.  I did mention it to a few subordinates.
9    Q.  What did you mention to subordinates?
10   A.  That I just had concerns about female --
11 equal treatment of women in the workplace and
12 equitable pay.
13   Q.  Well, hold on.  Now you're talking about
14 equal treatment of women in the workplace but --
15   A.  Yes.
16   Q.  -- you're talking about compensation
17 specifically, is that what you were discussing?
18 Originally you said that you -- she told you not
19 to talk about pay equity.
20   A.  Yeah, and you asked -- maybe I didn't
21 understand your question.  You asked me if I
22 talked to anybody else about -- you just want to
23 know if I -- can you ask me --
24   Q.  Okay.
25   A.  -- the question again?

1    Q.  Yes.  Yes.  So Cindy's conversation with
2  you was not to be discussing pay equity with
3  subordinate employees --
4    A.  Yes.
5    Q.  -- versus non-manager -- versus managers?
6    A.  Yes.  Well, really, not anyone besides my
7  supervisor and HR.  I think that's more fair to
8  say.
9    Q.  Okay.  Okay.
10   A.  Like, just try to avoid --
11   Q.  And that was around April of 2023?
12   A.  I think so, yeah.
13   Q.  Okay.  And then you mentioned something
14 about Tallese Alvarez?
15   A.  Uh-huh.
16   Q.  Yes?
17   A.  Yes.
18   Q.  And that was another -- in relationship
19 to further coaching or conversations with you
20 about your performance?
21      My original question to you was whether
22 during your employment anyone had brought concerns
23 to you about your performance, leadership or
24 professionalism?
25   A.  Okay.

1    Q.  Okay.
2    A.  (Witness nods.)
3    Q.  So what is your answer to that?
4    A.  I'm like, is that -- is that -- are you
5  asking the question again?
6    Q.  Yeah.
7    A.  The answer is yes.
8    Q.  Okay.  We talked about the -- the
9  conversation with Jerry in September?
10   A.  Yes.
11   Q.  Okay.  Talked about this conversation
12 after the PIP with Kris and Cindy about being
13 pleasant?
14   A.  Yeah.
15   Q.  Cindy told you not to talk about pay
16 equity with subordinates?
17   A.  Yes.
18   Q.  And then you mentioned something about
19 Tallese Alvarez?
20   A.  Yes.
21   Q.  Do you recall any other times when
22 concerns with your performance, leadership or
23 professionalism were brought to your attention?
24   A.  Does my annual review count?
25   Q.  Sure.  Any time somebody raised concerns

1  with your performance --
2  A.  Well, it --
3  Q.  -- leadership or professionalism.
4  A.  No, it was just a review of -- it just
5  said I was doing a lot better between biannual and
6  annual and that -- to keep focusing on
7  opportunities for growth.
8  Q.  Concerns with your performance?
9  A.  Then I would say no.  I would say the
10  biannual is not really even that.  I mean, I had a
11  biannual review where there was feedback.
12  Q.  Okay.
13  A.  I had an annual review feedback.  And
14  then --
15  Q.  And I'm not asking about feedback, I'm
16  asking just about concerns with your performance,
17  leadership or professionalism.
18  A.  Then I would say let's omit the biannual
19  review and -- since that does not technically
20  count.  It was a biannual review.  Since the
21  annual review doesn't count, then I would say that
22  just the conversation about being pleasant after
23  the PIP, and then the conversation about Tallese.
24  The --
25  Q.  Okay.  What's the conversation about

1  Tallese?
2  A.  I'm trying to think where to start
3  because my nature is to tell you what happened and
4  then go into -- but you don't need to -- you're
5  not asking what happened, you're saying what was
6  the conversation, okay.
7  Q.  I just want to know what you're referring
8  to.
9  A.  There was a -- yeah, so I need to --
10  okay.  So there was a situation with Tallese that
11  her and I had a conversation, I gave her
12  constructive feedback, she reported to HR that she
13  felt like I -- I can't remember her exact
14  language, but there is a document on it.  She
15  describes the way I made her feel, which wasn't
16  great.  And then after that we had a con -- HR had
17  a conversation with me about kind of that same
18  theme of being pleasant.  And they had us do a
19  DiSC assessment together.
20  Q.  What's a DiSC assessment?
21  A.  Well, not DiSC assessment.  We all take
22  DiSC -- EquipmentShare employees when you get
23  hired, you take a DiSC assessment and it
24  determines, like, your personality type, your work
25  type, your behavior, those kind of things.  It

1  outlines your strengths, your weaknesses.  And it
2  is used to determine a lot of times, like, if you
3  make a good sales rep, you'd be a strong D, those
4  kind of things.
5  Q.  Okay.
6  A.  You can use this DiSC assessment to
7  understand how to better communicate with someone
8  who doesn't maybe fall in your same personality
9  style.  So our job was to take her assessment and
10  mine and look at, like, the strengths and
11  weaknesses.  And then we were to come up with --
12  we come up with, like, the ways we thought we
13  disconnected when we would communicate.  And then
14  come up with, I believe it was, three ways that we
15  could, like, better communicate with each other.
16  It was something like -- an exercise like that.
17  Q.  Okay.  Okay.  Do you know what the
18  outcome of Tallese's complaint about you was?
19  A.  Can you expand?
20  Q.  Was there any -- like, do you know, was
21  there any sort of discipline issued to you, any
22  sort of feedback given to you?
23  A.  I think -- well, the -- the fact that we
24  had to do that DiSC assessment to me was
25  punishment.  Probably -- maybe not the best

1  word --
2  Q.  Okay.
3  A.  -- but it was --
4  Q.  Okay.
5  A.  Yeah.
6  Q.  All right.  Any other -- any other
7  concerns brought to your attention about your
8  performance, leadership, professionalism?
9  A.  I think that covers it.
10  Q.  Okay.  So did Kris -- so -- so if -- did
11  Kris ever speak to you about your leadership or
12  communication?
13  A.  Yeah, we've talked -- yes.
14  Q.  Okay.  And -- and those were in the
15  context of what you've discussed?
16  A.  Yes.
17  Q.  So if he said he had further
18  conversations with you about your performance or
19  that he coached you about your leadership or
20  communication, you deny that?
21  A.  No, I stand by what I said about their
22  comments about I needed to improve -- any time
23  Kris talked to me -- and I can't recall outside of
24  those instances, but we talked about it
25  previously, like -- I may not have said.  But

1 "Just make sure you're being pleasant, just make
2 sure you're being professional."
3    Q.   Would he have -- did he use the word
4 "pleasant"?
5    A.   Yes, on more than one occasion.
6    Q.   Okay.  And did he use the word
7 "professional"?
8    A.   Yes.
9    Q.   Okay.  Okay.  On more than one occasion
10 he -- he had that?
11    A.   Yes.  And those are the ones --
12    Q.   And did he say anything else that you
13 recall in those conversations?
14    A.   There was a comment once about being
15 humble, having humility.
16    Q.   Okay.  Do you remember when he was having
17 these conversations with you about professionalism
18 or -- or pleasantness or humility?
19    A.   Yeah, it was around the time leading up
20 into February and coming down to March, April,
21 May.  So that -- so that conversation was had at
22 the PIP meeting, that conversation was had at the
23 meeting regarding Tallese.
24    Q.   Okay.  So you had multiple conversations
25 with Kris and he's mentioning professionalism and

1 pleasantness --
2    A.   Yeah.
3    Q.   -- and --
4    A.   Humility.
5    Q.   -- humility?  Okay.
6    A.   Yes.  And the --
7    Q.   And those --
8    A.   -- coming off those specific scenarios,
9 yes.
10    Q.   Okay.  And those are conversations that
11 are occurring between February and May of 2023?
12    A.   Maybe, yeah.  Maybe.
13    Q.   Would it have extended into June or --
14    A.   Potentially --
15    Q.   Okay.
16    A.   -- we could have --
17    Q.   Okay.
18    A.   I'm trying -- I don't re --
19    Q.   Do you know how many conversations there
20 were?
21    A.   With Kris, and we have the two for sure.
22    Q.   So at least two?
23    A.   Maybe a third.  Maybe a third sometime.
24 You know, just like bringing -- you know, if we
25 were -- what I'm -- I guess what I'm trying to get

1 at is, I wouldn't put it past him if we were
2 having conversation about something and he'd be
3 like, okay, just -- you know, if I'm like, hey,
4 So-and-So this happened, he might say, okay, just
5 be professional, you know.
6       But I would say as far as the coaching
7 goes, two instances, and I'm going to say only
8 those two instances.
9    Q.   What two instances?
10    A.   The PIP, the ones we've covered a few
11 times.
12    Q.   Uh-huh.
13    A.   The post-PIP conversation, and then
14 regarding Tallese Alvarez.
15    Q.   Okay.  And there may have been more, but
16 those are the only ones that you're recalling?
17    A.   There are no more coaching sessions about
18 performance, no.  Those are all that I am
19 recalling.
20    Q.   Those are all that you recall, but there
21 may have been more?
22    A.   I'm going to say no.
23    Q.   Okay.
24    A.   I'm not going to call -- there -- no.
25    Q.   So if Kris said there would be more, that

1 would not be true?
2    A.   I agree, that would not be true.
3    Q.   What about with Cindy, did Cindy give you
4 any coachings outside of those conversations with
5 Kris?
6    A.   No.
7    Q.   Did anybody other than Cindy or Kris?
8    A.   Well, let me go back.  You said coaching,
9 like -- you mean just about performance, correct?
10    Q.   About your leadership, communication,
11 professionalism.
12    A.   If I ask -- if I asked for the advice and
13 then I got coached, does that count?  Hey, how do
14 I handle a situation when an employee, da, da, da,
15 and then she coaches me on it.
16    Q.   Sure.
17    A.   Does that count?
18    Q.   Sure.
19    A.   Okay.  There were several.  I mean, Cindy
20 and I worked so closely together I would say
21 probably for a year because there was separation
22 of employment for many members of my team that she
23 had to help me navigate through.  So there -- it's
24 a situation where a team member called someone the
25 N word.  I had to call her and say, "How do I

1 handle this?"
2     There was a situation --
3   Q.  Uh-huh.
4   A.  -- someone showed up impaired with two of
5 the wrong shoes on and making a scene. "Hey,
6 Cindy, how do I handle this?"
7     There was a situation when someone made a
8 written threat in Slack that said that they were
9 going to --
10   Q.  Okay.  So you're just describing
11 situations where you're seeking her feedback on
12 how to approach situations?
13   A.  Yes, but I -- those are coaching moments
14 of, like, this is how you should handle
15 yourself --
16   Q.  Okay.
17   A.  -- as a manager.
18   Q.  I'm really focused on instances where
19 people were raising concerns or giving you
20 negative feedback related to performance.
21   A.  Yeah.  So there would be just the -- the
22 PIP, post-PIP conversation, the Tallese
23 conversation.
24   Q.  And when you say "the PIP" and the
25 "post-PIP conversation," is that one conversation

1 after the -- that's one conversation with Kris and
2 Cindy after Jerry --
3   A.  Yes.
4   Q.  Okay.  We're not talking about two
5 different conversations --
6   A.  Huh-uh.
7   Q.  -- surrounding the PIP or -- okay.
8   A.  Huh-uh.  No.
9   Q.  Okay.  And then -- okay.  And -- and
10 you're familiar that -- or are you aware that
11 several subordinate employees or others made
12 complaints about you during your employment?
13   A.  I am.
14   Q.  Okay.  Are you aware of who complained
15 about you in your employment?
16   A.  I am.
17   Q.  Who are you aware of?
18   A.  I may not be of everyone.
19   Q.  Right.  Who are you aware who complained
20 about you?
21   A.  Jentrie Campbell.
22   Q.  Okay.  Who else?
23   A.  Potentially Cynthia Butler.
24   Q.  Okay.
25   A.  Tallese Alvarez.

1   Q.  Okay.  Any others that you're aware of?
2 Any other complaints you're aware of that you --
3   A.  Well, we had an anonymous feedback
4 survey, so there were several others, but I don't
5 -- I can't confirm who --
6   Q.  Who made them?
7   A.  Yeah.
8   Q.  Okay.  Okay.  Jentrie Campbell, who's
9 Jentrie Campbell?
10   A.  She was a customer success associate.
11   Q.  Did you hire Jentrie?
12   A.  I did not.
13   Q.  Is Jentrie a woman?
14   A.  She is.
15   Q.  Did she report to you?
16   A.  She did.
17   Q.  Who's Cynthia Butler?
18   A.  I don't recall what I gave her, what I
19 made her title to, but...
20   Q.  She was one of your reports?
21   A.  Yes.
22   Q.  And she's a female?
23   A.  Yes.
24   Q.  Did you hire Cynthia?
25   A.  No.

1   Q.  What -- who's Tallese Alvarez?
2   A.  Tallese was a subordinate in the end on
3 sales success.
4   Q.  And Tallese is a female?
5   A.  Yes.
6   Q.  Were all of these individuals employed
7 when your employment ended?
8   A.  Yes.
9   Q.  Okay.  And what do you understand Jentrie
10 Campbell's complaint against you to have been?
11   A.  She --
12   Q.  Well, actually, let me back up.  How are
13 you aware that Jentrie Campbell raised a complaint
14 about you?
15   A.  When she went out of town, she -- when
16 CSAs go out of town, we have -- their auto emails
17 get forwarded into a group inbox so that other
18 success associates can help manage their emails
19 and their customers so that we don't drop the ball
20 when they're gone --
21   Q.  Uh-huh.
22   A.  -- and that when they come back they have
23 a lighter load to carry.  And she -- her -- she --
24 we receive -- I say "we."  The leads that were
25 managing the inbox at the time saw an email come

67 (Pages 262 - 265)

1 in from Jentrie and reported it to me of, like, we
2 probably need to delete this, right? And it was
3 kind of an HR post-response of her reporting --
4 like, making a formal complaint because of not
5 getting a specific position.
6 Q. Okay. Would that have been around June
7 of 2023?
8 A. Oh, no, I was -- we were aware of that
9 before. I would have thought we were aware -- I
10 was made aware of that before June, but if that is
11 when Jen -- here's the deal. If that is when
12 Jentrie made the formal complaint, then it was in
13 June. But for some reason I felt like it was
14 before. But there's no way it could have been
15 before if she didn't file till June.
16     MR. JARROLD: If we can mark this.
17         (Exhibit 10 marked for
18         identification.)
19 Q. (By Mr. Jarrold) Showing you what's been
20 marked as Exhibit 10.
21 A. Okay. June it is.
22 Q. Is this what you were referring to,
23 Ms. Anderson --
24 A. Yeah.
25 Q. -- in terms of a complaint by Jentrie?

1 A. Yes. I didn't see this at the time. It
2 didn't show like all of this detail. It was an
3 email response to this complaint.
4 Q. So -- but around June of 2023, you
5 learned that there was some sort of complaint --
6 A. Yes.
7 Q. -- by Jentrie?
8 A. Yes.
9 Q. Okay. And you can actually just set that
10 aside.
11 A. Okay.
12 Q. What did you understand -- or, well,
13 okay. So you became aware of it because of some
14 sort of auto reply?
15 A. Yeah, and then there was some discussion,
16 too.
17 Q. Yeah, did you learn more about this
18 complaint or did you have any conversations with
19 anybody after -- after you became aware of it?
20 A. I think that's why I'm getting the dates
21 confused because Cynthia Butler had told me prior
22 that she -- that Jentrie felt passed over for the
23 role and she felt like there was favoritism. It
24 was just something that had been reported directly
25 to me from...

1     And there was also -- I can't -- and I
2 cannot recall, but I know that it was also
3 reported to me that, like, Jentrie was having side
4 conversations with her peers about the way that
5 she was feeling, and those got back to me. So
6 that's another --
7 Q. What were those?
8 A. Just that she felt like I chose Haley
9 Casillas for a lead position over her because I
10 had a personal relationship with Haley. And that
11 she deserved that position.
12 Q. Did you have a personal relationship with
13 Haley?
14 A. I did not.
15 Q. Do you know what happened with Jentrie's
16 complaint?
17 A. I know that it -- I know that it was
18 considered. I don't know if she was talked to
19 directly or anything, but Kris and I had a Slack
20 conversation about it in which he asked -- I -- I
21 volunteered, "Hey, here's all the evidence to the
22 contrary of any favoritism. This was entirely
23 based on performance."
24     Like -- and so I knew -- he -- he was
25 like, "Okay, yeah, send it." And I sent all that

1 in over to him. So there was, like, a
2 conversation around that with him. And so he
3 didn't really kind of tell me what came from it,
4 but I knew that he was aware of it and that HR was
5 aware of it. But I don't know what...
6 Q. Okay.
7 A. I never had an opportunity to -- I --
8 Q. Did you have further conversation with
9 Kris outside that Slack about Jentrie's complaint?
10 A. I'm trying to recall if he was on the
11 phone. You'll have to forgive me because it's
12 been some years. But, yeah, I don't think it was
13 that conversation. There was a conversation where
14 I felt like I had to defend myself, that I wasn't
15 given due process. And I don't know if it was
16 Jentrie, Tallese or the Slack memes I sent at the
17 end that -- I can't remember what it was, so I'm
18 going to say that I don't know. I don't recall.
19 Q. Okay. Do you know -- did you talk to
20 anybody in HR about Jentrie's complaint?
21 A. No, I don't -- that's what I'm saying --
22 Q. Okay.
23 A. -- I don't think so. I don't think we
24 talked about it.
25 Q. So you don't know what action, if any, HR

1 took, in light of her complaint?
2    A. Yeah, I think that -- well, I think that
3 they found merit in it and -- I think they used it
4 as -- I don't know if you want me --
5        THE WITNESS: I don't know, Erik,
6 if I should answer.
7    Q. (By Mr. Jarrold) Do you know who invest
8 -- do you know who received the complaint within
9 HR?
10    A. No.
11    Q. Okay. And -- and ultimately, you don't
12 know what they did with the complaint?
13    A. No.
14    Q. Okay. But you dispute that -- that
15 Jentrie Campbell was mistreated in any way?
16    A. Absolutely. I dispute that --
17    Q. Okay.
18    A. -- 100 percent.
19    Q. Okay. Why is that?
20    A. I operate at all times that I can really
21 control it with absolute integrity. And my goal
22 always is to operate with integrity. And so I'm
23 never going to do something to favor someone else
24 based on anything other than performance. If it
25 is a merit-based system in my opinion, promotions

1 and raises and benefits, all of those things
2 should depend strictly upon the person's
3 performance. It is -- yeah, I -- I live and stand
4 by that.
5    Q. Okay. Had Haley been in her CSA role for
6 more than six months when she was promoted?
7    A. I know that that was the -- that was the
8 point -- the point of contention there. I don't
9 think she had made it -- she -- I don't know that
10 she made it to a year when she was promoted.
11    Q. Okay. And that was your choice to
12 promote Haley?
13    A. It was mine and the other people who
14 were -- who interviewed all the candidates.
15    Q. Who else interviewed the candidates?
16    A. There's a calendar invite we can refer
17 to, but I -- we did two rounds of interviews.
18 There's one for lead and one for supervisor.
19    Q. Uh-huh.
20    A. Jentrie didn't get either. And on one
21 there was three or four people, and on the other I
22 think there was one or two. And my memory cannot
23 recollect who was on which, but I can assure you
24 that on both of those calls it was another manager
25 in addition to me. Could have been Jerry, could

1 have been Jared, Jesse or Kris. Likely Jerry.
2    Q. Well, it wouldn't have been Jerry, right,
3 Jerry was gone?
4    A. No. For the lead position, that was
5 pretty early on --
6    Q. Okay.
7    A. -- you know. And I could have pulled him
8 in as a manager, as a -- and I don't recall who it
9 was, but it could have been...
10    Q. But ultimately, you --
11    A. Some kind of manager was in that --
12    Q. Okay.
13    A. -- in that -- in that interview with --
14    Q. But ultimately, you were the one
15 selecting for these positions because they were
16 reporting to you?
17    A. Yes. Yes.
18    Q. Okay.
19    A. That's correct.
20    Q. You said you were also aware that Tallese
21 Alvarez -- well, actually, let's -- I think
22 actually next the one you said was Cynthia Butler,
23 one of your reports complained about you. How are
24 you aware that she complained about you?
25    A. Because we had a call with Kris to kind

1 of talk through what we were struggling with, our
2 disconnect.
3    Q. And what did Cynthia complain about?
4    A. She felt like I was distancing myself
5 from her because I removed anybody who was on my
6 social media. Like, I removed everyone and I
7 started to separate myself from her. Because we
8 were friends prior when we were on the customer
9 support team together. And she was like my number
10 two for the longest time. But it was a toxic
11 relationship that I had to identify, that, if
12 anything, she was receiving, you know, perceived
13 favor. But she was -- she deserved every bit
14 because she was an amazing employee. But I just
15 wanted to -- I wanted to get away from the
16 appearance of favoritism across the board. So I
17 deleted her on social media amongst others and I
18 separated myself. I stopped, like, having
19 personal conversations about how I was feeling.
20       It started -- I -- I felt like she was
21 being a toxic person and -- and not helping our
22 culture. She was actually going against our
23 culture of teamwork, fairness. And so I separated
24 myself and I felt that she got really frustrated
25 by that.

1    But the thing that really did it was,
2 she's an hourly employee and she was discovered to
3 be at a doctor's appointment while on the clock.
4 And she's not used to me asking her kind -- those
5 kind of questions. This is -- this would be new
6 to her. We were trying to get ahold of her
7 because she was not on a call that she needed to
8 be on. And she was -- and someone asked, "Where
9 is Cynthia?"
10    So I called her and I was like, "Hey,
11 where are you? You're not on this call."
12    And she got immediately offended of,
13 like, "Now you're tracking me. Like, you don't
14 believe that I'm being, you know, honest."
15    And it -- it was like, "Well, no, I just
16 don't know where you are and we need you on this
17 call."
18    But then when I -- when we -- she was
19 like, "Well, I'm at the doctor." And I did go
20 look and she was still clocked in. But I never --
21 I -- I just left it alone because we ended up
22 getting called into -- I think it was my idea of,
23 like, maybe we should talk to Kris, like, help
24 mediate this --
25    Q.  Okay.

1    A.  -- because there was some tension between
2 her and I --
3    Q.  Okay.
4    A.  -- that had formed. And so we did a call
5 where he was on it. And it was a tough
6 conversation where her and I, we were not able to
7 get on the same page. She wasn't understanding
8 kind of my role as a manager having to separate
9 myself I think from the friendship. And so, yeah,
10 I would say -- and she had an opportunity to, I
11 think, have a private conversation, I assume, with
12 Kris, and so that's why I -- I know that that --
13    Q.  Okay. Do you think that -- are -- are
14 you aware of whether she complained to Kris, Cindy
15 or anyone else prior to that conversation?
16    A.  I am not aware.
17    Q.  Okay. You just don't know?
18    A.  I don't know.
19    Q.  And that conversation, is it fair to say
20 that occurred after May of 2023?
21    A.  Jerry was gone, so I believe so.
22    Q.  Okay.
23    A.  That -- that might be fair to say.
24    Q.  Okay. And was -- she was raising
25 concerns -- and I understand maybe you disagree

1 with them, but she was raising concerns about you
2 not communicating with her --
3    A.  I think she was --
4    Q.  -- in part? I mean, I know you mentioned
5 other things, but one of the concerns that she
6 raised was about not -- you not communicating with
7 her?
8    A.  With her, maybe not -- personally,
9 communicating with her about personal matters.
10 Not professional work-related issues like --
11 she -- she didn't have concerns that she could
12 never call me and I wouldn't help her with a
13 single thing work related. It was more that I cut
14 her off on being my sounding board.
15    Q.  Okay. The only time you're aware of her
16 -- you're not aware of what she may have raised
17 outside of the call you had with Kris and her?
18    A.  Yeah, I could speculate that she --
19    Q.  Okay.
20    A.  -- was equally concerned about Jentrie
21 'cause she would tell me that.
22    Q.  Okay.
23    A.  She just didn't -- she just did not --
24 like, Haley -- Haley rubbed her the wrong way. So
25 I know she was also in that camp of feeling --

1 she -- she felt --
2    Q.  Okay.
3    A.  -- she had shared with me that she felt
4 like that was not a good decision either.
5    Q.  Okay.
6    A.  So I'm just saying she -- maybe she
7 talked to him about that.
8    Q.  Okay. And that conversation with -- with
9 you, Kris and -- and Cynthia was potentially
10 sometime on or after May of 2023?
11    A.  Yes.
12    Q.  Okay. Do you know, was there any
13 consequence or outcome of that?
14    A.  I do not know.
15    Q.  Okay. Do you know if H -- HR was
16 involved or looped in?
17    A.  I do not know.
18    Q.  They may have been but you don't know?
19    A.  I do not know.
20    Q.  Okay. And then you indicated that you're
21 also aware that Tallese Alvarez complained about
22 you --
23    A.  (Witness nods.)
24    Q.  -- during your employment there. How did
25 you become aware that Tallese Alvarez complained

1  about you?
2    A.  Well, as soon as Tallese and I had the --
3  the constructive feedback conversation that I gave
4  to her, I hung up the phone and called Kris
5  Dunn --
6    Q.  Uh-huh.
7    A.  -- and said, "This conversation just
8  happened with Tallese."
9        And he said to me, "She's calling me
10  now."  And that is how I became aware.
11    Q.  Okay.  And when did you give that
12  feedback to Tallese?
13    A.  I remember it was a Friday 'cause I was
14  running in to meet my fiancé.  And I want to say
15  it was probably technically after office hours,
16  but it could have been right around end of day.
17    Q.  Would it be around end of May of 2023?
18    A.  Potentially.
19    Q.  Okay.  And was that in person or is that
20  a call that you had with her?
21    A.  A call.
22    Q.  Virtual call with Tallese?
23    A.  A phone call.
24    Q.  Okay, a phone call.  And -- and so
25  sometime toward the end of May you had a phone

1  call with Tallese and you described it as -- well,
2  you -- you said that you were giving her feedback?
3    A.  Yes.
4    Q.  What feedback were you giving her?
5    A.  About the supervisor position.
6    Q.  Okay.
7    A.  She had called me no less than five times
8  that day inquiring about different questions she
9  thought of throughout the day about the supervisor
10  position.  And at one point she says, "Well, you
11  know, Kasey, I can go anywhere and make a hundred
12  thousand dollars" as part of this conversation.
13    Q.  Uh-huh.
14    A.  And I said, "Tallese, if you believe that
15  to be true, I would encourage you to explore your
16  options because during this time the -- your
17  performance does not match."  Sort of like -- I
18  don't know my exact words.  I'm -- I'm kind of
19  paraphrasing of, Listen, I've got some performance
20  concerns.  Like, I understand you feel like that's
21  what you're owed, but until I start to see X, Y
22  and Z, and I gave her examples.  Here -- you know,
23  just last week -- and I let her know, like, "you
24  didn't accomplish this goal."  And then in HubSpot
25  I noticed these three errors, if you remember --

1    Q.  Yeah.
2    A.  -- I had to bring correction to.  And we
3  really need to get better about accuracy in
4  reporting.  And so I'm, like, "I am with you all
5  the way.  I will be your number one advocate, but
6  I need to see some improvements in those areas in
7  order to be able to get you to that point" --
8    Q.  Uh-huh.
9    A.  -- "of wanting to make" -- even though
10  I -- I gave her a raise.  But as far as that --
11  that six figure, I'm, like, there's just some
12  things that I got to see.  And she did not like
13  that.
14    Q.  Okay.  Now, you said that you were
15  talking to her about the supervisor position --
16    A.  Yeah.
17    Q.  -- at the outset.  Was that something
18  that she had wanted and was passed over for?
19    A.  There were no decisions yet.  We hadn't
20  had interviews.
21    Q.  Okay.
22    A.  She just was inquiring about --
23    Q.  Okay.
24    A.  -- what would qualify or not qualify.
25  And if you get the position, what would the salary

1  be?  And then when she got that answer, just
2  called back and like, "Well, have you thought
3  about the salary being more than that?  Could it
4  be this 'cause I'm already making this" --
5    Q.  Okay.
6    A.  -- "and I feel like that would be a step
7  down in pay."
8        And I'm like, "I'm so sorry, we're not
9  paying more than that."  And that's kind of where
10  we got down in that salary conversation.
11    Q.  And -- and -- and you indicated that you
12  become aware that she had complained about you
13  when Kris said -- you called Kris right after?
14    A.  Uh-huh.
15    Q.  Is it common for you to call Kris about
16  conversations with your subordinate employees --
17    A.  Yes.
18    Q.  -- of about 30 different employees under
19  you?
20    A.  If it ends in her -- if it ends in an
21  employee -- if it would end in an employee being
22  frustrated like in a situation like that, I would
23  call him.  Absolutely.  As my manager, I want to
24  make him aware right away of what's going on --
25    Q.  Okay.

71 (Pages 278 - 281)

1    A.  -- and seek any advice or counsel of what
2 to do next.
3    Q.  Okay.  And so Kris tells you -- you call
4 him right after and then Kris tells you that she's
5 calling him?
6    A.  Yeah.
7    Q.  Did you learn anything further about her
8 complaint against you or have any conversations
9 with Kris, HR about her complaint?
10   A.  Yes.
11   Q.  What were those or what did you learn?
12   A.  I believe it was a Slack -- or it could
13 have been text messages.  There could be some -- I
14 might have a text message.  But yeah, basically
15 she just -- just Kris reiterating that she was
16 upset.  And I don't recall if that was a Slack
17 message or a phone call.
18       But it -- he -- I learned from him first
19 of, like, "Hey, yeah, I talked to Tallese.  She
20 was pretty upset about your conversation."  And I
21 remember being -- at some point, like, maybe not
22 that conversation with Kris, but then I learned
23 from HR, from Cindy, it was, like, some really
24 specific terms, like condescending.  I think
25 condescending was used.

1    Q.  Uh-huh.
2    A.  That could have been in Jerry's PIP.  But
3 I think that one -- like around -- things like not
4 easy to work with, moving the -- yeah, like things
5 like that.
6    Q.  Okay.
7    A.  Like, I de -- demean -- demeaning maybe
8 was a word that was used.  I demeaned her or I
9 made her feel -- I just didn't make her feel --
10 like, it just -- we left the call with her feeling
11 not great.  So --
12   Q.  Okay.
13   A.  -- that was expressed to me.
14   Q.  Do you know what the outcome of that
15 complaint was?
16   A.  We had to do the DiSC assessment
17 together.
18   Q.  That was the DiSC assessment?
19   A.  Yeah.
20   Q.  Okay.  And you aware that she raised
21 concerns about your communication?
22   A.  I was after I read it last night.
23   Q.  Were you aware at the time that she
24 raised concerns about her claiming that you were
25 belittling?

1    A.  No, not prior to that situation I hadn't.
2 I did not know that.
3    Q.  Okay.  Bullying?
4    A.  Yeah, I had no idea.
5    Q.  Okay.  And so you had a conversation with
6 Kris after he discussed with her, right?
7    A.  Yes --
8    Q.  Just one or two?
9    A.  -- at some point.
10       I'm not sure.  I can't recall.
11   Q.  Did Kris give you any feedback?
12   A.  I don't recall.  It kind of moved really
13 quickly to HR, Cindy getting involved, if I re --
14   Q.  Okay.
15   A.  -- if I recall.  So I don't know that he
16 necessarily did as much as -- I -- from what I
17 recall, it was Cindy.
18   Q.  Okay.  And did -- did Cindy give you any
19 feedback?
20   A.  I think it was just like -- again, like
21 back to those themes of like improve your tone,
22 make sure you are...
23   Q.  Okay.
24   A.  Along those lines.
25   Q.  Okay.

1        (Exhibit 11 marked for
2        identification.)
3    Q.  (By Mr. Jarrold)  I'm handing you what's
4 been marked as Exhibit 11.  Do you see that?
5    A.  I do.
6    Q.  Do you recognize this document?
7    A.  I do.
8    Q.  And this is a Slack message that you sent
9 on July 27, 2023; is that correct?
10   A.  I don't know if it was July 27th, but I
11 see that she copied and pasted the message on
12 July 27th, but the date is cut off on my -- the
13 front page.  But maybe July 26th, if not the 27th.
14   Q.  So either the 26th or 27th?
15   A.  Yes.
16   Q.  Of 2023?
17   A.  Yes.
18   Q.  And who is this Slack to?  Who -- who did
19 you send this to?
20   A.  The sales success and customer success
21 team as an entirety.
22   Q.  So all of your subordinates?
23   A.  Yes.
24   Q.  Anyone else?
25   A.  No.

1  Q.  And why did you send this?
2  A.  It came off the heels of Jesse Johnsey
3  having some complaints about the CSAs as far as
4  timekeeping.  And having -- like, not having a
5  distraction-free work environment when they're on
6  calls, like disrupting meetings because of noises
7  and stuff like that in the background.  And
8  Gabriel Lasley not showing up to a meeting with a
9  customer.
10         And he was like, "You got to do
11  something.  Like, you need to get your people in
12  line."
13         And I was like, "Okay."
14         So I met with the leads and I was, like,
15  "What should we do?"  Or maybe they were
16  supervisors at the time.  Rochelle and Haley I
17  think it was.  It was like -- and Cynthia 'cause
18  we wanted her to feel involved as kind of a lead.
19  I believe Cynthia, yeah.
20         And I was like, "What should we do?  You
21  know, like we've got some timekeeping things going
22  on.  We've got peers complaining about other peers
23  not answering their Slacks in time.  We've got
24  sales reps saying that CSAs sometimes don't
25  respond in time.  We got CSAs saying that people

1  are clocking out early or that their tasks or
2  metrics are not equal."  We -- you know, it's kind
3  of coming to a head with Jesse's message about you
4  gotta do something to get your people in line.
5         I was like, okay, maybe we need to just
6  grab a capture of the -- like, the time
7  punctuality language from the handbook and let's
8  get this out.  And so I got that approved by Kris.
9  I got the supervisors to sign off on it saying all
10  that as well.
11         And then in my -- in what I would
12  normally -- what I would try to do to keep
13  something so serious, playful and relatable and,
14  like, ironic is, I copy and pasted a message from
15  maybe six months ago that had just been sent to
16  the customer success team.  That was a culture we
17  had built on just having fun, being lighthearted,
18  being ironic.  And so, I was like, let me send
19  this with that document just to kind of like ease
20  the seriousness of it.  Because in my management
21  style, you know, nobody likes to have -- no one
22  likes to be told, you know, something -- so like,
23  "Hey, you need to sign this."  Like, that sounds
24  serious, right, you're getting this doc from
25  somebody.

1         I just tried to be like -- I just tried
2  to think if I was in their shoes and a manager
3  emailed me what -- I would want to make sure that
4  people know, look, this is a serious thing, but
5  let's have fun with it, too.  Like, let's just
6  keep it fun and ironic.  And that was a culture we
7  built in customer success.  Unfortunately, it
8  didn't translate well to both teams.
9  Q.  Okay.  And yeah, you mentioned that there
10  are a lot of links in here.  What are the links?
11  A.  Yeah, the links are to ironic workplace
12  Instagram videos, like -- almost like a -- like a
13  gif or a meme.
14  Q.  Uh-huh.
15  A.  But like in video form.
16  Q.  Okay.  And are you allowed to access
17  social media on EquipmentShare computers?
18  A.  The social media policy does not -- in
19  their handbook did not say whether you could or
20  could not, but it would have been accessed on my
21  phone and copy and pasted and sent to myself as a
22  text message.  That's kind of like how I like to
23  do it 'cause Instagram links can be kind of weird.
24  Not that that matters to --
25  Q.  Yeah, I'm just asking if -- if you're

1  permitted to.
2  A.  Yes.
3  Q.  If you're permitted to cruise social
4  media at EquipmentShare?
5  A.  Yes.
6  Q.  You are?  How do you know that?
7  A.  Because the social media policy doesn't
8  indicate that you can't be on social media during
9  work hours.
10  Q.  So it doesn't specific -- but does it say
11  you can be?
12  A.  It just says if you're going to be, make
13  sure it's -- you're representing yourself
14  professionally.  You represent the brand of
15  EquipmentShare.
16  Q.  You're sure that the policy says if
17  you're going to be on social media during working
18  hours --
19  A.  No, it doesn't say that.
20  Q.  It just says if you're on social media --
21  A.  Make sure you're representing yourself
22  well.
23  Q.  Okay.
24  A.  Yeah.
25  Q.  Okay.

73 (Pages 286 - 289)

Veritext Legal Solutions
www.veritext.com                                      888-391-3376
Case 4:24-cv-00531-BCW     Document 30-2     Filed 05/16/25     Page 74 of 91

1    A.   You represent EquipmentShare, so...
2    Q.   Right.  Right.  How long did it take you
3  to find these links?
4    A.   These links would be found -- like, I
5  would save them.  I have a folder.  These wouldn't
6  be during work hours.  These would be, like, in
7  the mornings or in the evenings when I would be
8  decompressing because I like to form my own
9  algorithm in -- in Instagram by liking things that
10 are relevant to me.
11       So I have a folder that's called -- that
12 was called like work -- I don't remember what it
13 was called, but it's only ironic funny memes.  And
14 I started a folder of those that as I came across
15 videos, I would save it there.  So putting
16 something like this together, like, I already had,
17 like, a reference to of just like -- like, oh,
18 what video would match that.
19   Q.   Yeah.
20   A.   Yeah.
21   Q.   How long did it take you to compile them
22 from that --
23   A.   I don't recall.
24   Q.   -- folder, do you think?
25   A.   I don't recall.

1    Q.   Okay.  Okay.  And did you type this out
2  yourself?
3    A.   I did type this out myself.
4    Q.   Okay.  You said something about copying
5  some stuff over from an earlier message, but this
6  was not a message you had sent previously, right?
7    A.   The housekeeping reminders was a message
8  I sent previously.
9    Q.   Every word of this you had sent
10 previously?
11   A.   I think so.  I think I just copy and
12 pasted it.
13   Q.   This was copy and pasted -- this was
14 something that you had sent previously?
15   A.   Yeah.  Bringing this archive message back
16 to CS remembrance, new for sales success.
17   Q.   And when did you send -- when do you
18 think you sent that previously?
19   A.   Probably -- I think it was six months
20 prior --
21   Q.   Okay.
22   A.   -- or around that time.
23   Q.   And would that have been before you had
24 those added people on your team?
25   A.   Yeah, it would have been just to the

1  customer success team.
2    Q.   And the message was just sent to your
3  subordinate employees, right?
4    A.   Yes.
5    Q.   At both -- so you're saying that you sent
6  this previously?
7    A.   Yes.
8    Q.   And when you sent it previously, it would
9  have also just been sent to your subordinate
10 employees --
11   A.   Yes.
12   Q.   -- at the time?  Okay.
13       Did you run the message by anybody before
14 you sent it?
15   A.   The second time, I don't think so, but I
16 think I like -- I had shown people -- I -- no, I
17 didn't run that -- that message right there by
18 Kris Dunn.  I know what you're -- yeah, I just --
19   Q.   I'm just asking if you --
20   A.   No, I didn't.
21   Q.   -- if you ever shared this message at any
22 point or any version with -- with Kris?
23   A.   No.
24   Q.   Okay.  Or Cindy?
25   A.   No.

1    Q.   Okay.  Now, do you believe that anything
2  that's contained in this message could be viewed
3  as demeaning or condescending?
4    A.   I feel like -- I feel like anything can
5  be viewed as -- that's kind of -- is that
6  speculative -- I mean, I would have to speculate.
7  It wasn't the intention.  It was to be ironic --
8    Q.   Sure.
9    A.   -- and fun and --
10   Q.   But you can see --
11   A.   -- lighthearted.
12   Q.   But you --
13   A.   That was the goal.  That's what I'm going
14 to answer, that was the goal.
15   Q.   Sure.  Your intention was for this to be
16 fun and --
17   A.   Yes.
18   Q.   -- lighthearted?
19   A.   Yes.
20   Q.   But you can see that it could be
21 interpreted to be condescending?
22   A.   No.
23   Q.   No?
24   A.   No.
25   Q.   Okay.  If you go down to the fourth

74 (Pages 290 - 293)

1 bullet, you say, "15 minute response time in slack
2 if online and not in a meeting (Keep slack open at
3 all times on that extra monitor you got. Or else
4 - I see you."
5   A. Uh-huh.
6   Q. Do you see that?
7   A. Yep.
8   Q. Is what you write there consistent with
9 EquipmentShare policy?
10   A. Yes.
11   Q. It is, 15-minute response time in Slack?
12   A. That's what Jesse Johnsey told me. We
13 worked as a team to come up with that time.
14   Q. Okay.
15   A. I did not -- I didn't come up with that
16 time.
17   Q. Okay.
18   A. That was something he expected.
19   Q. What about --
20   A. So I would say it's covered in the policy
21 under manager discretion.
22   Q. Okay. Do you think where you say, "Or
23 else - I see you" is professional?
24   A. When I was -- when Kris -- I -- it
25 depends on how you're asking.

1   Q. I'm just asking if you think it's
2 professional?
3   A. No, because the reason why I'm saying it
4 is because Kris -- the "or else" is like I'm
5 threatening, but it's not. It's an entire thing.
6 "Or else - I see you" which links them to a person
7 in Home De -- Home Goods when a boss says, "Hey,
8 you got a minute, jump on this meeting," and the
9 person's in the middle of Home Goods. Like, it --
10 it says, or else I see you as in, like, it's just
11 a joke of, like, if you're not on Slack and you're
12 not --
13   Q. Okay.
14   A. -- then you are not working if you are
15 not on Slack. So it was just a --
16   Q. But if somebody didn't click into that,
17 they would see it says, "Or else - I see you"?
18 "Or else - I see you" without that context of
19 your --
20   A. I think -- I think that -- you know what,
21 I actually think --
22   Q. All I'm asking is --
23   A. I would double down on that that I was --
24 yes, that is professional because you can see when
25 someone is not active in Slack. I see that you

1 are not active. Your button is not green and you
2 are no longer active in Slack.
3   Q. Okay. Okay. Looking at the last one, it
4 says, "When you request time-off we need a reason.
5 Do not leave the reason blank. Do not just say
6 'thank you.' I will decline your request just for
7 fun so you have to do it again."
8       Is that consistent with EquipmentShare
9 policy?
10   A. Well, I found out that it was not.
11   Q. Okay.
12   A. I did not know that you could not -- I
13 had no idea because I was taught from Jerry Lasley
14 specifically -- 'cause there was a time where I
15 was like, "Do you want me to note" --
16       And he's like, "Yes, always put why
17 you're going to be off."
18       And I just translated that down. And in
19 fact, after I was aware of this, I was like, oh,
20 no. I felt awful about it. I had a plan to,
21 like, put it in -- 'cause Cindy told me, "You
22 can't -- Kasey, you can't require people."
23       This was just like a management or
24 training issue that, like, I've been asking for
25 training resources that were never provided to me.

1 And I -- that -- that -- I will say that was
2 incorrect --
3   Q. All I'm asking is if that's consistent
4 with EquipmentShare policy?
5   A. I did learn that it is not consistent --
6   Q. Okay.
7   A. -- with policy. It was a mistake.
8   Q. Do you think it's professional to say, "I
9 will decline your request just for fun so you have
10 to do it again"?
11   A. It was supposed to be funny. I don't
12 know. I don't -- I'm not -- I can't say for sure.
13   Q. Okay. And I understand that you
14 disagree, but -- but fair to say that this could
15 be viewed as not professional?
16       MR. KLINKENBORG: Objection, asks
17 for speculation. We don't know who's viewing --
18 fair to say, it's been viewed by who?
19   Q. (By Mr. Jarrold) Do you believe this
20 could be interpreted to be not professional?
21   A. I don't know.
22   Q. Okay. Do you believe this could be
23 interpreted to be condescending?
24   A. No.
25   Q. Fair to say, not all of this reflected

75 (Pages 294 - 297)

Veritext Legal Solutions
www.veritext.com                                              888-391-3376
Case 4:24-cv-00531-BCW    Document 30-2    Filed 05/16/25    Page 76 of 91

1 the policies of EquipmentShare?
2   A.   That's fair to say.
3   Q.   Okay.  Let me show you...
4        (Exhibit 12 marked for
5        identification.)
6   Q.   (By Mr. Jarrold)  Putting in front of you
7 what's marked as Exhibit 12,
8 Equipmentshare/Anderson 197 to 202.  And -- and
9 all I wanted to ask you was, on pages 198 through
10 to the end, did these appear to be the links --
11   A.   They do.
12   Q.   -- associated with what was included in
13 your message?
14   A.   Yes.
15   Q.   Okay.  All right.  Are you aware that
16 employees complained about this message?
17   A.   Yes.
18   Q.   Okay.  Do you know who all complained?
19   A.   All I know is Kris told me he thought it
20 was Tallese and that he was going to find out more
21 information.
22   Q.   Okay.  So you don't know exactly who
23 complained?
24   A.   Huh-uh.
25   Q.   Okay.

1   A.   Well, I do now but I didn't then.
2   Q.   Well --
3   A.   I did not know.
4   Q.   -- who do you understand to have
5 complained?
6   A.   Tallese Alvarez.
7   Q.   And are -- do you -- you don't know,
8 though, if other individuals complained as well?
9   A.   I do not.
10   Q.   Okay.  Did you have an understanding of
11 what they were complaining about?
12   A.   I did not have an understanding -- oh, I
13 did at the time of -- Kris said, I think it's --
14 he screenshot the 15-minute one that you brought
15 up.  And he also screenshot the last bullet.  So I
16 was aware that he said that -- he's like, I think,
17 it's because you put "or else," like it's a
18 threat.
19        And I was like "Oh, my God, no.  It's or
20 else - I see you, and you have to click on the
21 link."  I tried to -- so -- but yes.  So I knew
22 that was a specific concern.  And then he said,
23 "And the time off was a concern."
24        And I said, "Wait," and there's a
25 question.  It's like, "Wait, did I break -- is

1 that not right?"  And then, "Can you get me -- I
2 need to get in touch with Cindy to find out what's
3 right, and I'll delete that."  I deleted it right
4 away and...
5        Those two things would be the things that
6 he pointed out that he thought was problematic
7 that was reported.
8   Q.   Okay.  And Kris indicated that he thought
9 it was Tallese that complained, but otherwise, no
10 one shared with you who --
11   A.   Huh-uh.
12   Q.   -- complained?
13   A.   That is correct.
14   Q.   Okay.  And so you don't know exactly, you
15 know, who all may have complained about this
16 message?
17   A.   Correct.
18   Q.   Okay.
19        (Exhibit 13 marked for
20        identification.)
21   Q.   (By Mr. Jarrold)  All right.  I'm showing
22 you what's been marked as Exhibit 13.  Do you
23 recognize this?
24   A.   Yes.
25   Q.   And these are Slack messages between you

1 and Kris Dunn, correct?
2   A.   Yes.
3   Q.   And then Kris is expressing to you that
4 that Slack message was not appropriate?
5   A.   He's quoting things that I think he
6 thinks are the concerns of what I reported, but
7 he's not -- can you repeat your question again?
8   Q.   Yeah, Kris is expressing to you that this
9 is not appropriate?
10   A.   He did not say that.
11   Q.   Okay.  He says he did not discuss &
12 approve the following (which is definitely the
13 crux of concern).
14   A.   He does say that.  I see that.
15   Q.   Did you have other conversations with
16 Kris about this other than in these Slack messages
17 on July 28th?
18   A.   I don't think so.
19   Q.   Okay.
20   A.   I -- we did -- we do a weekly call.  I
21 think on the week -- one of our weekly check-ins I
22 told him I was going to be doing the document.
23   Q.   I just mean after you sent the Slack
24 message out, did you have any further --
25   A.   Oh.

76 (Pages 298 - 301)

Veritext Legal Solutions
www.veritext.com                                888-391-3376
Case 4:24-cv-00531-BCW   Document 30-2   Filed 05/16/25   Page 77 of 91

1    Q.   After you sent that July 27th Slack
2  message to your team, did you have any further
3  conversations with Kris other than what's
4  reflected in Exhibit 13?
5    A.   Yes.
6    Q.   When did you have those conversations
7  with Kris?
8    A.   I don't remember if it was, like, that
9  same day or the next day, but we talked on the
10  phone.
11    Q.   Okay.  And what was discussed with Kris?
12    A.   He was, like, just trying to figure out
13  what was going on.  He's, like, some -- something
14  was reported again, someone didn't -- someone
15  reported it.  I'm trying to get to the bottom of
16  it.  And he's like -- he made a comment of, "At
17  this point both of our jobs might be at risk."
18        And I was like, "Oh, my gosh."
19        And he's like but I'll -- I'm going to
20  find out more and I'll let you know.
21    Q.   And why did -- do you know why he
22  suggested that both your jobs might be at risk?
23    A.   I mean, he was -- he always made comments
24  like being afraid of being let go.
25    Q.   Okay.

1    A.   So it just seemed like kind of in line
2  with --
3    Q.   Okay.
4    A.   -- his nervousness around anything that
5  could come up could mean that he doesn't have a
6  job.
7    Q.   And is -- is that when he shared with you
8  that he thought that Tallese may have complained?
9    A.   Yeah.
10    Q.   Did he express to you that he had a
11  problem with what you had sent?
12    A.   No.
13    Q.   He did not say that in that conversation?
14    A.   No.
15    Q.   Did he comment on the propriety of that
16  message at all at that point?
17    A.   I don't recall.
18    Q.   Okay.  Do you recall anything else being
19  discussed with Kris in that conversation?
20    A.   I don't recall.
21    Q.   You don't remember anything else at this
22  point?
23    A.   No.  I don't remember the specific
24  details.
25    Q.   Okay.  And -- and you think that call was

1  when?
2    A.   Probably -- I think it was either, like,
3  the day it happened or maybe the next day, but it
4  was before July 28, 2023, at 9:42 a.m.
5    Q.   Okay.  So it was before the Slack
6  messages reflected in Exhibit 13 when you had the
7  call with Kris?
8    A.   Yes.
9    Q.   Okay.  Did you have any other -- other
10  than what's reflected in Exhibit 13 and the call
11  with Kris on July 27th or 28th, did you have any
12  other conversations with Kris about the message?
13    A.   I don't recall.
14    Q.   Okay.  So you may not have had any other
15  conversations between this Slack reflected in
16  Exhibit 13 and your separation on August 2nd?
17    A.   Oh.  Well...
18    Q.   About the Slack itself.
19    A.   Yeah, there -- 'cause there was a -- I
20  did have a phone conversation with him and Cindy
21  'cause there's a message of me saying -- 'cause he
22  says, "You'll get a chance to talk about it."
23        And I had to be the one to be like, "Am I
24  going to get the opportunity?  Like, Cindy's
25  totally cut me off.  She's not respond -- like, am

1  I gonna?  She's working through you now.  I'm used
2  to her working through me.  So am I going to get a
3  chance to, like, give my perspective on this?"
4        And so Cindy allowed a meeting to occur
5  and on that it just felt like -- just like stream
6  of consciousness of word vomit of me being, like,
7  "This is what I meant, and I'm -- you know, I
8  didn't know."
9        And -- and she basically -- I was like --
10  I remember her at one point during this call, she
11  was like, "Okay, well, is that it?"
12        And I was, like, "You don't have any
13  questions for me?"
14        And she's, like, "No, you wanted this
15  call."
16        I was like, "Okay."  And that was the end
17  of that.  And that should have been the last
18  conversation.
19    Q.   Do you know when that call was?
20    A.   It would have been after July 28th but
21  before August 2nd.
22    Q.   And was Cindy the only one on that call
23  with you?
24    A.   Kris was on that call, if I remember.
25    Q.   Did Kris say anything during that call?

77 (Pages 302 - 305)

1    A.   No.
2    Q.   Did Cindy say anything on that call?
3 What did Cindy say?
4    A.   No, that was what she said.
5    Q.   Okay.
6    A.   She's like -- she just let me talk, "Hey,
7 I understand you want to have this meeting."  But
8 they gave me the floor, just like I talk, talk,
9 talk, and at the end I was like -- I think I was
10 like, "Do you have" -- I said something to the
11 effect of, like, "Do you have questions for me?
12 Like, is there anything else?"
13       And she's like, "No, you asked for this
14 meeting so --
15    Q.   Okay.
16    A.   -- "we gave it to you."
17    Q.   Did you have any conversations with Cindy
18 about this -- well, did you have any
19 conversation -- other than that call with Cindy --
20 and do you know when that was?  You said that
21 there was this call --
22    A.   Yeah, it happened after.
23    Q.   -- that the call that you had requested,
24 right, with Cindy and Kris?
25    A.   Uh-huh.

1    Q.   Again, when -- when do you think that
2 happened?
3    A.   I think it happened --
4    Q.   Sometime after July 28th but before your
5 separation?
6    A.   Yes.
7    Q.   Okay.  Do you recall -- other than that
8 one, other than that call, do you remember any
9 other conversations with Cindy between
10 July 27th and your separation?
11    A.   I know that we had a -- I know that on a
12 call we talked about how you can't tell people
13 they can't -- that they have to give you a reason
14 for their time off.  I don't know if that was the
15 call or if there was a separate call.  So I'll
16 just say I don't know.
17    Q.   Okay.
18    A.   I do not.
19    Q.   So there may have been --
20    A.   There could have been two calls.
21    Q.   Okay.  And in terms of your conversations
22 with Kris Dunn, I think you said that you believe
23 there was a call before this July 28 Slack message
24 reflected in Exhibit 13, right, between you and
25 Kris?

1    A.   Yes.
2    Q.   Then there were the Slack messages and
3 then Kris was on that call that you had
4 requested --
5    A.   Yes.
6    Q.   -- with Cindy?
7         Yes?
8    A.   Yes.
9    Q.   Do you remember, were there any other
10 conversations that you had had with Kris between
11 July 27th and your termination that you remember?
12    A.   I think we did kind of go back and forth
13 on Slack.  'Cause I was, like, anxious of, like,
14 what's going to come of this.  What's -- where do
15 we stand.  I think I might have posed a couple of
16 those questions.
17    Q.   Is that what's reflected in the second
18 page of Exhibit 13, if you recall?
19    A.   No.  I mean, if -- there could have been
20 more after this.
21    Q.   But if there was, it would be in Slack?
22    A.   It would.
23    Q.   So no other conversations that we haven't
24 touched on that would have been over the phone or
25 oral?

1    A.   I don't think so.
2    Q.   Okay.
3         MR. JARROLD:  Why don't we take
4 just a few minutes and then I'm -- I'm just going
5 to run to the restroom.  Let's go off the record.
6         MR. KLINKENBORG:  Yeah.
7         THE VIDEOGRAPHER:  Off the record
8 at 4:08.
9         (Recess.)
10        (Exhibit 14 marked for
11 identification.)
12        THE VIDEOGRAPHER:  We're back on
13 record at 4:15.
14    Q.   (By Mr. Jarrold)  All right, Ms.
15 Anderson, we are back on the record after a short
16 break.  You understand you're still under oath?
17    A.   Yes.
18    Q.   Okay.  And anything about your testimony
19 thus far that you believe is mistaken or you need
20 to correct?
21    A.   No.
22    Q.   Okay.  You have in front of you what's
23 been marked as Exhibit 14.  Have you seen this
24 document before?
25    A.   Last -- yesterday.

78 (Pages 306 - 309)

Veritext Legal Solutions
Case 4:24-cv-00531-BCW    Document 30-2    Filed 05/16/25    Page 79 of 91
www.veritext.com                                                    888-391-3376

1 Q. Okay. So you hadn't seen it before
2 yesterday?
3 A. No.
4 Q. And I'll represent to you that these are
5 notes from Cindy Hudson and --
6 MR. KLINKENBORG: I don't have 13.
7 MR. JARROLD: Oh, I'm sorry.
8 MR. KLINKENBORG: Or 14. Sorry, I
9 called it the wrong number.
10 MR. JARROLD: Here you go. Sorry
11 about that.
12 Q. (By Mr. Jarrold) So your employment was
13 terminated August 2nd, 2023, right?
14 A. Yes.
15 Q. And in a meeting with Kris Dunn and Cindy
16 Hudson?
17 A. Yes.
18 Q. Was that in person?
19 A. No.
20 Q. Was it a virtual discussion?
21 A. Yes.
22 Q. Okay. And who led that call?
23 A. Cindy.
24 Q. Okay. And you're free to look at
25 Exhibit 14, but what was relayed during that

1 conversation?
2 A. Cindy -- Cindy's messaging was very much
3 like the other document that was provided of,
4 We've done extensive coaching with you and we
5 believe that your leadership style does not align
6 with company values. And so effective today, you
7 are no longer -- yeah.
8 And she did say something to the effect
9 of like -- there was a script. Like, it's not a
10 Kasey problem or EquipmentShare problem -- some --
11 what HR say 'cause I was on many calls with her.
12 Q. Uh-huh.
13 A. So I just said, "Okay."
14 Q. Did you say anything else in that
15 conversation?
16 A. No. Because like I said, I've been on --
17 there's nothing you can say at that point.
18 Q. Okay.
19 A. I kind of knew the drill.
20 Q. And so she -- so if we're -- if we're
21 looking at these notes in Exhibit 14, it says:
22 Informed as aware of various conversations about
23 her professionalism and conduct with her team.
24 A. No.
25 Q. That was not said?

1 A. No, it was not.
2 Q. Did -- well, let me ask this: Did Cindy
3 say something along these lines in the call with
4 you?
5 A. No. She said, "As you know, we've done
6 extensive coaching with you and we don't feel like
7 your leadership style aligns with company values.
8 Effective today, you are no longer" --
9 Q. Okay.
10 A. And I didn't ask any follow-up questions
11 or anything. Like I said, I know how this goes,
12 so...
13 I mean, I wish I would have looking back,
14 I guess, to kind of get more -- because I had been
15 speculating ever since, like, what -- you know,
16 what were the things.
17 Q. Uh-huh. Uh-huh. Did you disagree with
18 her comment that you had been provided coaching?
19 A. Yes.
20 Q. Did you say anything to her at that
21 point?
22 A. No.
23 Q. Okay. And when she said, "We've been
24 providing you coaching," do you know who she was
25 referring to?

1 A. No.
2 Q. Okay. I know you disagree, but do you
3 think she believed that they had provided you
4 coaching?
5 A. No.
6 Q. You think she didn't believe that at all?
7 A. Yes.
8 Q. Why?
9 A. I believe that she knew that I was
10 talking about inequitable pay and she just -- and
11 each time she talked to me it was about tone,
12 which was not something a man would ever be talked
13 to about. So I think they just used that, but
14 they were -- I think she was, like, this is a
15 dangerous person who is talking way too much about
16 inequitable pay and unfair treatment. And they
17 kind of used that as a reason to -- a reason to
18 get me out because --
19 Q. And you had last talked to her about
20 those things in April of 2023, you said?
21 A. I think so, yeah, when I asked --
22 Q. Okay.
23 A. -- "Is -- is the tone" --
24 Q. Okay.
25 A. -- "policy? Would I be asked this if I

1 were a man?"
2    Q.   Okay.  Are you aware of who made the
3 decision to terminate your employment?
4    A.   It was -- I don't -- I'm not sure.  No,
5 I'm not sure entirely if it was Kris or Cindy --
6    Q.   Yeah, do you know --
7    A.   -- but it was one of them.  Or maybe
8 Cindy consulted with her team.  I -- I don't
9 completely know.
10    Q.   Okay.  So you believe that it was Kris
11 and/or Cindy who made the decision to terminate
12 your employment?
13    A.   Yes.
14    Q.   Anyone else?
15    A.   No.  I think they were the ultimate
16 decision-makers.
17    Q.   And as you mentioned, you ultimately
18 don't know who made that decision, right 'cause
19 you weren't involved with it?
20    A.   Yeah, there was just a form yesterday
21 that I think Cindy says she's -- what she's going
22 to do.  I think it -- I think it informs that
23 Cindy made the decision.
24    Q.   You -- you ultimately don't know, though,
25 what -- who made that decision 'cause you weren't

1 part of it, part of the decision-making?
2    A.   Other than she said that -- like, in that
3 document -- we'd have to refer to that document,
4 but I think she pretty much --
5    Q.   Okay.
6    A.   -- says what she's going to do.
7    Q.   Okay.
8    A.   So I'm going to stand by my I think Cindy
9 was the ultimate decision-maker.
10    Q.   Okay.  But it's possible that Kris was
11 the decision-maker?
12    A.   It's possible.
13    Q.   Okay.  So you're aware the customer
14 success division was eliminated shortly after you
15 left?
16    A.   Yes.
17    Q.   Do you know when that was eliminated?
18    A.   I mean, within like a month or two --
19    Q.   Okay.
20    A.   -- I believe.  Maybe three months.
21    Q.   And you're familiar that it resulted in a
22 number of layoffs?
23    A.   Yes.
24    Q.   Okay.  So you're aware that your position
25 was not filled?

1    A.   Uh-huh.  Yes.
2    Q.   Okay.  And you're aware that Jerry's
3 director role was never filled?
4    A.   Yes.
5    Q.   And that position was ultimately
6 eliminated when he was eliminated from employment
7 in February of 2023?
8    A.   Yes.
9    Q.   Okay.  When you were on that call with
10 Cindy and Kris, when your employment was ended,
11 did they refer to the Slack message?
12    A.   No.
13    Q.   They didn't mention it?
14    A.   No.
15    Q.   Okay.  All right.  So I want to go back
16 and make sure I understand the scope of your
17 claims.  And we've talked about most -- hopefully,
18 I think, everything.
19    A.   Yeah.
20    Q.   So we talked earlier about the fact that
21 you're alleging sex discrimination, retaliation in
22 this case, right?
23    A.   Yes.
24    Q.   Okay.  So -- and I want to understand the
25 ways in which you allege that you were

1 discriminated against based upon your sex --
2    A.   Okay.
3    Q.   -- okay?
4         Are you alleging that your termination
5 was related to your sex?
6    A.   Yes.
7    Q.   And why do you believe that your
8 termination was related to your sex?
9    A.   Because what predates or what -- it's
10 because what was presented are criticisms about
11 how I communicated that otherwise would not have
12 been in question if I were a male.  Because I
13 never once demeaned anybody or talked down to
14 somebody.  For the first time -- I was a female in
15 a management position who was responsible for
16 accountability, integrity and performance.  And in
17 situations where I had to make difficult decisions
18 about employees based on performance, those
19 incidents were reporting -- reported.  And based
20 on those reports, I don't believe I would have
21 ever been reported if I had been a male in that
22 same role having to give performance reviews that
23 were accurate based on data.  And I think --
24    Q.   Okay.
25    A.   -- that I was -- it is easy to say

80 (Pages 314 - 317)

1 somebody is, and excuse my language, a bitch, has
2 a tone, is -- is condescending, all of these terms
3 that because I'm a woman who's in a leadership
4 position, I felt like these claims were baseless,
5 they were never investigated, I never had an
6 opportunity --
7    Q.  What claims were baseless?
8    A.  The claims that I was condescending
9 towards Tallese for giving her work-related,
10 performance-related feedback was baseless.
11   Q.  Okay.
12   A.  The -- the report that I was
13 condescending or that I was bullying is based on
14 the fact that she's just never had someone in a
15 management position, especially a female, who was
16 giving her really tough feedback.
17   Q.  Okay.
18   A.  And so I think she used these terms of
19 condescending and -- but I think they're based on
20 her --
21   Q.  Okay.
22   A.  -- like, discriminating based on me being
23 a female.
24       And I think the same is true with -- with
25 Jentrie.  If I was in a -- if I was a male in a

1 management position making a decision based on
2 performance about another individual, I don't
3 think that I would have been reported.  And again,
4 that was baseless because there is proof and data
5 that shows that her performance --
6    Q.  Okay.
7    A.  -- was not where it needed to be.
8    Q.  So you believe that your termination was
9 related to sex because you disagree with the
10 feedback --
11   A.  I think --
12   Q.  -- that was provided by --
13       MR. KLINKENBORG:  Go ahead.
14   Q.  (By Mr. Jarrold)  Because you disagree
15 with the feedback from co-workers and Kris or
16 Cindy?
17   A.  Yes.  I believe HR's feedback was biased.
18   Q.  Okay.
19   A.  And retaliation as well.  I don't --
20   Q.  We'll get to it.
21   A.  Okay.
22   Q.  We'll get to that.
23       Is there -- other than disagreeing with
24 the legitimacy of the feedback, are there any
25 other reasons you believe your termination was

1 related to your sex or gender?
2    A.  Yes.
3    Q.  What?
4    A.  I had a proven track record as we went
5 through of being promoted and being given raises
6 based on performance throughout my tenure at
7 EquipmentShare.  And at every step I continued to
8 work hard and grow, but it felt like I had to work
9 10 times harder than the next male.  I'm the only
10 single female leadership team member that made it
11 to leadership team besides Mary -- Mary McClanahan
12 for, like, the couple months that she was on
13 there.  And throughout my tenure, it always felt
14 like there was a boys club with Jesse, Kris, and
15 Jared in particular.  And that I had to be a yes
16 person at all times.  And it felt like I was
17 targeted because I wasn't always a yes person.
18 I'm going to say no to things if I'm being
19 strategic.  And -- but then I'm blamed for being,
20 like, condescending when I'm just trying to make
21 strategic decisions that make the most sense for
22 our team.
23       And I felt like watching other male team
24 members not performing and I am -- I am performing
25 well and watching other male team members not

1 perform at the same level and either be demoted
2 and not let go as well as -- or be promoted after
3 poor performance also lends itself.  And then the
4 last thing would be that I watched other male team
5 members get reported for HR concerns and they
6 still have jobs today, and one of them is a
7 director now.
8    Q.  Okay.  So if I'm hearing you correctly,
9 you believe that your termination was related to
10 sex because, number one, you disagree with the
11 legitimacy of the feedback --
12   A.  Yes.
13   Q.  -- that you got?
14       Number two, you had gotten promotions and
15 pay raises throughout your employment?
16   A.  That's not a reason.
17   Q.  Okay.
18   A.  That wouldn't be a reason why I would get
19 fired, it's 'cause I -- I'm saying that --
20   Q.  No, no, I understand what you're saying,
21 but because you -- you -- up to that point you had
22 gotten promotions and pay raises, up to the point
23 of your termination, correct?
24   A.  But it's not a reason.  It's just to show
25 that I worked as hard and yet wasn't rewarded for,

81 (Pages 318 - 321)

Veritext Legal Solutions
Case 4:24-cv-00531-BCW    Document 30-2    Filed 05/16/25    Page 82 of 91
www.veritext.com                                                888-391-3376

1 other than -- like, in getting to that director
2 level --
3    Q.  Okay.
4    A.  -- I was passed over.  And a male who was
5 not performing, based on all of my -- compared to
6 my performances --
7    Q.  Okay.
8    A.  -- ended up getting that position over
9 me.
10    Q.  Okay.  And then you talked about, you
11 know, other males having -- there being HR
12 concerns --
13    A.  Yes.
14    Q.  -- raised about them?
15       The promotions and pay raises, many of
16 those were extended to you by Kris Dunn as we
17 talked about earlier, right?
18    A.  Yes.
19    Q.  Okay.  And he was fully aware of your
20 gender --
21    A.  Yes.
22    Q.  -- as you can imagine, right?
23    A.  Yes.
24    Q.  Okay.  Are you aware of any other
25 employees being terminated for the same reason

1 that was given to you for your separation?
2    A.  I would -- I mean, I had my -- I have my
3 beliefs on why they were actually fired under the
4 same guise of like -- like the re -- I think there
5 was retaliation.  Like, Jerry was fired.  And yes,
6 he was fired based on him retaliating against me,
7 but again, he was raising questions about Jesse
8 Johnsey, he's gone.
9       Adam Meyers started raising questions
10 about Jesse, he's gone.
11       Steve Avalos (ph) was let go under a
12 sales performance --
13    Q.  Yeah.
14    A.  -- but he was raising questions about
15 Jesse Johnsey.  So I feel like there are a number
16 of employees --
17    Q.  Okay.
18    A.  -- who don't have jobs today because of
19 retal -- just trying to get them --
20    Q.  Okay.  Well, and Jerry and -- and the
21 other individual you mentioned was who?
22    A.  Steve Avalos.
23    Q.  Okay.  Other than those two, are you
24 aware of anybody that engaged in the same conduct
25 or behavior for which it was relayed that you were

1 terminated?
2    A.  No.
3    Q.  Okay.  And you said that HR concerns were
4 raised about some other --
5    A.  Yes.
6    Q.  -- individuals?
7    A.  Yes.
8    Q.  Who -- who were those individuals?
9    A.  Jared Johnanning was one as far as
10 conduct is -- is concerned.
11    Q.  Okay.  Anyone else?
12    A.  I can't, like -- I can't say for sure.  I
13 just know that people have said they reported RC
14 Davis and that they reported Jared Lasley (sic),
15 but I don't -- I didn't have proof of that.
16    Q.  Okay.  What was the -- how familiar --
17 you're familiar with an HR concern raised about
18 Jared Johnanning?
19    A.  Two.
20    Q.  Okay.
21    A.  Yeah, two.  Two.
22    Q.  Two.  What were those?
23    A.  Well, I say two because I'm -- I'm not
24 entirely sure.  I know two were raised to Kris,
25 one raised to H -- one of those two were raised to

1 HR.  I'm not sure of the second one.
2       The first was a trip to Con Expo in Las
3 Vegas.
4    Q.  Uh-huh.
5    A.  Jared cussed out Cynthia Butler.  There
6 were a few witnesses, myself included.
7    Q.  When was that, this Con Expo trip?
8    A.  Con Expo I want -- it was -- I don't
9 recall, maybe Q1 of 2023.  Was Jerry still with
10 us?  No, let's let the dust settle.  Jerry was
11 gone, so it had to be Q2.
12    Q.  Okay.  And how do you know -- did you
13 witness Jared do this?
14    A.  Yes.
15    Q.  Okay.  And who else was there to witness
16 it?
17    A.  I think it might have just been us three
18 and -- people were in the background.  But I'll
19 just say us three.  That's what I'm confident in.
20    Q.  The three of you being you --
21    A.  And Jared Johnanning and Cynthia Butler.
22    Q.  Okay.  And how do you know that was
23 escalated to outside of that group?
24    A.  I know because Kris Dunn asked me about
25 the sit -- he had found out the situation from

1 Penny Spear and his concern was like -- sorry, her
2 concern was wondering if I handled that situation
3 the best that I could as Cynthia's manager. And
4 less about what Jared did.
5     Q.  Okay.
6     A.  And so I had to produce -- I don't know
7 if I physically produced text messages, but I --
8 and I have those, but of Jared the next day. And
9 so I talked -- like, him regretting it and saying
10 apology. We had a conversation where I
11 facilitated medi -- not mediation, but, you know,
12 I was there as a middle person for Jared to
13 apologize to Cynthia for it.
14        But yeah, it made its way to Kris because
15 I believe Cynthia reported it to Penny Spear in a
16 ride back to the airport. And Penny went to Kris
17 and was like, "Did you know that this happened to
18 Cynthia" and --
19     Q.  Who's Penny?
20     A.  The office manager.
21     Q.  Okay.
22     A.  In the same conversation she reported,
23 like, hearing that I was potentially going to get
24 a raise and a title change. And she said to him,
25 "Where is my raise and title change?"

1        And he -- told me, "I think she's just
2 jealous." And I was, like, get in line.
3     Q.  What was Jared Johnanning's role at that
4 point?
5     A.  Manager of sales engineering.
6     Q.  And what was this cursing?
7     A.  It was like, You need to shut the F up.
8 Like, you're being a little F'ing this, that and
9 the other. Kasey's great.
10     Q.  What's specifically F'ing this, do you
11 remember?
12     A.  No. He was upset -- he misunderstood
13 like a -- he was intoxicated --
14     Q.  Uh-huh.
15     A.  -- and he thought Cynthia and I were,
16 like, fighting. We were having a conversation.
17     Q.  Okay.
18     A.  He -- Jared is known to get drunk at
19 after parties --
20     Q.  Okay.
21     A.  -- and become aggressive. It's not the
22 first time.
23     Q.  Okay.
24     A.  But in this instance it was with a
25 subordinate, so...

1     Q.  Your subordinate?
2     A.  Yeah, with my subordinate, so...
3        But we were just planning -- I thought --
4 Cynthia had told me the next day, like, "Let's
5 just let it go."
6     Q.  Okay.
7     A.  But we had -- had them talk or whatever.
8 But yeah, he misunderstood the conversation. He
9 thought we were fighting, and so he was like --
10 the way he described it to me the next day of what
11 he was trying to defend -- not defend them, but
12 explain was, like, "Man, Kasey, I just thought,
13 like, you-all were fighting and I was just trying
14 to, like, say Kasey is good people. Like -- like,
15 be nice to Kasey. Like, she" -- whatever. Like,
16 he was trying to do something like that. He -- he
17 just didn't know what was going on. He
18 misunderstood. He --
19     Q.  Okay.
20     A.  And so he was just, like, telling her to
21 "Shut the F up. Kasey's great. Like, you need
22 to" -- yeah.
23     Q.  And what did she say to him?
24     A.  She shut down and started crying. She,
25 like, went to a corner. He went on about his life

1 unaware that she was even upset --
2     Q.  Okay.
3     A.  -- until we were -- I think we -- there's
4 -- I think it was the text conversation between
5 Jared. And I was maybe the first. Or I told him
6 in person maybe before we left, like, "You really
7 upset Cynthia."
8     Q.  Okay.
9     A.  And so it was brought to his attention
10 either in person by me or by text. And then he
11 was like -- it was, like, hours later we got back
12 to the hotel.
13     Q.  Do you know if Cindy was looped in on
14 that?
15     A.  I don't.
16     Q.  Okay. Do you know if anyone from HR was
17 looped in on that?
18     A.  I don't.
19     Q.  Do you know what outcome there was to
20 that?
21     A.  No outcome. I don't know if there was --
22     Q.  But you --
23     A.  -- an outcome.
24     Q.  Okay. Okay. And you don't know exactly
25 when that was?

1    A.   It was at Con Expo.  So it would have
2  been after April 21st but before -- isn't -- hold
3  on a second.
4    Q.   But do you know what year?  Would that
5  have been --
6    A.   I'm trying -- it would have been 2023.
7    Q.   You're sure it would have been 2023?
8    A.   The reason why I think it is because I'm
9  basing it on my conversation with Kris Dunn when
10  he was like, "Let's just let the dust settle.
11  After Con Expo, we'll revisit the director
12  position."
13    Q.   But that's an annual thing, right?
14    A.   Yes.
15    Q.   So you're not sure exactly when the year
16  was?
17    A.   I think it was -- no, I am sure.  It's
18  2023 and I believe it was March.  Because my kids
19  were on spring break -- or we missed spring break
20  by a week, and so we flew out.  So it was
21  March 2023.
22    Q.   Okay.  And then you said you thought
23  maybe there had been some complaints about RC
24  Davis or Jerry Lasley?
25    A.   Yeah, just, like, back when I was on

1  customer -- well, with Jerry Lasley, Cynthia would
2  make comments like "I'm going to go talk to Kris
3  about him.  Like I -- Kasey, the way" -- I've got
4  text messages from her.  "The way he treats you is
5  so unfair.  Like it's not okay."  I just --
6    Q.   Who said this?
7    A.   Cynthia Butler.
8    Q.   Said the way --
9    A.   The way Jerry treats me is not okay.
10    Q.   Okay.
11    A.   Like, I am not okay with this.  And I
12  know she was having a skip level with him -- even
13  him to meet with Kris.
14    Q.   Uh-huh.
15    A.   And so I think that she had reported
16  Jerry's behavior or the things that she was --
17    Q.   Okay.
18    A.   -- concerned about around Jerry to Kris.
19  I -- I believe she did go through --
20    Q.   But you don't know whether she reported
21  anything about Jerry?
22    A.   She told me she did, but...
23    Q.   She told you that she reported --
24    A.   Yeah, yeah, because she had a meeting set
25  with Kris.

1    Q.   Reported what?  What did she tell you
2  that she reported?
3    A.   Just that she felt like Jerry -- I mean,
4  at the time -- like, I'd have to look at the exact
5  words on the text, but, like, just that she felt
6  like he treated me unfairly, like, he wasn't even
7  doing his job, he wasn't helpful in his job at
8  all, that kind of thing.  Like, he wasn't
9  actually --
10    Q.   And then she told you that, yeah, she
11  actually reported this?
12    A.   Yeah, to Kris.
13    Q.   And when would this have been?
14    A.   I wish I had my text messages.  Those are
15  in the -- I'd have to refer to the text messages
16  that are submitted.
17    Q.   Any idea when that would have been?
18    A.   I mean, he -- it had to be before
19  February 'cause he was still working.
20    Q.   Okay.
21    A.   So we'll just say maybe, like, November,
22  December, January --
23    Q.   Any other --
24    A.   -- February.
25    Q.   -- complaints that you were aware of

1  about Jerry Lasley other than your own that we've
2  talked about?
3    A.   Not that I'm aware of.
4    Q.   Okay.  You mentioned RC Davis may have --
5    A.   Uh-huh.
6    Q.   Somebody may have complained about RC
7  Davis?
8    A.   Uh-huh.
9    Q.   What was that?
10    A.   Well, there just was, like, a number of
11  disgruntled employees that kind of would talk
12  about how unfair it was that Kat, his niece, got
13  -- or his sister's -- his -- his wife's sister.
14  Just like -- and so I -- I'll just say that, like,
15  I -- they've said that they said things, but I
16  don't know for sure.  And that's been years.
17    Q.   Okay.
18    A.   Like, that was back when I was on the
19  customer support team --
20    Q.   Okay.
21    A.   -- so I don't even recall.
22    Q.   So somebody supported -- back when you
23  were on the customer support team, somebody
24  indicated that there may have been a complaint
25  about nepotism --

84 (Pages 330 - 333)

1    A.   Yeah.
2    Q.   -- by RC Davis?
3    A.   Yes.
4    Q.   I'm just -- yeah, okay.  Anything else?
5  Any other complaints about RC Davis that you --
6    A.   Not that I'm like --
7    Q.   -- formulate --
8    A.   Yeah, not that I'm like --
9    Q.   Okay.
10   A.   Just complained -- just -- yeah, I don't
11  know --
12   Q.   Okay.
13   A.   And I -- yeah, I don't know.  Like, the
14  same thing Kris told me about demoting him, if he
15  reported that to HR or not.
16   Q.   Okay.  Have we talked about all the
17  reasons you believe your termination was related
18  to sex?
19   A.   Well, there was a --
20   Q.   I'm just talking about sex.
21   A.   Yeah -- no, there's a second with Jared
22  Johnanning.  That was one incident.
23   Q.   Oh, okay.
24   A.   The second is that he actually told me
25  himself that he was reported by a female employee

1  for being demeaning on a call that he was on.
2  That he demeaned her on that call.  And he was,
3  like, trying to figure out who it was 'cause it
4  was, like, on a product team call with, like,
5  engineers and product managers.  And so he had
6  just told me that Kris told him about it and that
7  he at that point had not met with HR about it, but
8  that he was just more talking about, like, who
9  could it have been.  He would say dude a lot.
10  "Dude, like, what did I say?  Like, I'm trying to,
11  like, think how I could have done that."  You
12  know, that kind of thing.
13   Q.   Okay.
14   A.   And to my knowledge, that didn't go
15  anywhere.  And he's now in a director level
16  position today.
17   Q.   Do you know when he shared that he
18  thought he'd been reported for being demeaning?
19   A.   It was like -- I mean, it could have --
20  it was 2023 and it could have been Q1 or Q2.  I
21  want to say Q2 because I believe it came after Con
22  Expo.  So I want to say, like, April, May, June.
23   Q.   Okay.  Do you know who it was reported
24  to?
25   A.   I don't -- it was re -- I do not.  I know

1  it was reported to HR, but I don't know who in HR
2  it was reported to.
3    Q.   And -- and you understand that it was
4  reported to HR because Jared told you that?
5    A.   Yes.
6    Q.   Okay.  And do you know what outcome there
7  was, if any?
8    A.   I do not.
9    Q.   Okay.  Have we now covered all the
10  reasons that you believe your termination was
11  related to sex?
12   A.   Yes.
13   Q.   Okay.  Are you alleging any other forms
14  of sex discrimination?
15   A.   No.
16   Q.   Okay.  You're also claiming retaliation
17  in this?
18   A.   Yes.
19   Q.   Okay.  In what ways are you claiming that
20  you were retaliated against?
21   A.   I -- I think I was retaliated against
22  because I reported Jesse Johnsey.  Because I was
23  highlighting sales metrics not being accurate and
24  him directly benefiting or compensate -- his
25  compensation benefiting based on not being

1  truthful.
2    Q.   Okay.  And how do you believe you were
3  retaliated against?
4    A.   I believe that -- I believe that I was
5  retaliated against because instead of being
6  demoted or -- or given an opportunity to have a
7  write-up or things like that, all of that was
8  skipped and I was just fired based on, again, what
9  I think are biased reasons.  Because I think in
10  the back of Kris' mind when he's work -- I don't
11  know, I just, like -- I really feel like -- he
12  always made comments to me, like, "I'm going to be
13  next," about himself.  "I'm going to be fired
14  next.  They're going to take me next."
15       And I seen too many times with Jesse
16  Johnsey how -- how Kris would sacrifice another
17  person who brought up an issue so he could keep
18  his job.  Because he's the senior director of T3
19  sales.  If Willy finds out, what's going to happen
20  to his position?  I think he would do anything to
21  protect it.
22   Q.   Okay.
23   A.   And so, again, instead of demoting me, I
24  feel like I'm -- I was -- I was retaliated
25  against.  So let's fire her as opposed to --

1  Q.  Okay.
2  A.  Because managers have discretion.  If
3  HR -- he could have said, like, let's demote her,
4  let's move her like we've done some of the others.
5  Let's get her in a different position.  Maybe
6  she's not ready for management.
7  Q.  Okay.  So you think that -- that you were
8  retaliated against because Kris either --
9  A.  Was getting too close.
10  Q.  -- either -- either fired or allowed the
11  firing to go through because of your complaints
12  related to Jess --
13  A.  Jesse Johnsey.
14  Q.  -- Jesse Johnsey's sales metrics?
15  A.  That's correct.
16  Q.  Okay.  Any other ways in which you are
17  claiming you were retaliated against?
18  A.  Because I reported to Cindy that -- or
19  because it was reported to Cindy that I was
20  talking about inequitable pay in the workforce.
21  Q.  Okay.
22  A.  That was another ammo to, like, say she's
23  got to be fired instead of demoted because then
24  I'm still there and I could still be talking about
25  it.

1  Q.  Okay.  And -- and why do you believe that
2  -- and so you believe you were -- your termination
3  had something to do with your complaining about
4  the -- or, I'm sorry, discussing pay equity
5  issues?
6  A.  Uh-huh.
7  Q.  Yes?
8  A.  Yes.
9  Q.  And -- and what leads you to believe that
10  the -- your termination was related to that?
11  A.  Because other male team members who had
12  conduct issues or performance issues were demoted
13  and I was fired.
14  Q.  And I don't -- okay.  I'll leave it
15  there.  Any other ways in which you're claiming
16  you were retaliated against?
17  A.  No.
18  Q.  Okay.  So we've covered all the ways in
19  which you were discriminated against based on sex
20  and retaliated against?
21  A.  Yes.
22  Q.  Okay.  I just want to -- we're almost --
23  like, we're almost done.
24  MR. JARROLD:  These are going to
25  have to be separate.

1  (Exhibits 15 and 16 marked for
2  identification.)
3  Q.  (By Mr. Jarrold)  All right.  You have in
4  front of you what's been marked as Exhibits 15 and
5  16, okay?  I just wanted to ask you, do you
6  recognize these documents?
7  A.  Yes.
8  Q.  And -- and are these your sign-offs on
9  receipt of the handbook and various policies?
10  A.  Yes.
11  Q.  Okay.  And I'm not going to get to into
12  this, but you understood that EquipmentShare has,
13  policies on anti-discrimination?
14  A.  Yes.
15  Q.  And they have policies on
16  anti-harassment?
17  A.  Yes.
18  Q.  And anti-retaliation?
19  A.  Yes.
20  Q.  And their policies lay out ways in which
21  you can raise complaints about discrimination,
22  harassment or retaliation, right?
23  A.  Yes.
24  Q.  Okay.  All right.  You can set those
25  aside.  I just wanted to have that.  Almost there.

1  A.  Okay.
2  (Exhibit 17 marked for
3  identification.)
4  Q.  (By Mr. Jarrold)  I'm handing you what's
5  been marked as Exhibit 17.  This is a document
6  that you produced to us.  I just -- what is this?
7  Can you tell me what this document is?
8  A.  Yeah, this is the second page that goes
9  with my -- is it my biannual or my annual?  One
10  was in September and one was in December.  This
11  was -- I want to say this was my biannual.  Yeah,
12  because I think he went and got...
13  Q.  And the -- the --
14  A.  Sought out -- he told me --
15  Q.  -- the typed text, is that something that
16  you wrote?
17  A.  No.  Jerry Lasley wrote it.
18  Q.  Okay.  And are these your notes
19  underneath?
20  A.  Yes.
21  Q.  Okay.  So this is something that -- so --
22  so you're saying that Exhibit 17 here indicating
23  that this is part of the biannual that Jerry
24  Lasley gave you?
25  A.  Yes.

Case 4:24-cv-00531-BCW    Document 30-2    Filed 05/16/25    Page 87 of 91

1   Q.  Okay.  You can set that aside.
2        All right.  I want to talk to you about
3   after your employment with EquipmentShare, okay?
4   A.  Okay.
5   Q.  So I understand that you found employment
6   with Connell Material Handling in August of
7   2023 --
8   A.  Yes.
9   Q.  -- correct?
10  A.  Correct.
11  Q.  Do you know -- do you recall what day you
12  started with Connell?
13  A.  August 28.
14  Q.  Okay.  So your employment with
15  EquipmentShare ended August 2nd and then you
16  started with Connell August 28th?
17  A.  Yes.
18  Q.  Okay.  And what position did you start in
19  at Connell Material Handling?
20  A.  Branch manager.
21  Q.  Branch manager.  So what do you do in
22  that role?
23  A.  I manage the day-to-day operations of our
24  company and I project manage every aspect of
25  servicing, rentals, purchasing of equipment from

1   customers.  I -- and then I managed personnel.
2   Q.  Okay.  How many people do you manage?
3   A.  I manage two.
4   Q.  Okay.  Are you the highest-level person
5   at this location?
6   A.  I am.
7   Q.  Okay.  How many employees are at the
8   location?
9   A.  There's 13.
10  Q.  So they all flow up to you?
11  A.  They did when I first started, but they
12  now flow to the service manager on -- so there's
13  service technicians that -- and a service
14  coordinator that flow to the service manager.  And
15  that service manager reports to the director of
16  parts and service.
17       And then I'm the branch manager, so I --
18  I am in charge over everything operationally, but
19  my only direct reports are the parts associates.
20  Q.  And what kind of work does Connell
21  Material Handling do?
22  A.  So they're an industrial forklift dealer.
23  Q.  Okay.
24  A.  Yeah.  So they rent industrial forklifts,
25  they repair them at customer jobsites, and they

1   sell them.
2   Q.  Do you like the job?
3   A.  Not particularly.
4   Q.  Okay.
5   A.  Please don't tell them that.  Not in this
6   economy.
7   Q.  Okay.  And you started working there --
8   you started at $80,000 plus benefits?
9   A.  Yes.
10  Q.  After some waiting period?
11  A.  Yes.
12  Q.  Okay.  And what are you currently making?
13  A.  I think it's 82,800.  There was a
14  3 percent increase.
15  Q.  So less than 83,000?
16  A.  Yeah, less than 83.
17  Q.  Okay.  And so with that last pay bump
18  that Kris authorized at EquipmentShare, that's
19  about -- well, to start about 10,000 less annually
20  and now a little less than 8,000?
21  A.  Correct.
22  Q.  Okay.  So your total lost wages as of
23  today, April 10th, 2025, would be something under
24  $18,000, right?
25  A.  I'm not sure.

1   Q.  Okay.  That's fine.  Have you looked for
2   other roles since you started working at Connell?
3   A.  Yeah.
4   Q.  Okay.
5   A.  Yeah.
6   Q.  Any -- are you -- are you along the road
7   with or down the process, I mean, with -- with any
8   existing -- with any other employers right now?
9   A.  No.
10  Q.  Okay.  And -- and why are you looking for
11  other roles?
12  A.  It's just I want something more
13  challenging, something more customer facing.
14  Right now I'm back in grad school, so, you know, I
15  took -- thinking about the idea of starting my
16  career all over again because I can't get back
17  into customer success now based on my experience
18  of trying to pursue that career path after
19  EquipmentShare.
20  Q.  You don't want to go back into customer
21  success?
22  A.  I do, but I -- I -- I do want to go back
23  into customer success but I -- I think that that
24  ship sailed when I got terminated.
25  Q.  Why?

87 (Pages 342 - 345)

1    A.  Because a lot of these customer success
2  managers have to have five plus years of
3  experience, and you wouldn't find that on my
4  resume.  I was cut short that opportunity.
5    Q.  Okay.
6    A.  I mean, I applied for more than 75
7  positions after EquipmentShare, and 90 percent of
8  them were customer success roles, and I didn't get
9  one call back.
10    Q.  Okay.  What -- did you look for any other
11  jobs while you were employed with EquipmentShare?
12    A.  Yeah.
13    Q.  Were you applying outside of
14  EquipmentShare while you were --
15    A.  I did it a few other -- one time I
16  applied for, like, a nonprofit -- back in the
17  nonprofit sector.
18    Q.  Do you know when that was?
19    A.  Shoot.  I don't.  I --
20    Q.  Okay.
21    A.  It was before COVID.  I know -- so before
22  2020.
23    Q.  Okay.  After 2020, do you recall while
24  being employed with EquipmentShare whether you
25  applied for any jobs outside of EquipmentShare?

1    A.  I don't recall.  I don't believe so.
2    Q.  So you may have?
3    A.  I don't believe so.
4    Q.  You don't believe so?
5    A.  No, no.
6    Q.  Are you claiming emotional distress in
7  this case?
8    A.  Yes.
9    Q.  Okay.  And what are -- how are you --
10  what are you alleging in the way of emotional
11  distress?
12    A.  Well, I mean, it's still feels fresh
13  every time we talk about it and we're two years
14  out.  You know, this is -- this is hard to, like,
15  talk through 'cause you -- emotionally, mentally,
16  you feel like did I -- am I -- you doubt yourself,
17  and you become less confident in yourself.
18    Q.  Okay.
19    A.  And so you're constantly -- emotionally I
20  just don't feel as secure as I used to.  Like, I
21  just question myself.  I doubt myself all the time
22  in my day-to-day personal life, professional life,
23  like...
24    Q.  And this is as a result of your
25  termination?

1    A.  Yeah.
2    Q.  Okay.
3    A.  It's like I lost some of that -- that
4  self-esteem and -- and self-assuredness that I --
5  I know what I'm doing, that I'm -- that I'm -- I'm
6  operating, you know.
7    Q.  Yeah.
8    A.  It doesn't -- you doubt yourself because
9  you think that you're -- you're doing things the
10  right way, you're doing the best that you can, and
11  you never know that even doing the best that you
12  can, you could still tomorrow could just lose
13  everything and have to start all over.  It's just
14  that -- and the lack of confidence in self to be a
15  leader and...
16    Q.  Did you -- and -- and I understand you
17  did not seek any sort of medical treatment related
18  to emotional distress?
19    A.  I did not.
20    Q.  Okay.  Is there an amount you're seeking
21  in damages in connection with your emotional
22  distress?
23    A.  Not specifically.
24    Q.  No number in mind?
25    A.  For emotional distress?  I mean, it's

1  quite specific.
2    Q.  Okay.
3        MS. PERKINS ALLEN:  For a total
4  or...
5    A.  Okay.
6    Q.  (By Mr. Jarrold)  Let me -- I've got one
7  more exhibit and I don't really have any questions
8  on it, just maybe one or two.
9        (Exhibit 18 marked for
10        identification.)
11    Q.  (By Mr. Jarrold)  We're not going to read
12  through that.  This is 18?  Okay.
13    A.  Yeah.
14    Q.  So I'm handing you what's been marked as
15  Exhibit 18.  I just have a couple of questions for
16  you.
17    A.  Okay.
18    Q.  Number one, is this the Charge of
19  Discrimination that you filed --
20    A.  Yes.
21    Q.  -- against EquipmentShare?
22    A.  Yes.
23    Q.  Okay.  And you signed off on this
24  document, correct?
25    A.  Correct.

1    Q.   All right.  And is it fair to say that
2  this was filed on or about October 23rd -- or
3  24th, rather, 2023?
4    A.   Yes.
5    Q.   Okay.
6    A.   I think.  I see my signature of the 23rd,
7  but I don't know where you see the 24th.
8    Q.   At the top.  So you signed it
9  October 23rd, 2023, right?
10    A.   Yes.
11    Q.   Okay.
12    A.   Oh, I see it.  I see it, 24th, yes.  I
13  agree.
14    Q.   Okay.  So fair to say, it was filed on or
15  about October 24, 2023?
16    A.   Yes.
17    Q.   Okay.  You can set that aside.  Let's go
18  off the record.  I'm just going to look at my
19  notes and then I think we're probably all set.
20        MR. KLINKENBORG:  Okay.
21        THE VIDEOGRAPHER:  Off the record,
22  4:59.
23        (Recess.)
24        THE VIDEOGRAPHER:  Back on the
25  record, 5:05.

1    Q.   (By Mr. Jarrold)  Okay.  I don't have any
2  further questions for you.  The only thing I
3  wanted to note was, I know you mentioned a lot of
4  documentation here today, and to the extent that
5  there's any sort of documentation that wasn't
6  produced and I have questions on it, I would want
7  the opportunity to question you about that.  But,
8  you know, I think that's unlikely, but I just want
9  to make that note on the record.  But otherwise,
10  I've got nothing further for you.
11        MR. KLINKENBORG:  No redirect.
12        MR. JARROLD:  Okay.
13        THE VIDEOGRAPHER:  Taking us off
14  the record at 5:05.
15
16
17
18
19
20
21
22
23
24
25

1        C E R T I F I C A T E
2
3      I, Lea Ann Martin, Certified Court Reporter
4  #688 in Missouri and Certified Shorthand Reporter #913
5  in the State of Kansas, do hereby certify:
6        That prior to being examined the witness was
7  by me duly sworn:
8        That said deposition was taken down by me in
9  machine shorthand at the time and place hereinbefore
10  stated and was thereafter reduced to writing under my
11  direction:
12        That I am not a relative or employee or
13  attorney or counsel of any of the parties, or a relative
14  or employee of such attorney or counsel, or financially
15  interested in the action.
16        WITNESS my hand and seal this 23rd day of
   April, 2025.
17
18
19        _____
         Lea Ann Martin, CSR, RPR, CCR
20
21
22
23
24
25

1        COURT MEMO
2
3
   Anderson, Kasey
4
5      Plaintiffs,
               Cause No.
6  vs.            4:24CV00531BCW
7  Equipmentshare.Com, Inc.
8      Defendant.
9      CERTIFICATE OF OFFICER AND
       STATEMENT OF DEPOSITION CHARGES
10  (Rule 57.03 (g) (2) (a) & Sec., 492.590 RsMO 1985.)
11      DEPOSITION OF Kasey Anderson
               ON
12             4/10/2025
13  Name and address of person or firm having custody of the
   original transcript:  R. Evan Jarrold
14
15  TAXED IN FAVOR OF:  R. Evan Jarrold
         TOTAL................ $_____
16
   TAXED IN FAVOR OF:  Other Attorneys
17       TOTAL................ $_____ *
18  Upon delivery of transcript, the above charges had not yet
   been paid.  It is required that all charges will be paid in
19  the normal course of business.
20  IN WITNESS WHEREOF, I have hereunto set my hand and seal on
   this   day of      ,  .
21
22       _____
           Notary Public
23
24  * A completed signed Certificate of Officer and Statement of
   Deposition Charges pursuant to Rule 57.03(g)(2)(a) shall be
25  provided upon request.

1         Veritext Legal Solutions
2         1100 Superior Ave
         Suite 1820
3         Cleveland, Ohio 44114
         Phone: 216-523-1313
4
   April 24th, 2025
5
   To: Mr. Erik P. Klinkenborg
6
   Case Name: Anderson, Kasey v. Equipmentshare.Com, Inc.
7
   Veritext Reference Number: 7299499
8
   Witness: Kasey Anderson     Deposition Date: 4/10/2025
9
10 Dear Sir/Madam:
11
   Enclosed please find a deposition transcript. Please have the witness
12
   review the transcript and note any changes or corrections on the
13
   included errata sheet, indicating the page, line number, change, and
14
   the reason for the change. Have the witness' signature notarized and
15
   forward the completed page(s) back to us at the Production address
16 shown
17 above, or email to production-midwest@veritext.com.
18
   If the errata is not returned within thirty days of your receipt of
19
   this letter, the reading and signing will be deemed waived.
20
21 Sincerely,
22 Production Department
23
24
25 NO NOTARY REQUIRED IN CA

---

1       DEPOSITION REVIEW
       CERTIFICATION OF WITNESS
2
   ASSIGNMENT REFERENCE NO: 7299499
3   CASE NAME: Anderson, Kasey v. Equipmentshare.Com, Inc.
   DATE OF DEPOSITION: 4/10/2025
4   WITNESS' NAME: Kasey Anderson
5    In accordance with the Rules of Civil
   Procedure, I have read the entire transcript of
6 my testimony or it has been read to me.
7    I have made no changes to the testimony
   as transcribed by the court reporter.
8
   _____
9 Date       Kasey Anderson
10    Sworn to and subscribed before me, a
   Notary Public in and for the State and County,
11 the referenced witness did personally appear
   and acknowledge that:
12
   They have read the transcript;
13   They signed the foregoing Sworn
   Statement; and
14   Their execution of this Statement is of
   their free act and deed.
15
   I have affixed my name and official seal
16
   this _____ day of _____, 20____.
17
18    _____
   Notary Public
19
   _____
   Commission Expiration Date
20
21
22
23
24
25

---

1       DEPOSITION REVIEW
       CERTIFICATION OF WITNESS
2
   ASSIGNMENT REFERENCE NO: 7299499
3   CASE NAME: Anderson, Kasey v. Equipmentshare.Com, Inc.
   DATE OF DEPOSITION: 4/10/2025
4   WITNESS' NAME: Kasey Anderson
5    In accordance with the Rules of Civil
   Procedure, I have read the entire transcript of
6 my testimony or it has been read to me.
7    I have listed my changes on the attached
   Errata Sheet, listing page and line numbers as
8 well as the reason(s) for the change(s).
9    I request that these changes be entered
   as part of the record of my testimony.
10
   I have executed the Errata Sheet, as well
11 as this Certificate, and request and authorize
   that both be appended to the transcript of my
12 testimony and be incorporated therein.
13    _____
   Date       Kasey Anderson
14
   Sworn to and subscribed before me, a
15 Notary Public in and for the State and County,
   the referenced witness did personally appear
16 and acknowledge that:
17   They have read the transcript;
   They have listed all of their corrections
18   in the appended Errata Sheet;
   They signed the foregoing Sworn
19   Statement; and
   Their execution of this Statement is of
20   their free act and deed.
21   I have affixed my name and official seal
22 this _____ day of _____, 20____.
23    _____
24    Notary Public
25    _____
   Commission Expiration Date

---

1      ERRATA SHEET
    VERITEXT LEGAL SOLUTIONS MIDWEST
2      ASSIGNMENT NO: 7299499
3 PAGE/LINE(S) /      CHANGE     /REASON
4 _____
5 _____
6 _____
7 _____
8 _____
9 _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
   _____    _____
20 Date      Kasey Anderson
21 SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22 DAY OF _____, 20_____ .
23 _____
     Notary Public
24 _____
25     Commission Expiration Date